IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

LEON WEINGRAD, individually    )
and on behalf of a class of    )
all persons and entities       )
similarly situated,            )
                               )  Case No.
          Plaintiff,           )
                               )  3:25-cv-00396-SI
     vs.                       )
                               )
DABELLA EXTERIORS LLC,         )
                               )
          Defendant.           )
_____)

DEPOSITION OF LEON WEINGRAD

Taken at the instance of the Defendant

August 18, 2025

10:00 a.m.

Via videoconference

Exhibit 2
Page 1 of 47

Leon Weingrad
August 18, 2025

Page 3

1                        I N D E X :

2

3    LEON WEINGRAD vs. DABELLA EXTERIORS, LLC

4    Case No. 3:25-cv-00396-SI

5    August 18, 2025

6

7

8                    T E S T I M O N Y

9

10   LEON WEINGRAD                          PAGE NO:

11
        Examination by Ms. Zelmer              6 - 73
12

13

14

15

16
                     PRODUCTION REQUESTS:
17

18   1      Screen shot of first text message      29/30
               received from Dabella
19

20
     2      A document that shows date phone was
21             purchased and number was obtained      66

22

23

24

25

Exhibit 2
Page 2 of 47

Leon Weingrad
August 18, 2025

Page 4

1                    E X H I B I T S :

2
   No:                 Identification:              Page:
3

4    1        Notice of Deposition                     7

5

6
     2        AT&T Prepaid Account Information         16
7

8

9
     3        Certificate and Video Screen shot       24
10

11

12
     4        AT&T Call Logs                          29
13

14

15
     5        Text Message                            30
16

17

18
     6        DNC Registry Confirmation               33
19

20

21
     7        Audio File; 2/7/25; Inbound Call        37
22

23

24   8        Audio File; 2/7/25; Outbound Call       37

25

Exhibit 2
Page 3 of 47

Leon Weingrad
August 18, 2025

Page 5

1                          EXHIBITS (Cont'd)

2

    No:                    Identification:                    Page:
3

4
     9              Merlin Home Magic                          47
5

6

7   10              Complaint                                  52

8

9

10  11              Leon Weingrad; LinkedIn                    60

11

12

13  12              Dabella Response First RFA                 65

14

15

16  13              Dabella Response First RFP                 65

17

18

19

20

21

22          *                    *                    *

23

24

25

www.lexitaslegal.com
(800) 676-2401

Exhibit 2
Page 4 of 47

Leon Weingrad
August 18, 2025

Page 6

1              (LEON WEINGRAD, called as a witness by the

2    Defendant, being first duly sworn to tell the truth,

3    the whole truth and nothing but the truth, was

4    examined and testified as follows:)

5

6                              EXAMINATION

7

8    BY MS. ZELMER:

9         Q.    Good morning.  My name is Diane Zelmer.

10   I represent Dabella Exteriors in the case that was

11   filed by you, Mr. Leon Weingrad, in the Oregon

12   District Court.  The case number is 3:25-cv-00396

13   -SI.

14              Could you please state your full name?

15        A.    Leon Weingrad.

16        Q.    Do you have any middle initial or

17   anything?

18        A.    Louis is my middle name.

19        Q.    L-O-U-I-S, or --

20        A.    L-O-U-I-S.  You got it right.

21        Q.    Okay.  Ever gone by any other names?

22        A.    No.

23        Q.    Okay.  And I am going to share with you

24   my screen so that I can show you some documents.

25              And I'll have the court reporter mark

Exhibit 2
Page 5 of 47

Page 14

1    A.    No.

2    Q.    The number that is the subject of the

3    lawsuit is 503█████████.  Can you tell me when you

4    obtained that number?

5    A.    About a year ago.

6    Q.    So about August 2024?

7    A.    Yes.

8    Q.    And the carrier is AT&T.

9          Is that correct?

10   A.    Yes.

11   Q.    Okay.  Do you have any other numbers?

12   A.    Yes.

13   Q.    What are the other phone numbers?

14         MR. PERRONG:  Objection.  That goes

15   beyond the scope of what the court has limited the

16   scope of this deposition to.

17         MS. ZELMER:  I disagree.

18         MR. PERRONG:  The court explicitly

19   said we're not going to allow to ask about his other

20   cases or numbers.

21         MS. ZELMER:  I don't remember the

22   court saying we couldn't ask about his other

23   numbers.

24         MR. PERRONG:  Well, we have -- We can

25   order the transcript, as the court's order is on the

Exhibit 2
Page 6 of 47

Leon Weingrad
August 18, 2025

Page 15

1   record.  But that's what the court said on the

2   record.

3               MS. ZELMER:  Okay.  Well, we

4   disagree.  Specifically I remember the court said we

5   couldn't go into other cases.  But I don't see how

6   another telephone number that he uses and how he

7   uses that versus the phone number that is the

8   subject of this action isn't a subject that we

9   shouldn't be able to --

10              MR. PERRONG:  The court limited the

11  scope of the deposition to the purported opt in and

12  the purported website consent.

13              To the extent that you have questions

14  about other numbers or other cases, you've already

15  preserved that objection, and that can be addressed

16  at the proper time.

17              MS. ZELMER:  Again, we disagree.  We

18  think you're improperly limiting it.  Perhaps maybe

19  at some point we can see if we can get on a call

20  with the court.

21              But I'll go ahead and proceed.

22      Q.    Can you tell me for the number 503-

23  ███████, for what purposes do you use that

24  telephone number?

25      A.    Personal.

Exhibit 2
Page 7 of 47

Leon Weingrad
August 18, 2025

Page 16

1    Q.    Is it for your businesses at all?

2    A.    No.

3    Q.    What number do you use for business?

4    A.    At work they provide a phone.

5    Q.    So I've marked as Exhibit 2 this AT&T

6    prepaid screen shot, I guess, that you produced.

7    That will be Exhibit 2.

8                        (Deposition Exhibit Number 2

9                        was marked for identification).

10    Q.    (BY MS. ZELMER:)  Can you tell me what this

11    is, or how you obtained this document?

12                   MR. PERRONG:  I'm going to object to

13    the extent that this asks for attorney/client

14    privilege.

15                   Instructing the witness not to answer.

16    Q.    (BY MS. ZELMER:)  Can you answer that

17    question without stating anything that you

18    communicated with your attorney?

19    A.    No.

20    Q.    Were you the one who obtained this

21    document and produced it to your attorney?

22                   MR. PERRONG:  Objection.  Calls for

23    attorney/client privilege.

24                   Instructing the witness not to answer.

25                   MS. ZELMER:  How is whether or not he

Exhibit 2
Page 8 of 47

Leon Weingrad
August 18, 2025

Page 17

1    obtained the document attorney/client privilege?

2                    MR. PERRONG:  Because it was obtained

3    together with me.

4                    MS. ZELMER:  Okay.  I'm just

5    wondering how that has anything to do --

6                    MR. PERRONG:  I'm a little confused,

7    because I just lodged an objection as to

8    attorney/client privilege and I explained why it's

9    privileged.  Which is because myself and Mr.

10   Weingrad undertook together, collaboratively, a

11   search for responsive documents, which we provided.

12                   MS. ZELMER:  Okay.  Can you tell me

13   -- I don't have a date on this document.  Can you

14   tell me what date it was that you obtained this

15   document?

16                   MR. PERRONG:  We can provide a

17   privilege log as to the date that the document was

18   produced.

19                   MS. ZELMER:  I'm not asking for the

20   date that the document was produced, but for the

21   date that the document was actually obtained.

22                   MR. PERRONG:  As I said, we can

23   produce a privileged log as to the date when we

24   undertook the search for the responsive documents.

25                   MR. ZELMER:  Okay.

Exhibit 2
Page 9 of 47

Leon Weingrad
August 18, 2025

1    attorney?

2              MR. PERRONG:  Objection to form, to

3    the extent that you can't answer that question

4    without disclosing what we can do.  We can just say

5    that.

6              THE WITNESS:  That has to be said?

7              MR. PERRONG:  Just to the extent that

8    if it was a communication with us, you can just say

9    "it was communication with us."

10             THE WITNESS:  Yeah.  It was

11   communication with us.

12        Q.   (BY MS. ZELMER:)  So when (inaudible)?

13             MR. PERRONG:  I didn't even hear the

14   question.

15        Q.   (BY MS. ZELMER:)  When did you meet Mr.

16   Andrew Perrong?

17        A.   That was maybe two, three years ago,

18   approximately.  I don't remember.

19        Q.   And how did you find out about him?

20             MR. PERRONG:  Objection.  Calls for

21   attorney/client privilege.

22             Instructing the witness not to answer.

23             MS. ZELMER:  I'm having trouble

24   understanding how that is attorney/client privilege,

25   because I'm just trying to figure out how he found

Exhibit 2
Page 10 of 47

Page 20

1   out about you.

2                    MR. PERRONG:  My marketing and

3   advertising practices, and the way that I advertise

4   to clients and how I obtain clients is completely

5   privileged.

6        Q.    (BY MS. ZELMER:)  At some point were you

7   searching for an attorney because of all the calls

8   that you were getting on your phone?

9        A.    Yes.

10       Q.    And that started about two to three years

11  ago?

12       A.    Yes.

13       Q.    Did you (inaudible) any?

14       A.    I'm sorry.  I couldn't hear you.

15       Q.    Did you meet with any other attorneys

16  other than Andrew Perrong?

17       A.    No.

18       Q.    Okay.  Did you know Andrew Perrong on a

19  personal basis before you obtained him as your

20  attorney?

21       A.    No.

22       Q.    Are you familiar with the address ███

23  ████████████████

24       A.    Yes.

25       Q.    Is that your address?

Exhibit 2
Page 11 of 47

Leon Weingrad
August 18, 2025

Page 22

1              MR. PERRONG:  Objection to form.  And

2    just wait, so that I can make objections.

3              THE WITNESS:  Got it.

4         Q.   (BY MS. ZELMER:)  Are there any other

5    devices at your residence other than your personal

6    computer that can access the internet?

7              MR. PERRONG:  Objection to form.

8         You can answer.

9              THE WITNESS:  Yes.

10        Q.   (BY MS. ZELMER:)  How many other devices?

11        A.   Just one.

12        Q.   What is that?

13        A.   It's another Apple laptop.

14        Q.   And who uses that?  Is that yours or your

15   wife's?

16        A.   My wife uses that.  It's hers.  I don't

17   ever use it.  You asked if there was another device.

18        Q.   Okay.  Have you ever been to the website

19   searchrenovation.us?

20        A.   Never.

21        Q.   Has anybody on your behalf ever been to

22   the website searchrenovation.us?

23        A.   No.

24        Q.   Have you ever asked anybody to submit

25   information on your behalf in order to obtain a

Exhibit 2
Page 12 of 47

Leon Weingrad
August 18, 2025

Page 25

1      A.    Absolutely not.

2      Q.    And you don't know who did?

3      A.    I do not.

4      Q.    Do you know anybody who would have a

5  motive to submit this information with a different

6  name, your telephone number and your address?

7            MR. PERRONG:  Objection to form.

8            You can answer.

9            THE WITNESS:  No.

10     Q.    (BY MS. ZELMER:)  And this isn't the

11 first time somebody has submitted a form essentially

12 to contact you with a different name other than

13 yours.

14           Isn't that correct?

15           MR. PERRONG:  Objection.  That's

16 outside the scope of this deposition, as it asks as

17 to facts for other cases.

18           I am instructing the witness not to

19 answer.

20           MS. ZELMER:  Again, we disagree.

21 We're not asking about other cases.  We're asking

22 about facts.

23           MR. PERRONG:  Facts that are

24 connected to other cases which the court explicitly

25 said that you cannot ask about.

Exhibit 2
Page 13 of 47

Page 26

1          MS. ZELMER:  The court said I

2    couldn't ask about other cases.  I agree with you on

3    that.  But --

4          MR. PERRONG:  To the extent that

5    those facts are in other cases or allegations made

6    in other cases, I think that that would be very

7    clearly about facts in other cases and about other

8    cases.

9          MS. ZELMER:  Well, it could be that

10   there are not other cases filed, that there are

11   other instances that he hasn't filed a case on.

12   Whether a case was filed or not filed, these would

13   be facts that were relevant to our inquiry as to how

14   essentially this is occurring or there's false names

15   being submitted on his behalf.

16          But I've noted your objection and will

17   move on.

18     Q.    Did you ever do any investigation to

19   determine who may have completed this form on your

20   behalf?

21          MR. PERRONG:  Objection to form.

22   Objection to the extent that it calls for

23   attorney/client information or investigative

24   information.

25          Instructing the witness not to answer

Exhibit 2
Page 14 of 47

Leon Weingrad
August 18, 2025

Page 29

1    communications you've had with Dabella.  When was

2    the first communication you received from Dabella on

3    your telephone?

4         A.    That was February.  I think it was

5    February of this year.

6         Q.    I will mark this as Exhibit 4.

7                         (Deposition Exhibit Number 4

8                         was marked for identification).

9         Q.    (BY MS. ZELMER:)  This is the AT&T

10   prepaid account history that you produced.

11        A.    Okay.

12        Q.    Looking at this document can you tell me,

13   is this the first call that you received on

14   February 6th at 10:20 a.m.?

15        A.    I don't think that is.

16        Q.    Okay.  That's an incoming text message.

17        Right?

18        A.    Yes.

19        Q.    So that was the first communication you

20   received from Dabella, is a text message?

21        A.    Looks like it.

22        Q.    Did you respond to that text message at

23   all?

24        A.    I don't think so.

25        Q.    Do you have a screen shot of that text

Exhibit 2
Page 15 of 47

Leon Weingrad
August 18, 2025

Page 31

1      A.    No.  I didn't type that.

2          Q.    Okay.  Going back to the call log, I see

3   an incoming call on February 6th at 12:49 p.m., 1

4   second.

5              Did you answer that call?

6      A.    I don't think so.  To my knowledge, I

7   didn't.

8          Q.    And then the next one is an incoming call

9   at 6:19 p.m., 1 second.

10             Did you answer that call?

11     A.    Not to my knowledge.

12         Q.    And then there is an incoming call on

13  February 7th at 11:50 a.m., 3 minutes, 30 seconds.

14             Did you answer that call?

15     A.    Yes.

16         Q.    Was that the only incoming call that you

17  answered from Dabella?

18     A.    To my knowledge, yes.

19         Q.    And then there's an outgoing call on

20  February 7th at 12:15 central standard time,

21  1 minute and 59 seconds.  That was the call that you

22  made to Dabella Exteriors.

23             Is that correct?

24     A.    Yes.

25         Q.    And you used the same phone number to

Exhibit 2
Page 16 of 47

Leon Weingrad
August 18, 2025

Page 32

1    call them?

2        A.    Yes.

3        Q.    Okay.  And you had produced audios of the

4    calls.  Can you tell me how you recorded them?

5        A.    The phone automatically records, unless

6    it's a contact in my phone.

7        Q.    Is it a program that's doing it?

8        A.    Yes.

9        Q.    What program?

10       A.    I don't recall the name of it.

11       Q.    And what (inaudible)?

12       A.    What's that?

13       Q.    What is the reason for recording your

14   calls?

15             MR. PERRONG:  Objection to form.

16             You can answer.

17             THE WITNESS:  Just because sometimes

18   I can't hear some of the things that they are

19   saying, or I have a hard time remembering.  You

20   know, it could be anyone calling me for a doctor's

21   appointment, when it is, you know, reference numbers

22   and things like that.  I just record it so I can go

23   back and reference it in case I need to.

24       Q.    (BY MS. ZELMER:)  Did you start recording

25   for the purpose of any of these incoming calls that

Exhibit 2
Page 17 of 47

Leon Weingrad
August 18, 2025

Page 33

1  you may be receiving that you think you shouldn't be

2  receiving or didn't consent to receive?

3                    MR. PERRONG:  Objection to form.

4                    THE WITNESS:  Can I still answer?

5                    MR. PERRONG:  Yes.

6                    THE WITNESS:  Okay.  I've always --

7  As I've gotten older I've noticed that my memory

8  just kind of slips me every now and then.  So, yeah,

9  I've been recording a lot of calls before then.

10      Q.    (BY MS. ZELMER:)  So you didn't start

11  this practice just because you're involved in this

12  litigation.

13              Is that correct?

14      A.    I use it in all aspects of my life.

15      Q.    Okay.  So would you say that one of the

16  purposes would be because you're involved in TCP

17  litigation and you have a recording?

18                    MR. PERRONG:  Objection to form.

19                    THE WITNESS:  It's been useful.

20      Q.    (BY MS. ZELMER:)  I'm going to show you

21  what I will mark as -- Exhibit 6?

22                    COURT REPORTER:  Yes.

23                    (Deposition Exhibit Number 6

24                     was marked for identification).

25      Q.    (BY MS. ZELMER:)  Okay.  Exhibit 6 is the

Exhibit 2
Page 18 of 47

Page 34

1    DNC Registry.  Did you obtain this document, or did

2    you obtain it with your attorney?

3                    MR. PERRONG:  Objection to the extent

4    it calls for attorney/client privilege.

5               Instructing the witness not to answer.

6               MS. ZELMER:  You can answer.

7               MR. PERRONG:  I instructed the

8    witness not to answer.

9        Q.    (BY MS. ZELMER:)  Is it true that you did

10   not obtain this document on your own?

11                   MR. PERRONG:  Objection to the form.

12   Objection to the extent it calls for attorney/client

13   privilege.

14              Instructing the witness not to answer.

15              MS. ZELMER:  Okay.  There is nothing

16   attorney/client privilege about that question.

17              MR. PERRONG:  You can ask him if he

18   obtained it in conjunction with his attorney or not.

19              MS. ZELMER:  I asked that, and you

20   didn't let him answer.

21              MR. PERRONG:  I objected to the form

22   of the question, and instructed to the extent that

23   form calls for --

24              MS. ZELMER:  I just want to know

25   where the source of this document came from.  I'm

Exhibit 2
Page 19 of 47

Leon Weingrad
August 18, 2025

Page 35

1    not asking for attorney communication.  I just want

2    to know where did this document come from.

3                    MR. PERRONG:  It was obtained in

4    conjunction with consultation with me.

5                    MS. ZELMER:  There is no date on this

6    document either.

7                    So what was the date that this document

8    was obtained?

9                    MR. PERRONG:  We will provide you

10   with a privilege log as to the dates that we

11   conducted the search for relevant documents.

12                   MS. ZELMER:  That would be the date

13   that this particular document was obtained?

14                   MR. PERRONG:  That would be the date

15   that this particular document was obtained, correct.

16      Q.    (BY MS. ZELMER:)  It states on here you

17   successfully registered your phone number ending in

18   6495 on August 28, 2021.

19                   Did you register your phone number on the

20   DNC on August 28, 2021?

21      A.    No.

22                   MR. PERRONG:  Objection to form.

23      Q.    (BY MS. ZELMER:)  Do you know who

24   registered it on the DNC?

25      A.    No.

Exhibit 2
Page 20 of 47

Leon Weingrad
August 18, 2025

1    Q.    Have you ever registered your telephone

2    number on the DNC?

3    A.    Not this number, no.  I tried to register

4    this number, and it was already registered.

5    Q.    Do you know when you made that effort?

6    A.    I don't remember when, the exact date

7    that I went on.  But I tried to register this

8    number, and it was already registered prior to me

9    owning the phone.

10    Q.    So you went on the DNC website and you

11    put in the information and it came back that it was

12    already registered?

13    A.    Correct.

14    Q.    Do you have the document that states

15    that?

16    A.    No.

17    MS. ZELMER:  I want to play the audio

18    of the call that was made to you from Dabella.

19    If the court reporter could tell me

20    whether or not she can take down the audio call or

21    not, if you can hear it or not?

22    COURT REPORTER:  Okay.

23    (Pause in the proceedings).

24    MR. PERRONG:  We can't hear anything.

25    Q.    (BY MS. ZELMER:)  Do you remember the

Leon Weingrad
August 18, 2025

Page 37

1    call from Dabella Exteriors?  Do you remember the

2    content of that call at all?

3         A.    Not really.  I mean, not word for word,

4    no.

5         Q.    I'll pull up our transcribed version.

6               Do you remember Dabella Exteriors asking

7    you if they were speaking with Robert and you

8    saying, "Yes"?

9               MR. PERRONG:  Objection to form.  And

10   objection to the extent that you're trying to I

11   guess introduce a transcript that is not marked as

12   an exhibit and that has not been introduced.

13              MS. ZELMER:  We will give the actual

14   audio files to the court reporter and we'll ask the

15   court reporter to do a formal transcription of them.

16   I'll do that for both.  The incoming call from

17   Dabella to Mr. Weingrad, we will do that as

18   Exhibit 7.

19                         (Deposition Exhibit Number 7

20                          was marked for identification).

21              MS. ZELMER:  And the one that Weingrad

22   called back Dabella, we will do that as Exhibit 8.

23                         (Deposition Exhibit Number 8

24                          was marked for identification).

25              MS. ZELMER:  So we will produce those

Exhibit 2
Page 22 of 47

Leon Weingrad
August 18, 2025

Page 38

1    audios and have the court reporter actually do a

2    formal transcription on those.

3        Okay?

4            MR. PERRONG:  All right.  So then

5    we'll preserve any objection to the extent that your

6    transcript here does not reflect the transcription

7    made by the court reporter.

8            MR. ZELMER:  Okay.  Understood.

9    Q.    Do you remember Dabella asking you

10   whether you were Robert and you saying, "Yes"?

11   A.    Yes.

12   Q.    Okay.  So obviously you're not Robert.

13        Is that correct?

14   A.    Yes.

15   Q.    So why did you say that you were on the

16   phone?

17   A.    Because I was trying to identify who was

18   calling me illegally.

19   Q.    Okay.  But do you know that she had said

20   that she was with Dabella even before she asked you

21   that question?

22   A.    I couldn't really understand.  I had

23   never really heard of Dabella before, so when she

24   said it I didn't really understand what it was, the

25   word.

Exhibit 2
Page 23 of 47

Leon Weingrad
August 18, 2025

Page 39

1      Q.    Why not just ask, "I'm sorry.  I didn't

2    understand.  Who is this?"  Rather than pretend that

3    you're somebody that you're not?

4      A.    I think I asked later in the conversation

5    to clarify.

6      Q.    You think you asked what?

7      A.    What company it was, because I didn't

8    hear her.

9      Q.    Okay.  So, again, why would you not

10    immediately just ask her that instead of pretending

11    to be somebody that you're not?

12      A.    Just because I just was going to ask it

13    later anyway.  If I didn't know who she was, or who

14    was calling, I just wanted to be able to identify

15    who was calling.

16            So I don't know whoever was calling me

17    illegally, I kind of just wanted to let her say what

18    she was gonna say and then I asked her.

19      Q.    So Dabella asked, "Do you know how many

20    windows you were looking into?"

21            And you answered, "10 windows."

22            Do you recall answering that?

23      A.    Well, the answer, as you were saying

24    before, if I don't kind of go along with these

25    calls, they just hang up on me.  So in the past I've

Exhibit 2
Page 24 of 47

Leon Weingrad
August 18, 2025

Page 40

1    had difficulties identifying these people.  So I

2    don't get too abrasive.

3            I just -- I just, you know, my privacy

4    has been violated enough, so I just kind of go along

5    and do whatever I have to do to identify these

6    people.  Because if I get abrasive and I start

7    asking too many questions, they hang up from the

8    very beginning.

9            So I normally wait until the end of their

10   spiel or whatever you want to call it, and then I

11   ask for the company name.  And they don't normally

12   hang up when I do that.

13       Q.    Okay.  But you would agree that your

14   response that you were looking for 10 windows is

15   incorrect.  You weren't looking for 10 windows.

16            Correct?

17       A.    No.  I was just going along with their

18   spiel.

19       Q.    And by going along, you mean that you

20   were actually providing false information.

21            Isn't that correct?

22       A.    No.

23       Q.    So you were looking for 10 windows?

24       A.    No.

25       Q.    She asked you "Are the windows vinyl,

Exhibit 2
Page 25 of 47

Leon Weingrad
August 18, 2025

Page 41

1   alluminum or wood."  And you answered, "Wood."

2        A.    I was just trying to find out who was

3   calling me illegally.  That was my point of saying

4   what I said.  But I did not need 10 windows.

5        Q.    Okay.  So, again, instead of answering

6   the question with a false statement, why didn't you

7   just ask her who she was with right then and there?

8        A.    Because she would have hung up on me.

9        Q.    How do you know that?  I mean, you asked

10  her later down in the call and she told you again

11  who she was with.

12              MR. PERRONG:  Objection.

13              THE WITNESS:  Well, because normally

14  if I just let the caller speak and go through their

15  process, in my experience when I ask later which

16  company is this, they always answer.  And it seems

17  to work out better that way.

18        Q.    (BY MS. ZELMER:)  Okay.  So when you

19  stated that you were experiencing some draft in the

20  windows, that was not a correct statement?

21              MR. PERRONG:  Objection to form.

22        Q.    (BY MS. ZELMER:)  Is that right?

23        A.    Yes.

24        Q.    Okay.  And when she asked you if you

25  owned a home and you said "I own it alone," that's

Exhibit 2
Page 26 of 47

Page 42

1   not an accurate statement either, is it?

2                   MR. PERRONG:  Objection to form.

3                   THE WITNESS:  No.  It is not an

4   accurate statement.

5       Q.    (BY MS. ZELMER:)  Okay.  And then when

6   you recognized that it's Dabella on the call, you

7   still proceed with exchanging information.

8               Isn't that correct?

9       A.    Yes.  They could lie to me.

10      Q.    So, now your address is ▪▪▪▪▪▪▪▪▪▪▪▪

11  ▪▪▪▪▪▪.  That's not somebody else's address.

12              Correct?

13      A.    That's not.  And I was making sure it was

14  the actual company that was talking to me because

15  sometimes they are impersonating another company.

16      Q.    And then you proceed to make an

17  appointment for ▪▪▪▪▪▪▪▪  the next day.

18              Is that correct?

19      A.    Yes.

20                  MR. PERRONG:  Objection to form.

21      Q.    (BY MS. ZELMER:)  And then when she asks

22  you to verify your email, you say it's

23  ▪▪▪▪▪▪▪▪▪▪▪▪▪▪@gmail.com.

24              And then Dabella states that they have a

25  different one, ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪  And she

Exhibit 2
Page 27 of 47

Leon Weingrad
August 18, 2025

Page 44

1   you consenting essentially to her contacting you

2   using that email address?

3        A.    Consent is not retroactive.

4        Q.    So why did you give her the email address

5   if you didn't want Dabella to contact you?

6        A.    Because it's another form of

7   identification.

8        Q.    What do you mean, "it's another form of

9   identification"?

10       A.    Because if they email me, I can see who

11  is emailing me, coming from where, and that way it's

12  another form of identification.  Because anyone on

13  the phone can tell me they are any company.  But by

14  emailing me, I can easily identify them.

15       Q.    You did want her to email you, though?

16       A.     It doesn't negate the call was illegal in

17  the first place.

18       Q.    I didn't ask that question.  But you did

19  want her to email you so that you could identify who

20  it was.

21             Correct?

22       A.    I wanted her to email my email so I could

23  identify who it was that was calling me illegally.

24       Q.    Okay.  And then you call back later that

25  day around 12:15.

Exhibit 2
Page 28 of 47

Leon Weingrad
August 18, 2025

Page 47

1    measuring our windows, and asked me who they were.

2    Then I told her what, you know, that -- I was pretty

3    upset.  I canceled that appointment.  They shouldn't

4    be at the house.  I said don't answer the door or

5    anything.

6         Q.    Okay.  So other than measuring the

7    windows, did they do anything else there?  Did you

8    have any other interactions with them, or your wife

9    have any interaction with them?

10        A.    No.

11        Q.    Did you ever get the quote?

12        A.    No.

13        Q.    Did -- After you had called back and

14   cancelled the appointment on February 7, 2025, did

15   you ever get any other communications from Dabella?

16        A.    Not to my knowledge.

17        Q.    The telephone number that you're using

18   that's the subject of this litigation, was that ever

19   used for business purposes?

20        A.    No.

21        Q.    I'll mark this as the next exhibit,

22   Exhibit 9.

23                    (Deposition Exhibit Number 9

24                    was marked for identification).

25        Q.    (BY MS. ZELMER:)  It is a screen shot

Exhibit 2
Page 29 of 47

Leon Weingrad
August 18, 2025

Page 50

1    told you.

2              Have you ever heard of a company

3    (inaudible)?

4                   MR. PERRONG:  I'm sorry.  Can you say

5    that again?

6        Q.    (BY MS. ZELMER:)  Richardson Marketing

7    Group?

8                   MR. PERRONG:  Objection to the form.

9                   THE WITNESS:  Never heard of that.

10       Q.    (BY MS. ZELMER:)  Have you ever received

11   any kind of compensation for obtaining a lead for

12   another company?

13       A.    No.

14       Q.    Do you know anybody in that industry?

15       A.    Not at all.

16       Q.    Do you know anyone who knows how to spoof

17   IP numbers?

18                  MR. PERRONG:  Objection to the form.

19                  THE WITNESS:  No, I do not.

20       Q.    (BY MS. ZELMER:)  Can you tell me how

21   much compensation you received for violations of the

22   TCPA today?

23                  MR. PERRONG:  Objection.  Outside the

24   scope of the court's order.

25                  Instructing the witness not to answer.

Exhibit 2
Page 30 of 47

Page 53

1    receive calls from Dabella in paragraph 22.  But

2    didn't you consent when you made an appointment with

3    them?

4         A.    No.   Consent is not retroactive, like I

5    said before.  It doesn't mean the call wasn't

6    illegal in the first place.

7         Q.    And I'm not really talking about the

8    initial phone call.  But during that call when you

9    asked to make an appointment or you confirmed making

10   an appointment, didn't you consent for Dabella to

11   contact you?

12        A.    No, I did not.

13              MR. PERRONG:  And I'll object to the

14   form.

15        Q.    (BY MS. ZELMER:)  Did you look to see

16   what number was associated with 503█████████, the

17   number that the phone calls came from?

18        A.    No.

19        Q.    So you said that you only answered one

20   phone call.  Do you know what the purpose of the

21   other calls were for that Dabella made, but you

22   never answered?

23        A.    No.

24              MR. PERRONG:  Objection to form.

25        Q.    (BY MS. ZELMER:)  Okay.  It says on

Exhibit 2
Page 31 of 47

Leon Weingrad
August 18, 2025

Page 54

1    paragraph 36 that you had not made inquiry for

2    windows or home improvements.  But on that call

3    where Dabella had called you, you made an

4    appointment, so isn't that an inquiry for windows?

5                    MR. PERRONG:  Objection to form.

6                    THE WITNESS:  That was during the

7    call.  That wasn't prior.  I never made an inquiry

8    for these phone calls.

9        Q.    (BY MS. ZELMER:)  So you never made an

10   inquiry prior to the call, but during the call you

11   would agree that you did inquire on home improvement

12   of windows.

13               Correct?

14                   MR. PERRONG:  Objection to form.

15                   THE WITNESS:  I couldn't hear.  Could

16   you repeat the question?

17       Q.    (BY MS. ZELMER:)  Right.  So prior to the

18   call you did not make an inquiry for windows, but

19   you would agree that during the call you did make an

20   inquiry for windows?

21                   MR. PERRONG:  Objection to form.

22                   THE WITNESS:  I did during the call,

23   and I explained why earlier.

24       Q.    (BY MS. ZELMER:)  Okay.  It states that

25   your privacy has been violated.

Exhibit 2
Page 32 of 47

Page 55

1          **How was your privacy violated?**

2                    MR. PERRONG:  Objection to form.

3               You can answer.

4                    THE WITNESS:  I was called illegally,

5     number one.  Number two, I mean, my privacy was

6     violated twice in two different ways.

7                    First it was the call, which was

8     unsolicited.  Second one was they came to my house

9     after I had already completed the cancelation of the

10    appointment.  They showed up to my house anyway onto

11    my property, ███████████████████████.

12             ██████████████████████████████████████

13    ████████████████████. ███████████████████████████

14    ██████████████████████████████████

15    █████████████████████████

16         Q.    (BY MS. ZELMER:)  Okay.  Was there any

17    other privacy interests with regard to the call

18    itself?

19                    MR. PERRONG:  Objection to form.

20               You can answer.

21                    THE WITNESS:  Yes.  I put my, you

22    know, there is a reason I put my phone number on a

23    do not call list.  I do not want to be bothered by

24    any of these calls.

25         Q.    (BY MS. ZELMER:)  You realize that you

Exhibit 2
Page 33 of 47

Leon Weingrad
August 18, 2025

1    voluntarily stayed on the phone call for much longer

2    than you needed to?

3                    MR. PERRONG:  Objection to form.

4                    THE WITNESS:  Can you ask that again?

5    I couldn't hear you.

6        Q.    (BY MS. ZELMER:)  You do understand that

7    you voluntarily stayed on the phone by answering

8    questions and making an appointment much longer than

9    you needed to.

10                  Do you agree with that?

11                   MR. PERRONG:  Objection.

12                   THE WITNESS:  No.  I stayed on the

13   phone as long as I needed to to try to further

14   identify who was calling me illegally.  And to

15   confirm who it was, and to get as much evidence as

16   possible of who is calling me.

17       Q.    (BY MS. ZELMER:)  Have you ever been

18   arrested or convicted of any crime at all?

19                   MR. PERRONG:  Objection to form.

20                   THE WITNESS:  No.

21       Q.    (BY MS. ZELMER:)  Were you involved with

22   Second Story Farming?

23                   MR. PERRONG:  Objection to form.

24                   THE WITNESS:  Yes, I was.

25       Q.    (BY MS. ZELMER:)  And what was your role

Exhibit 2
Page 34 of 47

Leon Weingrad
August 18, 2025

Page 62

```
 1    cannot be traced?
 2                   MR. PERRONG:  Objection to form.
 3                   THE WITNESS:  Can you speak into your
 4    microphone?  I really can't hear you.
 5        Q.   (BY MS. ZELMER:)  Yeah.  Do you think
 6    it's odd that people are using fake names with your
 7    phone number and using IP addresses that can't be
 8    traced?
 9                   MR. PERRONG:  Objection to form.
10             You can answer.
11                   THE WITNESS:  I mean, it's pretty
12    common in illegal telemarketing.
13        Q.   (BY MS. ZELMER:)  You think it's common?
14                   MR. PERRONG:  Objection to form.
15             You can answer.
16                   THE WITNESS:  I believe it is.  I
17    mean, I guess it's illegal, so people do illegal
18    stuff sometimes.
19        Q.   (BY MS. ZELMER:)  You do understand that
20    my client, Dabella Exteriors, was operating off of a
21    consented lead was valid that you submitted?
22                   MR. PERRONG:  Objection to form.
23             You can answer.
24                   THE WITNESS:  Was that a question?
25        Q.   (BY MS. ZELMER:)  Do you understand that?
```

Exhibit 2
Page 35 of 47

Leon Weingrad
August 18, 2025

Page 64

1                    THE WITNESS:  Can you repeat the

2     question again?

3          Q.    (BY MS. ZELMER:)  Yeah.  You indicated

4     that it's pretty common in the industry for these

5     fake names and these fake IP's.

6                    My question is:  Do you have an

7     independent basis for forming that opinion, other

8     than communications with your counsel?

9                    MR. PERRONG:  Objection.  Same

10    objection.  To the extent that you can answer.

11                   THE WITNESS:  I don't know what they

12    use to generate leads.  I have no idea.  I don't

13    know.  But I'm pretty sure they have some way of

14    generating as much leads as possible.  That makes

15    them more money.

16                   But I'm not a professional at that.  But

17    just based on these calls that I'm getting, that's

18    kind of what I'm running into.

19         Q.    (BY MS. ZELMER:)  Okay.  Any other basis

20    for that opinion other than communications you've

21    had with your counsel other than for the fact you

22    think it's common because you've been getting these

23    calls?

24         A.    Yeah.  That's it.

25         Q.    Okay.  I'm going to put -- These are for

Exhibit 2
Page 36 of 47

Leon Weingrad
August 18, 2025

Page 71

```
1      A.    Yes.

2      Q.    Okay.  Do you have any other documents

3   with the national do not call registry other than

4   what you've produced?

5                MR. PERRONG:  Objection to form.

6                THE WITNESS:  Not to my knowledge.

7      Q.    (BY MS. ZELMER:)  This production asked

8   for documents related to reflect any online

9   activities that you performed on February 6th to

10  February 7th, 2025.

11               Did you do any investigation to determine

12  what kind of searches that you may have done on

13  those dates?

14               MR. PERRONG:  Objection to form.

15  Objection to the extent it calls for attorney/client

16  information.

17               Instructing the witness not to answer to

18  the extent it reveals conversations that we've had.

19     Q.    (BY MS. ZELMER:)  Can you answer that

20  question, did you do any investigation to seek any

21  documents in response to this request for

22  production?

23     A.    No.

24               MS. ZELMER:  Okay.  Let's see here.

25  I think that's all I have, subject to obviously
```

Exhibit 2
Page 37 of 47

Leon Weingrad
August 18, 2025

Page 74

```
 1    STATE OF OREGON          )
                               )  ss.
 2    County of Umatilla       )

 3

 4          I, Alicia J. Bridges, do hereby certify that

 5    at the time and place heretofore mentioned in the

 6    caption of the foregoing matter, I was a Notary Public

 7    for the State of Oregon; that at said time and place I

 8    reported in stenotype all testimony adduced and

 9    proceedings had in the foregoing matter; that

10    thereafter my notes were reduced to typewriting and

11    that the foregoing transcript consisting of 73

12    typewritten pages is a true and correct transcript of

13    all such testimony adduced and proceedings had and of

14    the whole thereof.

15          Witness my hand at Pendleton, Oregon, on

16    this _____ day of August, 2025.

17

18

19

20

21          Alicia J. Bridges
            Notary Public of Oregon
22          Commission No. 1047732
            My certificate expires: 04/28/28
23

24

25
```

Exhibit 2
Page 38 of 47

## AT&T PREPAID Account History

### Total Usage - Voice, Text, Data Details for 503-▮▮▮▮ From 2/6/2025 to 2/7/2025

| Usage | Contact | Date | Time | Duration | Charges |
|-------|---------|------|------|----------|---------|
| ▮ | | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Incoming MMS | 503-563-2370 | 2/6/2025 | 10:20:57 AM CST | NA | $0.00 |
| ▮ | ▮ | ▮ | | | ▮ |
| Incoming Call | 503-298-4701 | 2/6/2025 | 12:49:35 PM CST | 0min 1sec | $0.00 |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | |
| ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Incoming Call | 503-298-4701 | 2/6/2025 | 06:19:54 PM CST | 0min 1sec | $0.00 |
| ▮ | ▮ | | ▮ | ▮ | ▮ |
| ▮ | ▮ | | ▮ | ▮ | ▮ |
| Incoming Call | 503-298-4701 | 2/7/2025 | 11:50:56 AM CST | 3min 30sec | $0.00 |
| Outgoing Call | 503-298-4701 | 2/7/2025 | 12:15:21 PM CST | 1min 59sec | $0.00 |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

Usage Summary



*Time is US/Central



1

Exhibit 2
Page 39 of 47



## Conversation History

**Enter A Last Name or Phone Number**

search

Contact: Bronson, Robert - ██████████     ▼     (1 Match)

From Number: ██████████     ▼

### DaBella

Hi Robert, this is DaBella. I see you are interested in a Home Improvement estimate. I can get you scheduled for a free in home estimate. What day/time works best? reply STOP to opt out of text messages. data & msg rates may apply.

Carrier message received
Feb 06, 2025 08:31 am PST
Integreted Data

Reopen Chat

Close



EXHIBIT
Leon Weingrad
**5**

**DABELLA000050  8/15/2025**

Exhibit 2
Page 40 of 47

## National Do Not Call Registry - Your Registration Is Confirmed
1 message

**Verify@donotcall.gov** <Verify@donotcall.gov>

Thank you for registering your phone number with the National Do Not Call Registry. You successfully registered your phone number ending in 6495 on August 28, 2021. Most telemarketers will be required to stop calling you 31 days from your registration date.

Visit https://www.donotcall.gov  to register another number or file a complaint against someone violating the Registry.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Please do not reply to this message as it is from an unattended mailbox. Any replies to this email will not be responded to or forwarded. This service is used for outgoing emails only and cannot respond to inquiries.



Exhibit 2
Page 41 of 47

1

2                    EXHIBIT 7

3               Transcription

4    Audio File; 2/7/25; Inbound Call

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Exhibit 2
Page 42 of 47

Page 2

```
 1              MR. WEINGRAD:  Hello?

 2              OPERATOR:  Hi.  My name is Teresa with

 3   Dabella on a recorded line.

 4              Am I speaking with Robert?

 5              MR. WEINGRAD:  Yes.

 6              OPERATOR:  Hi, Robert.  I was just

 7   reaching out to you in regards to a windows inquiry

 8   that we had received.  It looks like you were

 9   needing some assistance.

10              Do you know about how many of those

11   windows you were looking into?

12              MR. WEINGRAD:  Um, I think it was 10.

13              OPERATOR:  10 windows.  Okay.  And are they

14   framed in vinyl, alluminum, or wood?

15              MR. WEINGRAD:  Wood.

16              OPERATOR:  And are they original to the

17   home?

18              MR. WEINGRAD:  Yes, they are.

19              OPERATOR:  Okay.  And what's going on with

20   the windows?  Is there any condensation,

21   draftiness, energy sufficiency issues that you've

22   noticed?

23              MR. WEINGRAD:  Some draft.

24              OPERATOR:  Some draft.

25
```

Exhibit 2
Page 43 of 47

Page 3

1              MR. WEINGRAD:  Some draft coming through.
2    And which company was this, again?  I'm sorry.
3              OPERATOR:  No, you're fine.  So it's
4    Dabella and we're out here in Portland.  So we were
5    just reaching out since we're going to be out in
6    the area tomorrow.  So what we do is we provide
7    commitment free and obligation evaluations.
8              So we would just have our specialist come
9    by and go over our different options with you and
10   leave you with that piece in writing.  And then they
11   also just do a house check to see if there is
12   anything else going on with the windows, especially
13   since you are noticing draft already.
14             MR. WEINGRAD:  Okay.
15             OPERATOR:  But for that estimate we do ask
16   to meet with all homeowners and decision makers for
17   90 minutes.  Do you own this home alone or with a
18   family member or a spouse?
19             MR. WEINGRAD:  I own it alone.
20             OPERATOR:  Okay.
21             MR. WEINGRAD:  And I'm sorry.  You broke
22   up.  I couldn't hear you.  Which company was this?
23             OPERATOR:  Dabella.
24             MR. WEINGRAD:  Dabella.  Okay.  I've heard
25   of you.  Yeah.  I own it alone.

Exhibit 2
Page 44 of 47

Page 4

```
 1              OPERATOR:  Okay.  Is there anyone else that

 2   should be present to help make decisions on the

 3   home, or, again, just you, Robert?

 4              MR. WEINGRAD:  Just me.

 5              OPERATOR:  Okay.  And I have you here at ███

 6   ██████████.  Can I have you verify the house

 7   number for me?

 8              MR. WEINGRAD:  Yeah.  It's ████████████

 9   ███.

10              OPERATOR:  Perfect.  And it is a ██████

11   ██████████ from what I'm seeing, correct?

12              MR. WEINGRAD:  Yes.

13              OPERATOR:  Okay.  And it looks like

14   ████████ Street would be a good cross-street to

15   you?

16              MR. WEINGRAD:  A cross-street?  It's in a

17   ████████.

18              OPERATOR:  Okay.

19              MR. WEINGRAD:  So there wouldn't be a

20   cross-street.

21              OPERATOR:  Okay.  Okay.  And so with that

22   address I do see that we will have a specialist out

23   there tomorrow.  Would ██████████. or ██████████

24   work better for you?

25              MR. WEINGRAD:  Tomorrow?  Um, ████████
```

Exhibit 2
Page 45 of 47

Page 5

1          OPERATOR: ▆▆▆▆▆  And for visual

2   reference what is the outside color of the home?

3          MR. WEINGRAD: ▆▆▆.

4          OPERATOR: ▆▆▆▆  Okay.  And then one more

5   thing.  If I could just have you verify the email

6   that we should have on file for you?

7          MR. WEINGRAD:  It's ▆▆▆▆▆▆▆▆▆.

8          OPERATOR:  Okay.  I have a different one.

9   I have ▆▆▆▆▆▆▆▆▆▆.  Is that still a

10  good one, or did you want me to switch it to the

11  one you just mentioned?

12         MR. WEINGRAD:  Switch it to the one --

13  ▆▆▆▆▆▆▆▆▆▆▆.

14         OPERATOR:  Okay.  Perfect.  I have you

15  scheduled tomorrow for ▆▆▆▆ on February ▆.

16  Now before I let you go, is there anything that you

17  think of that would prevent you from seeing us at

18  that time, or is that still a good time to set the

19  appointment at for you?

20         MR. WEINGRAD:  That's good.  Thank you.

21         OPERATOR:  Okay.  If anything does come up,

22  please give us a call back at 844-▆▆▆▆.  But

23  if not, we look forward to seeing you tomorrow,

24  Robert.  You have a great day.

25         MR. WEINGRAD:  You, too.  Thanks.

Exhibit 2
Page 46 of 47

Page 6

```
1    OPERATOR:  Thank you.  Bye-bye.

2

3

4

5

6    *              *                    *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 2
Page 47 of 47