Andrew Roman Perrong, OSB No. 243320
a@perronglaw.com
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, PA 19038
215-225-5529
Attorney for Plaintiff and the Proposed Class

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF OREGON
## PORTLAND DIVISION

|  |  |
|---|---|
| LEON WEINGRAD, individually and on behalf of a class of all persons and entities similarly situated, | |
| Plaintiff | Case No. 3:25-cv-00396-SI |
| vs. | |
| DABELLA EXTERIORS LLC | |
| Defendant. | OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT TCPA (47 U.S.C. § 227) DEMAND FOR JURY TRIAL |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.      **Introduction** ................................................................................................................. 1

II.     **Factual Background** ..................................................................................................... 2

III.    **Legal Standard** ............................................................................................................ 5

IV.     **Argument** ..................................................................................................................... 5

    A.    DaBella's Motion injects atextual requirements into the statute that do not exist.............. 5

    B.    There is no "personal" registration requirement for the Do Not Call Registry, since the DNCR does not collect names. Even so, Mr. Weingrad expressly indicated his desire to remain on the Registry, and did not want to remove his number therefrom, so he has standing. 12

    C.    The Plaintiff himself did not and does not hold the number out to the world as a business number. ........................................................................................................................... 17

    D.    Defendant has adduced no evidence of consent to contact Plaintiff, which is itself not Plaintiff's burden. ........................................................................................................... 21

    E.    Defendant cannot avail itself of a Reassigned Number Database defense absent further proof. ............................................................................................................................... 24

    F.    Plaintiff received eight calls, including one after he filed this lawsuit; there is no EBR for the September 11 call. ..................................................................................................... 26

    G.    Plaintiff has been injured because he has suffered a violation of the statute................... 31

V.      **Conclusion** ................................................................................................................. 35

Opposition to Motion for S.J.

# TABLE OF AUTHORITIES

**Cases**

*Abrahamian v. loanDepot.com LLC,* No. 2:23-cv-00728, 2024 WL 1092442 (D. Ariz. Mar. 13, 2024) ................................................................................................................16

*Abramson v. Oasis Power LLC,* No. 2:18-cv-00479, 2018 U.S. Dist. LEXIS 129090 (W.D. Pa. July 31, 2018)................................................................................................32

*ACA Int'l v. Fed. Commc'ns Comm'n,* 885 F.3d 687 (D.C. Cir. 2018)............................22, 24, 26

*Allan v. Pa. Higher Educ. Assistance Agency,* 968 F.3d 567 (6th Cir. 2020) .............................26

*Atkinson v. Choice Home Warranty,* No. CV 22-04464, 2023 WL 166168 (D.N.J. Jan. 11, 2023) ................................................................................................................28

*Bais Yaakov of Spring Valley v. Educ. Testing Serv.,* 367 F. Supp. 3d 93 (S.D.N.Y. 2019).........34

*Barlow v. Ground,* 943 F.2d 1132 (9th Cir. 1991) ......................................................................5

*BedRoc Ltd. v. United States,* 541 U.S. 176 (2004).....................................................................34

*Bird v. Pro Star Builders, Inc.,* No. 222CV03610JLSJEM, 2022 WL 18216007 (C.D. Cal. Nov. 28, 2022) ...............................................................................................28

*Bostock v. Clayton County,* 590 U.S. 644 (2020) ......................................................................35

*Bradley v. DentalPlans.com,* 2024 WL 2865075 (D. Md. June 6, 2024).....................................29

*Campbell-Ewald Co. v. Gomez,* 577 U.S. 153 (2016) .................................................................34

*Charvat v. Southard Corp.,* No. 2:18-CV-190, 2019 WL 13128407 (S.D. Ohio Sept. 30, 2019) ................................................................................................................29, 30

*Com'r. v. Beck's Estate,* 129 F.2d 243 (2d Cir. 1942)...................................................................8

*Connor v. ServiceQuick, Inc.,* No. 1:24-CV-02286-CNS-NRN, 2025 WL 2855393 (D. Colo. Oct. 8, 2025) .......................................................................................18

*Cunningham v. Rapid Response Monitoring Servs.,* 251 F. Supp. 3d 1187 (M.D. Tenn. 2017)...32

*Deleo v. Nat'l Republican Senatorial Comm.,* No. 221CV03807BRMESK, 2021 WL 5083831 (D.N.J. Nov. 1, 2021)..........................................................................34

*Dickson v. Direct Energy, LP,* 69 F.4th 338 (6th Cir. 2023) .....................................................34

*Ebert v. Poston,* 266 U.S. 548 (1925)..........................................................................................8

*Elleby v. Liberty Univ., Inc.,* No. 521CV00093KDBDCK, 2022 WL 715577 (W.D.N.C. Mar. 9, 2022) ...............................................................................................24–25

*Evans v. Nat'l Auto Div., LLC,* Civ. No. 15-8714, 2016 WL 4770033 (D.N.J. Sept. 13, 2016)...33

*Greenley v. Laborers' Int'l Union of N. Am.,* 271 F. Supp. 3d 1128 (D. Minn. 2017) ................33

*Hall v. Smosh Dot Com, Inc.,* 72 F.4th 983 (9th Cir. 2023) ................................................16, 21

*Harrison v. Humana, Inc.,* No. 3:24-CV-00262-GNS, 2024 WL 4828737 (W.D. Ky. Nov. 19, 2024) ................................................................................................................29

*Hossfeld v. Allstate Ins. Co.,* 726 F. Supp. 3d 852 (N.D. Ill. 2024)......................................22–23

Opposition to Motion for S.J.

*Human v. Fisher Invs., Inc.,* No. 4:24-CV-01177-MTS, 2025 WL 2614039 (E.D. Mo. Sept. 10, 2025) ...................................................................................................................33

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* CG Docket No. 02-278, 18 FCC Rcd. 14014 (2003)..................................................................14

*Iselin v. United States,* 270 U.S. 245 (1926).........................................................................8

*Laccinole v. Int'l Union of Police Associations AFL-CIO,* 638 F. Supp. 3d 110 (D.R.I. 2022) ...32

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118 (2014) ..............................34

*Mantha v. QuoteWizard.com, LLC,* 347 F.R.D. 376 (D. Mass. 2024) ........................................30

*Massarello v. Power Home Remodeling Grp., LLC,* 2025 WL 2463153 (E.D. Mich. Aug. 27, 2025) ...................................................................................................................22

*McMillion v. Rash Curtis & Assocs.,* No. 16-CV-03396-YGR, 2018 WL 692105 (N.D. Cal. Feb. 2, 2018) ...............................................................................................................30

*Moore v. Healthcare Sols. Inc.,* No. 21-CV-4919, 2022 WL 17487823 (N.D. Ill. Dec. 7, 2022).27

*Morris v. Unitedhealthcare Ins. Co.,* No. 4:15-CV-638, 2016 WL 7115973 (E.D. Tex. Nov. 9, 2016) ...................................................................................................................33

*Murch v. GPS Cap. Mkts., LLC,* 2025 U.S. Dist. LEXIS 169651 (D. Or. June 6, 2025)15–16, 27–28

*Murray v. GMAC Mortg. Corp.,* 434 F.3d 948 (7th Cir. 2006).......................................................32

*N.L. by Lemos v. Credit One Bank, N.A.,* 960 F.3d 1164 (9th Cir. 2020) .....................................22

*Nichols v. eHealthInsurance Servs., Inc.,* No. 23-CV-06720-EKL, 2025 WL 689721 (N.D. Cal. Mar. 3, 2025)..........................................................................................................16–17

*Outley v. New York,* 837 F.2d 587 (2d Cir. 1988) .........................................................................32

*Rombough v. Robert D. Smith Ins. Agency, Inc.,* No. 22-CV-15-CJW-MAR, 2022 WL 2713278 (N.D. Iowa June 9, 2022)..............................................................................................12

*Shelton v. Nat'l Gas & Elec., LLC,* 2019 WL 1506378 (E.D. Pa. Apr. 5, 2019) ..........................29

*Shelton v. Pro Source Lending Grp. LLC,* No. CV 24-4394, 2025 WL 817485 (E.D. Pa. Mar. 14, 2025) ...................................................................................................................20

*Shelton v. Target Advance LLC,* 2019 WL 1641353 (E.D. Pa. Apr. 16, 2019).......................19–20

*Smith v. Univ. of Wash. Law Sch.,* 233 F.3d 1188 (9th Cir. 2000) ....................................................5

*Stoops v. Wells Fargo Bank, N.A.,* 197 F. Supp. 3d 782 (W.D. Pa. 2016) ..............................31–33

*Thomas v. Dun & Bradstreet Credibility Corp.,* 100 F. Supp. 3d 937 (C.D. Cal. 2015) ..............19

*Van Patten v. Vertical Fitness Grp., LLC,* 847 F.3d 1037 (9th Cir. 2017)..............................9, 34

*Weingrad v. DaBella Exteriors, LLC,* No. 3:25-CV-396-SI, 2026 WL 496609 (D. Or. Feb. 23, 2026) .......................................................................................................26, 28, 30

**Statutes**

15 U.S.C. § 6151(b) ..............................................................................................................13

Opposition to Motion for S.J.

15 U.S.C. § 6153................................................................................................6, 13

44 U.S.C. § 3501 ...................................................................................................14

47 U.S.C. § 227(a)(4)..............................................................................................27

47 U.S.C. § 227(c) ............................................................................................21, 25

47 U.S.C. § 227(c)(3)..............................................................................................21

47 U.S.C. § 227(c)(5).........................................................................................21, 28

Do Not Call Implementation Act of 2003, 15 U.S.C. § 6153.........................................6

Do-Not-Call Improvement Act of 2007, Pub. L. No. 110-187, 122 Stat. 633 (2008)................6–8

## Rules and Regulations

16 C.F.R. § 310.4(b) ................................................................................................6

16 C.F.R. § 310.4(b)(1)(iii)(B) ...........................................................................12, 13

47 C.F.R. § 64.1100(h) ...........................................................................................21

47 C.F.R. § 64.1200(c)............................................................................................16

47 C.F.R. § 64.1200(c)(2)................................................................................7, 12, 13

47 C.F.R. § 64.1200(c)(2)(ii).....................................................................................21

47 C.F.R. § 64.1200(f)(5) ........................................................................................30

47 C.F.R. § 64.1200(f)(5)(i)......................................................................................30

47 C.F.R. § 64.1200(m) ...........................................................................................25

Fed. R. Civ. P. 56(a) .................................................................................................5

Fed. R. Civ. P. 56(c)(1)..............................................................................................5

Fed. R. Civ. P. 56(c)(3)..............................................................................................5

Fed. R. Civ. P. 56(d) .................................................................................................5

## Other Authorities

Advanced Methods to Target and Eliminate Unlawful Robocalls, CG Docket No. 17-59, Second Report and Order, 33 FCC Rcd 12024 (2018)................................................................25

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012) .8, 15

OMB Control Nos. 3060-0519 and 3084-0169 .........................................................14

Report To Congress: Regarding the Accuracy of the Do Not Call Registry, FTC (Oct. 2008) ..10–11, 15

Opposition to Motion for S.J.

## I.    INTRODUCTION

DaBella asks this Court to grant summary judgment as to Count I of the Complaint before class discovery has begun and while simultaneously moving to deny class certification, raising substantially the same arguments in both motions. Its twin motions are designed to force this Court to resolve deeply contested factual questions before Plaintiff has had any meaningful opportunity to develop the full evidentiary record. That approach should be rejected. At bottom, DaBella's motion for partial summary judgment injects atextual requirements into the TCPA's Do Not Call provisions that simply do not exist and asks this Court to draw every factual inference in DaBella's favor, the precise opposite of what Rule 56 requires.

DaBella's motion rests on five overarching but defective propositions. *First*, DaBella contends that Plaintiff lacks standing because he did not personally register his telephone number on the Do Not Call Registry or that his registration was somehow "invalidated" because his number was reassigned to him, despite neither requirement appearing in the statute, and despite an overwhelming number of courts who have rejected similar arguments. *Second*, DaBella contends that Plaintiff's telephone number is a "business" line and therefore not entitled to DNC protection, despite Plaintiff having no connection with the claimed business and despite adducing no evidence that the Plaintiff held his number out to the world as a business number. *Third*, DaBella asserts that Plaintiff only "received" one call and therefore cannot satisfy the "more than one" threshold, of the statute, but Plaintiff received at least eight contacts from DaBella, and DaBella's cramped reading of what constitutes a "received" call conflicts with the weight of authority. *Fourth*, DaBella claims that it is entitled to avail itself of a Reassigned Number Database safe harbor without adducing any evidence it even used that database. And *fifth*, DaBella insists Plaintiff has not suffered a cognizable injury, despite meeting Article III standing requirements under binding Ninth Circuit and Supreme Court precedent.

Critically, the purported "consent" upon which DaBella stakes much of its motion is fatally flawed on its own terms. The parties do not dispute that the "consent," which DaBella refuses to produce in discovery, and which the website operator and reseller, SBBNet and Richardson Marketing Group have refused to respond to subpoenas over, was submitted under the name "Robert Bronson," not Leon Weingrad. DaBella had an opportunity to subsequently depose the subscriber of record for the IP address associated with that submission, who confirmed he never visited the website in question, never submitted the Plaintiff's telephone number, does not know Plaintiff, and suspected his device had been compromised. On this record, DaBella has adduced no admissible evidence of consent, a burden that is DaBella's, not Plaintiff's, and yet asks this Court to resolve the case in DaBella's favor as a matter of law. That is not what summary judgment is for.

This Court has already denied DaBella's Motion to Dismiss and Strike Class Allegations in this very action. Many of the arguments DaBella advances here in support of summary judgment are the same arguments the Court has already assessed, and rejected, in that context. DaBella should not be permitted to achieve through a Rule 56 motion what it failed to achieve through a motion to dismiss, particularly before class discovery has closed. The motion should be denied in its entirety.

## II.    FACTUAL BACKGROUND

Plaintiff Leon Weingrad's telephone number is on the National Do Not Call Registry. Despite that registration, DaBella contacted Mr. Weingrad at least eight times last year, including at least one time after he filed suit. On February 6, 2025, DaBella sent two unsolicited text message calls to Mr. Weingrad, one displaying DaBella's logo and another addressing him as "Robert" and marketing a home improvement estimate. The same day, DaBella placed four voice

2

Opposition to Motion for S.J.

calls to Mr. Weingrad. Mr. Weingrad missed the first two calls. When he answered the second two, he heard only dead air before the call disconnected. The following day, DaBella called again. A representative named "Teresa" attempted to sell Mr. Weingrad windows and to schedule an in-home estimate. Mr. Weingrad engaged the caller to ascertain the identity of the company contacting him, a common and understandable response when receiving unwanted calls from unknown numbers. He subsequently cancelled the appointment and filed suit.

Yet DaBella placed at least one additional call to Mr. Weingrad on at least September 11, 2025, six months after DaBella knew of this lawsuit, and after Mr. Weingrad had cancelled the appointment. The caller again referred to Mr. Weingrad as "Robert" and asked if he was still interested in getting a quote for windows. When Mr. Weingrad asked why he was getting a call from DaBella, the representative said, "Well, looks like I . . .," and then hung up. In response to Defendant's Motion to Dismiss, this Court has already observed that "DaBella makes no argument that Mr. Weingrad did not, in effect, communicate with the company that he wanted the communications to stop." The telephone numbers DaBella used to contact Mr. Weingrad are not associated with a caller ID naming DaBella. And two of them cannot be used to make a "do not call" request during regular business hours.

DaBella claims it obtained a "consent form" to call Plaintiff's number from two third party companies, SBBNet, who sold it to Richardson Marketing Group, who sold it to DaBella. Neither has responded to subpoenas. To this day, DaBella refuses to produce any evidence of consent to contact any other class member. It is also not even clear what precise evidence DaBella has produced for the "form" DaBella relies upon with respect to Plaintiff, although it purports to claim to know the language contained on that form. In any event, DaBella claims that this "form" was submitted under the name "Robert Bronson." DaBella subsequently deposed the

3

Opposition to Motion for S.J.

subscriber of record for the IP address it claims was associated with that "form," who confirmed that he never visited the website claimed, did not submit the consent form, does not know the Plaintiff, and suspected his phone may have been hacked. This individual, who lives alone, also testified that nobody else in his house had access to his IP address. To this day, DaBella cannot authenticate the very records upon which its motion relies.

Moreover, DaBella's other motion reveals, perhaps inadvertently, the systemic nature of its lead acquisition practices, having readily ascertained not only that the Plaintiff's lead originated from a company called Richardson Marketing Group (which has not responded to discovery), but that this very same lead generator has been implicated in four other lawsuits against DaBella, which caused DaBella to pause all traffic from them in October of 2025.

With respect to Plaintiff's telephone number specifically, his number was reassigned to him in approximately July of 2024. DaBella adduces inadmissible evidence of third party websites it claims has the Plaintiff's telephone number on them. But Mr. Weingrad denies any connections to those websites, and denies having placed his telephone number online or holding it out to the world as a business number. Indeed, Mr. Weingrad, a car salesman, has a separate number that his work provides him. Mr. Weingrad has also pled that he uses the number for personal, residential, and household purposes. Mr. Weingrad has no connection to the claimed previous subscriber of his number, "Joe Arnold," nor the business DaBella Mr. Weingrad claims to be associated with, "Merlin Home Magic."

DaBella has now moved for partial summary judgment as to Count I of the Complaint, raising arguments that largely mirror those it pressed, unsuccessfully, in its Motion to Strike Class Allegations. This response follows.

Opposition to Motion for S.J.

## III.    LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. *Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991). Each party's position must be supported by (1) citations to particular portions of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) argument showing that the materials cited do not establish the presence or absence of a genuine factual dispute or that the opposing party cannot produce admissible evidence to support its position. *See* Fed. R. Civ. P. 56(c)(1).

Even if there exist no disputed evidentiary facts, a party is not entitled to summary judgment when it cannot demonstrate that it is entitled to judgment as a matter of law. *Smith v. Univ. of Wash. Law Sch.*, 233 F.3d 1188, 1193 (9th Cir. 2000). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an *essential element* of a claim on which the non-moving party has the burden of proof. *See id.* The court may consider other materials in the record not cited to by the parties, but it is not required to do so. *See* Fed. R. Civ. P. 56(c)(3). If the party opposing summary judgment demonstrates, through affidavit or otherwise, that additional discovery is necessary to oppose the motion, the Court may either deny the motion, defer consideration to take the necessary discovery, or issue any other appropriate order. Fed. R. Civ. P. 56(d).

## IV.    ARGUMENT

A.    *DaBella's Motion injects atextual requirements into the statute that do not exist.*

As an initial matter, DaBella's first basis for summary judgment, in which it argues that

5

Opposition to Motion for S.J.

the Database Administrator's failure to remove Mr. Weingrad's reassigned number from the Do Not Call Registry somehow allegedly "invalidated" his DNC Registration, is inaccurate both as a matter of law and as a question of standing. Looking at the explicit text of the statute, it is clear that Mr. Weingrad has standing, because the DNC Registry protects "telephone numbers" on the Registry, *regardless of* the persons who *use* such numbers. To see why, it is important to understand the genesis of the TCPA's DNC regulations. Those regulations were brought about by the explicit text of the Do Not Call Implementation Act of 2003, 15 U.S.C. § 6153, where Congress directed the FCC to issue a final rule to implement the Do Not Call Registry. Congress explicitly directed the FCC to "coordinate with the Federal Trade Commission to maximize consistency with the rule promulgated by the Federal Trade Commission," contained at 16 C.F.R. § 310.4(b). Congress later amended the 2003 Act through the Do-Not-Call Improvement Act of 2007, Pub. L. No. 110-187, 122 Stat. 633 (2008) ("2007 Act"), abolishing the FTC's previous 5-year reregistration requirement, stating that telephone numbers on the Registry "*shall not* be removed from such registry except as provided for in subsection (b) or upon the request of the individual to whom the telephone number is assigned," and directing the FTC to "submit a report describing the efforts it has taken to improve the accuracy of the Registry."

Mr. Weingrad's number was on the Do Not Call Registry. It is therefore protected, he has suffered a concrete injury under the very text of the statute, and he can state a claim for violation of the TCPA's DNC Requirements. Congress made clear that once a number is on the Registry, it "shall not" be removed. 2007 Act. Consider the reasoning behind Congress' mandate. Concerned that the Registry would soon be purged of telephone numbers used by persons who still desired not to receive telemarketing calls but failed to re-register their telephone numbers after five years, Congress explicitly changed the FTC regulations and mandated that Do Not Call

6

Opposition to Motion for S.J.

Registry registrations remain on the registry *permanently* and "*shall not* be" removed. *Id.* The FCC's regulations say the same thing, requiring such registrations to be honored "indefinitely." 47 C.F.R. § 64.1200(c)(2). Congress, concerned about the possibility that the Registry would potentially become inaccurate, imposed two additional requirements. *First*, it mandated the FTC to report to Congress about the steps it has taken to "improve the accuracy" of the Registry. *Id. Second*, it explicitly outlined the three circumstances under which a number would be removed: if the individual requests removal, if the telephone number is "invalid[1]" (i.e. a clearly improper telephone number like 555-555-5555), or if the telephone number has been "disconnected *and* reassigned," as determined "through national or other appropriate databases." *Id.*

In so doing, it is clear that Congress's first priority was to ensure that registrations remained on the Registry indefinitely and the Registry would be maintained in a reasonably accurate form through the measures it directed the FTC to implement, accounting for number disconnection and reassignment. Congress was clearly cognizant of the balance it was striking, seeking to maintain the Registry in a reasonably accurate form while expanding consumer protections by eliminating the 5-year renewal requirement. Significantly, if Congress had wanted to go further, it could have included language that expressly invalidated certain types of registrations or specified the databases or process it desired to have the FTC use, *but it didn't*.

---

[1] Defendant improperly conflates an "invalid telephone number" with an alleged "invalidity" of "Weingrad's DNC Registry," a concept it simply makes up. (MSJ at 22). As a matter of statutory construction, an "invalid telephone number" is not the same thing as an "invalid DNC registration." And the ordinary meaning of "invalid telephone number" is precisely that: a telephone number that does not conform to the proper format and thus cannot even be called, *not* one that is reassigned. In 2003, the contemporary definition of "invalid" was to be "not conforming to the correct format or specifications." "Invalid," OXFORD DICTIONARY OF ENGLISH (2003). Thus, it makes sense why the FTC could remove such "invalid" numbers at "any time," since it's readily obvious that a telephone number in a non-existing area code or a telephone number with only nine digits, for example, cannot even be called as an initial matter.

Opposition to Motion for S.J.

*See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012) ("The principle that a matter not covered is not covered is so obvious that it seems absurd to recite it. . . . Nor should the judge elaborate unprovided-for exceptions to a text, as Judge (later Justice) Blackmun noted: '[I]f the Congress [had] intended to provide additional exceptions, it would have done so in clear language.'").

DaBella reads precisely such requirements into the statute, despite Congress' silence. Where the legislature "could easily have written" broader limiting language, such as a provision expressly "invalidating" inaccurate registrations, or requiring use of a certain database, but did not, the negative-implication canon forecloses reading such a limitation into the text. *Id.* at 111. "The silence of Congress is strident." *Id.* at 182 (quoting *Com'r. v. Beck's Estate*, 129 F.2d 243, 245 (2d Cir. 1942) (Frank, J.)). A court may not supply what Congress chose to omit, *casus omissus pro omisso habendus est*: a matter not covered is to be treated as not covered. *Id.* at 93. As Justice Brandeis put the point unambiguously, "a *casus omissus* does not justify judicial legislation," and "[t]o supply omissions transcends the judicial function." *Id.* at 94 (quoting *Ebert v. Poston*, 266 U.S. 548, 554 (1925) and *Iselin v. United States*, 270 U.S. 245, 251 (1926)). DaBella's reading asks this Court to do precisely what Justice Brandeis and ancient legal scholars before him forbid: to insert into the statute a restriction that Congress considered, was capable of drafting, and elected not to include, an act that "flatly contradicts democratic self-governance." *Id.* at 96. And, as will be explained below, that reading also claims the FTC should have used the Reassigned Number Database, instead of the directory assistance database it chose.

And, as a practical matter, DaBella's "invalidation" theory is unworkable and would take a hatchet to a statute designed to protect consumers by penalizing consumer for, at most, a database maintenance error that they likely would not even be aware of. *Van Patten v. Vertical*

8

Opposition to Motion for S.J.

*Fitness Grp., LLC*, 847 F.3d 1037, 1047 (9th Cir. 2017) ("Because the TCPA is a remedial statute intended to protect consumers from unwanted automated telephone calls and messages, it should be construed in accordance with that purpose."). Construing no adverse consequences, let alone "invalidation," from the failure to remove a number from the Registry is consistent with that purpose. Treating registrations on the Registry as valid is the only workable solution and most closely aligns with Congress' stated intent that a number "shall not" be removed. Moreover, both from a consumer protection standpoint, and a practical matter, it is the most workable solution and the one most susceptible to evidentiary proof as it permits the Court to ask a single, straightforward question: is the number on the Registry, or is it not?

DaBella's argument is also precluded by the very evidence it attempts to marshal in support of its contention that the Plaintiff's telephone number registration was not appropriately "invalidated" (a word that, as noted above and in footnote one, DaBella injects without any support) at the time it was reassigned to Plaintiff. In support thereof, DaBella attempts to marshal undisclosed, extrinsic expert evidence for the proposition that the Plaintiff's number was not allegedly on the reassigned number database. This is fatal to DaBella's position for two reasons. First, by DaBella's *own admission*, *even if* its position were treated as true (which flips the summary judgment standard on its head), then the Plaintiff's number would *not* have shown as "disconnected *and* reassigned," as determined through the RND database itself. Thus, the FTC, the "Database Administrator," did not act wrongfully in keeping the Plaintiff's telephone number on the Registry at the time it was reassigned to the Plaintiff, even if it should have been removed.

Second, DaBella has not, and cannot, meet its burden of demonstrating that the number should have been removed as an initial matter, because the FTC has chosen *not to use the database* that DaBella even uses. To begin with, that question is of no consequence because the

Opposition to Motion for S.J.

statutory text makes clear that only one question matters: was the number on the DNC Registry or not? But even so, to even begin to demonstrate that the FTC somehow acted wrongfully, DaBella must demonstrate that its choice of database shows *both* that the Plaintiff's number was disconnected *and* reassigned and thus that the Reassigned Number Database is an "appropriate database." As its name suggests, the RND does not show disconnections; it only shows reassignments, and the FTC *does not use it* in determining whether a number should be removed or not. Thus, if Plaintiff's telephone provider simply reassigned the number immediately without disconnecting it first, the number would have been "reassigned," but not disconnected. The RND *cannot* be an "appropriate database" when it does not even show data relating to *both* prongs, disconnection and reassignment, that Congress mandated the FTC to consider. So, any argument that the FTC somehow neglected its statutory mandate by failing to consider the RND fails because DaBella's suggestion that the RND is an "appropriate database" is itself inappropriate.

But, at the end of the day, the question of whether or not the RND is an "appropriate database" does not even matter because the FTC chose a *different* database and process to satisfy its statutory mandate. In providing the report Congress required of the FTC in the 2007 Act, the FTC explicitly noted that the "commission developed a process to purge a telephone number from the Registry only when the number has been disconnected **and** subsequently reassigned." *Report To Congress: Regarding the Accuracy of the Do Not Call Registry*, FTC (Oct. 2008), https://www.ftc.gov/sites/default/files/documents/reports/do-not-call-improvement-act-2007-report-congress-regarding-accuracy-do-not-call-registry/p034305dncreport.pdf (emphasis original) ("2008 Report"). Neither mere disconnection nor mere reassignment will suffice to remove a number from the Registry. Indeed, the FTC determined that, if it only used one of the two prongs, approximately sixteen percent of numbers identified by commentors that allegedly

Opposition to Motion for S.J.

should have been scrubbed "would have been scrubbed in error." *Id.*

The FTC further explained its process for purging disconnected **and** reassigned numbers and the database used for that purpose. A subcontractor *chosen by an industry trade group, the Direct Marketing Association*, removes a number from the Registry "only when there is a high degree of confidence that the telephone number has been disconnected and reassigned to a new customer." *Id.* That subcontractor obtains its information from the "National Directory Assistance ("NDA") database," which represents "99.97% of the *land lines* in the U.S." *Id.* (emphasis added). It does *not* obtain the information from some other "authoritative third party sources" or the Reassigned Number Database, as DaBella wrongly claims, MSJ at 22, and which did not even exist at the time. Notably, that directory assistance process that the FTC used to exercise its "statutory authority" only tangentially includes "wireless carriers," since they "are not required to provide information to the NDA related to their disconnected or reconnected telephone numbers." *Id.* Such process would also fail to account for numbers not listed with directory assistance. Despite these shortcomings, the Commission concluded that its procedures were adequate and sufficient under the circumstances. *Id.* The Commission also cited statistics showing cell phones are reassigned at a slower rate than land-line numbers, making the error rate negligible. *Id.* Moreover, the Commission concluded that a process that utilized time-based purging, regardless of reassignment, was inappropriate, since numbers could disconnect because of a variety of reasons, including service issues, changes in carrier, or local moves. *Id.*

At bottom, DaBella's proposition that there is something wrong about the Plaintiff's telephone number remaining on the Do Not Call Registry is itself wrong both as a matter of statutory text and the FTC's regulation itself. The statutory text only requires the FTC to use "national or other appropriate databases" to remove numbers that have been both disconnected

11

*and* reassigned. The FTC explicitly chose the *Directory Assistance Database*, not the database of DaBella's choice, to do so, and explicitly noted the shortcomings of that approach to the Congress. Congress took no further action. That the Plaintiff's number remained on the Registry does not indicate that the FTC wrongly failed to remove it, given Congress' mandate and the FTC's own explicit rulemaking. But even if it did, DaBella reads a consequence of failing to remove the Plaintiff's number, an alleged ineligibility on the basis that the registration was "defective and invalid," MSJ at 13, that Congress did not write into the law. There is no basis to grant even partial summary judgment to DaBella on this basis.

B.      *There is no "personal" registration requirement for the Do Not Call Registry, since the DNCR does not collect names. Even so, Mr. Weingrad expressly indicated his desire to remain on the Registry, and did not want to remove his number therefrom, so he has standing.*

Reading 47 C.F.R. § 64.1200(c)(2) to require personal registration for each new subscriber cannot be reconciled with the requirement that registrations "must be honored indefinitely," or with the reality that the Registry stores only numbers, not names. Relying on *Rombough v. Robert D. Smith Ins. Agency, Inc.*, No. 22-CV-15-CJW-MAR, 2022 WL 2713278, at *2 (N.D. Iowa June 9, 2022), the Defendant misstates the applicable law. To see why, start with what the Do Not Call Registry protects: *telephone numbers*; not specific persons. 16 C.F.R. § 310.4(b)(1)(iii)(B). ("*That person's telephone number* is on the "do-not-call" registry, maintained by the Commission . . ."). Thus, the regulation clearly states the only requirement for proving a violation of the FTC Telemarketing Sales Rule: that the "person's telephone number" be on the DNCR. (*Cf.* MSJ at 21 "The FCC certainly could have stated that a violation occurs when solicitations are made to *any number registered on the DNC*.") It says *nothing* about who must have placed it there or even that the subscriber must have placed it there at all.

DaBella does not seriously contend that the telephone number is not the Plaintiff's and

12

Opposition to Motion for S.J.

has adduced no evidence showing otherwise. And, significantly for *Loper Bright* purposes, Congress explicitly *ratified* the language the Federal Trade Commission promulgated when the FTC outlined what the DNC Registry protects: "telephone numbers" that are "on the [DNCR]", full stop, and without reference to who registered the number. 15 U.S.C. § 6151(b). As such, the Plaintiff clearly has standing because he received a telemarketing call while his telephone number was on the Registry, just as required under the FTC and FCC Regulations.

Relatedly, the FCC's Do Not Call regulations under the TCPA, under which the Plaintiff sues here, permit a "residential telephone subscriber" to register "his or her telephone number" on the Registry. 47 C.F.R. § 64.1200(c)(2). Once a telephone number is registered on the Registry, the "registrations must be *honored indefinitely*, or until the registration is cancelled by the consumer of the telephone number is removed by the database administrator." *Id.* And, as explained above, Congress outlined the two circumstances under which the database administrator, the FTC, could remove a number (invalid or disconnected and reassigned), and left it to the FTC to determine the appropriate process for doing so, which it did by deciding to use the Directory Assistance database. It's clear how the FTC and FCC provisions, sued under here, can be read in harmony, particularly as Congress explicitly directed the FCC to "maximize consistency with the rule promulgated by the Federal Trade Commission." 15 U.S.C. § 6153.

DaBella's reading of the subject regulation, that the use of the term "his or her telephone number" reflects some sort of implied personal registration requirement that makes it legal to call numbers on the Registry after someone else acquires them, MSJ at 20, is inconsistent with that Congressional mandate and the very language of the FTC Regulation that *Congress ratified*, "*That person's telephone number* is on the 'do-not-call" registry,'" which cannot credibly be read to require personal registration in any manner. 16 C.F.R. § 310.4(b)(1)(iii)(B). The FTC

13

Opposition to Motion for S.J.

regulation upon which the FCC regulation is based makes it abundantly clear that a violation occurs when solicitations are made to *any* number that "*is*" on the DNC. *Id.* DNC *registration* may continue to bind telemarketers and protect *any* person who receives violative calls to that registered *number*, particularly insofar as registration attaches to the number and persists "indefinitely" until cancelled or removed.

Despite accusing Plaintiff of doing so, it is DaBella who again inserts language that is not present into the text of the FCC regulation, inserting the term "personally" into "[a] residential telephone subscriber who has [personally] registered his or her telephone number on the national do-not-call registry." As explained above, that is impermissible. The Registry is a registry of *telephone numbers*, not names, and protects those *telephone numbers*. For that matter, such a requirement would also run afoul of the order creating the Do Not Call Registry, to which DaBella also cites, which explicitly noted that "the only consumer information telemarketers and sellers will receive from the national registry is the registrant's telephone number. *This is the minimum amount of information that can be provided* to implement the national registry." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, 14037 (emphasis added).

Moreover, the Paperwork Reduction Act of 1995, 44 U.S.C. § 3501, applies to the collection of an individual's phone number for inclusion on the Do Not Call Registry. And the FCC's and FTC's Paperwork Reduction Act notices for registration on the Do Not Call Registry *do not permit the collection of personally identifiable information* so as to establish whether an individual personally registered their number on the Registry. *See generally OMB Control Nos.* 3060-0519 and 3084-0169. Registering a telephone number on the Registry does not require the provision of any personally identifiable information, and requiring such information would

14

Opposition to Motion for S.J.

defeat the purposes of registration, consumer privacy, the very aim that the Registry is designed to protect. Thus, as an initial matter, the government is *not even authorized* to collect the information the Defendant claims the Plaintiff is required to prove as a legal matter. It follows that proving such information cannot be an element of a TCPA claim.

Moreover, DaBella's injection of a personal registration requirement unnecessarily adds disharmony and tension into two regulatory schemes, the FTC's, which Congress expressly ratified, and the FCC's, which Congress directed to "maximize consistency" with the FTC's. Both schemes can comfortably exist without a personal registration requirement and reading a personal registration requirement into the FCC's scheme not present in the FTC's (which Congress ratified), injects unnecessary atextual requirements. "The provisions of a text should be interpreted in a way that renders them compatible, not contradictory." *Reading Law* 180. The canon of harmonious reading is "more categorical than most other canons of construction because it is invariably true that intelligent drafters do not contradict themselves." *Id.* Accordingly, "there can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously." *Id.* The Court should do so here, particularly as the FTC already addressed this issue in considering whether to amend the Telemarketing Sales Rule to add some form of personal registration requirement, noting, "During the comment period for the Amended TSR, some commenters suggested that only the line subscriber or person who is billed for the telephone line be allowed to register that number in the National Registry. The Commission determined that this approach was not realistic." 2008 Report.

In any event, *Rombough* has been rejected by a multitude of courts, including both this one and by at least two other Ninth Circuit Courts. In *Murch v. GPS Cap. Mkts., LLC*, 2025 U.S. Dist. LEXIS 169651, *38 (D. Or. June 6, 2025), Judge Baggio adopted Magistrate Judge

15

Opposition to Motion for S.J.

Beckerman's Report and Recommendations on the issue, in which she concluded that, "[a]fter fully considering the TCPA's private right of action, the statutory scheme, and other language in the implementing regulation as discussed above, the Court declines to follow *Rombough*." In so doing, this Court cited favorably to the reasoning in *Abrahamian v. loanDepot.com LLC*, No. 2:23-cv-00728, 2024 WL 1092442, at *2 (D. Ariz. Mar. 13, 2024), in which the Court concluded that "as phone numbers change hands, the DNC Registry may not always reflect which consumers requested to be included" and "that the [regulation's] language includes the term 'indefinitely' to remove the ambiguity of which numbers should be protected." *Id.*

As the *Abrahamian* Court also noted, the impracticality and atextual nature of DaBella's proposed rule underscores its untenability. Millions of Americans change phone numbers every year. If Defendant's theory were correct, each consumer inheriting a number that had already been placed on the Registry, just as the Plaintiff here, would unknowingly lose their protections, even if they attempted to "*re*register" the number, which is itself impossible. Telemarketers could then flood those numbers with impunity, despite Congress's intent to stop unwanted solicitations. That runs contrary to the remedial purpose of the TCPA and took a broad view of the regulatory language in a manner to benefit consumers. *Id.* (quoting *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 988-91 (9th Cir. 2023)). And the Northern District of California similarly made forcefully clear how much of an outlier *Rombough* was on these grounds:

> [T]he Court holds that a plaintiff alleging a violation of the TCPA's NDNC Registry provision need not allege or prove that he personally registered his phone number to state a claim. Every court to consider this issue — with one exception — has reached the same conclusion. . . .In *Rombough*, the court focused on the following language from the implementing regulation: "No person or entity shall initiate any telephone solicitation to . . . [a] residential telephone subscriber *who has registered* his or her telephone number on the" NDNC Registry." 47 C.F.R. § 64.1200(c) (emphasis added). This language was viewed in isolation, and the court did not explain how its construction could be reconciled with the very next sentence of the implementing regulation, which provides that "registrations must be honored indefinitely[.]" *Id.* There is no limitation as to time

16

Opposition to Motion for S.J.

period; nor is there a limitation as to whether the phone number is still used by the person who originally listed it in the NDNC Registry.

*Nichols v. eHealthInsurance Servs., Inc.*, No. 23-CV-06720-EKL, 2025 WL 689721, at *3 (N.D. Cal. Mar. 3, 2025).

Not only that, but Mr. Weingrad has explicitly testified at deposition that he personally attempted to re-register his telephone number on the Do Not Call Registry but could not because the number was already on it. (Weingrad Dep 70:1-25, 71:1-6). Thus, at the very least, the issue of whether Plaintiff registered, or perhaps more accurately, attempted to *re*register his number, on the Do Not Call Registry is a disputed factual issue inappropriate for adjudication at summary judgment, to the extent it matters as a matter of law (it does not). In any event, Defendant itself admits Mr. Weingrad's number has been on the Registry since 2021. Its argument is that the Registry somehow ceased to protect Mr. Weingrad when he became the subscriber a few years later is an atextual result that the regulation's "indefinite" language, and the corresponding FTC regulation, squarely rejects. Nothing in the statute, regulations, or case law supports this loophole, and this Court should not create one. This Court should reject Defendant's invitation to import an atextual personal registration requirement that appears nowhere in the statute and would eviscerate its protections. This is no basis to grant summary judgment to DaBella, either.

C.    *The Plaintiff himself did not and does not hold the number out to the world as a business number.*

Despite DaBella's attempts to characterize the Plaintiff's telephone number as an allegedly "business" number, DaBella fails to mention the fact that the Plaintiff's deposition established (1) that he has no connection with the claimed business, Merlin Home Magic, (2) that he has no connection with the previous owner, Joe Arnold, and (3) that it adduces *zero* evidence to substantiate that the Plaintiff *himself* held the telephone number out to the world as a business

17

Opposition to Motion for S.J.

number. (Weingrad Dep 16:1-4). The Plaintiff cannot be faulted for obtaining someone else's telephone number that appears to have been associated with a business at some point in time.

This case is remarkably similar to the case of *Connor v. ServiceQuick, Inc.* In that case, the Defendant moved for dismissal or early summary judgment on the basis that the Plaintiff's telephone number was "listed online as the main phone line of a business on Google." No. 1:24-CV-02286-CNS-NRN, 2025 WL 2855393, at *2 (D. Colo. Oct. 8, 2025) (cleaned up). In reality, the number was just reassigned. And, the plaintiff in *Connor* pled, just as the Plaintiff here, that he used his telephone number for "personal, residential, and household reasons," and that he paid for the telephone number with his "personal financial accounts." *Compare id. with* (Weingrad Dep 52:19-24). The Court concluded that "[a]lleging that Plaintiff's phone number, which is listed "on the DNC" registry, "is not associated with a business and is used for personal purposes," is sufficient to establish that Plaintiff is a "residential telephone subscriber," and not a business, under the TCPA." *Id.* Nor does DaBella's claim of a voicemail greeting hold any weight; the McMillan declaration makes clear that the voicemail recording was obtained on November 1, 2023, prior to the Plaintiff obtaining the number, by DaBella's own argument, in July of 2024. All that shows was that the number may have been associated with Merlin Home Magic prior to reassignment, not that the Plaintiff used the number as the same afterwards.

Plaintiff has met his burden at summary judgment of demonstrating that he uses the telephone number at issue for residential purposes, much in the same manner as he would use his residential telephone line. (MSJ at 26). For starters, consider what the calls Defendant made were pitching, and which Plaintiff answered: they were pitching *home improvement* services for the Plaintiff's home. Those are the sorts of calls that one would traditionally expect to receive on one's residential landline phone. The Plaintiff further shores up these allegations by explaining

18

Opposition to Motion for S.J.

that he uses his telephone number for personal, residential purposes. (Weingrad Dep 52:19-24.) The fact that the Defendant attempts to shoehorn internet materials whose factual bases are disputed, doesn't make their motion successful; it just makes the relevant facts and accompanying conclusions all the more disputed.

Nor does the Plaintiff control what other people put on the internet about his phone number. DaBella adduces zero evidence for the fabricated proposition the Plaintiff himself listed the number as one for some random business. Inaccurate internet information is an unfortunate fact of life, but this fact does not stand for the proposition that a residential telephone subscriber somehow loses their privacy protections because of inaccurate information on the internet. Indeed, even on far greater factual record than the one developed here, courts have rejected a defendant's assertion that a number is not entitled to TCPA protections because in the past it may have been used for business purposes. *See, e.g. Thomas v. Dun & Bradstreet Credibility Corp.*, 100 F. Supp.3d 937, 943 (C.D. Cal. 2015) (denying motion to dismiss holding "[E]ven assuming the line is used by J and J Thomas, Inc. for business purposes . . . .[nothing] suggests Plaintiff is not the current subscriber, regular user, or intended recipient of the calls to 'his' . . . telephone.").

Defendant's reliance on *Shelton v. Target Advance LLC* is misplaced. In *Target Advance*, the plaintiff sued Target Advance, a business loan company, for calls made to plaintiff's personal cell phone, which he also used as a number for his business. 2019 WL 1641353, at *5 (E.D. Pa. Apr. 16, 2019). The Court's holding in *Target Advance* was limited to whether, during the time period at issue, the plaintiff's telephone number was eligible for inclusion on the National Do Not Call Registry, which is limited to residential numbers and mixed-use numbers for residential purposes, noting that "it appears that the calls at issue were directed and made to the *business use of the cellphone*, and not to his personal use." *Id.* In sum, all *Target Advance* stands for is the

19

Opposition to Motion for S.J.

unremarkable proposition that a plaintiff cannot not sue for business-to-business Do Not Call list violations for the time that that cell phone is used for business purposes. So, *Target Advance's* reasoning would not even apply to this case, since DaBella's calls were made and oriented to the residential use of Plaintiff's telephone line in selling home improvements. And the same Court later revisited its holding in *Target Advance* and held that the very same named plaintiff had stated a claim for *business* calls to his cell phone when he later ceased using his cell phone for business use and resumed using it for solely personal use. *Shelton v. Pro Source Lending Grp. LLC*, No. CV 24-4394, 2025 WL 817485, at *2 (E.D. Pa. Mar. 14, 2025).

The Plaintiff himself is not inviting nor consenting to calls "not only from customers, but also from other contractors who may want to do business with Plaintiff." (MSJ at 28). The Merlin Home Magic is not the Plaintiff's business. Plaintiff is employed as a car salesman, not a self-employed contractor. (Weingrad Dep. 11:8-11.) He does not receive calls for his job at the subject number. (Weingrad Dep. 16:3-4.) He does not even own windows and had no need for DaBella's services. (Weingrad Dep. 41:2-4.) The Plaintiff did not invite or consent to anything based on inaccurate, out of date information on random internet websites that the Plaintiff did not even post. DaBella has adduced precisely *zero* evidence in support of its baseless propositions that (a) the Plaintiff himself set up any of the websites, (b) that he himself "invited" anyone to call him, or (c) that he himself ever "consented" to receive calls from DaBella or anyone else in "the world" for that matter. (MSJ at 28) (failing to cite Plaintiff). Plaintiff's TCPA litigation history, in fact, shows the opposite.[2] DaBella has not met its burden of showing that the number is a business number at summary judgment.

---

[2] In its Introduction, the Defendant maligns Plaintiff for having filed at least "34 other TCPA cases." (MSJ at 12). If anything, this shows that Plaintiff does not want to be contacted and seeks to hold those who violate this clearly expressed desire accountable for their actions.

Opposition to Motion for S.J.

D.    *Defendant has adduced no evidence of consent to contact Plaintiff, which is itself not Plaintiff's burden.*

Relatedly, even if, *arguendo,* Defendant possessed consent to contact the previous owner of the telephone number, MSJ at 23-24, that consent does not extend to Plaintiff. In this regard, citing *Breslow*, DaBella conflates two distinct regimes under the TCPA: the TCPA's DNC registration regime, *see sections A., B., supra*, and the TCPA's consent regime. The regulations implementing § 227(c) make that clear. Congress directed the Commission to create "a single national database to compile a *list of telephone numbers* of residential subscribers who object to receiving telephone solicitations." 47 U.S.C. § 227(c)(3) (emphasis added). By contrast, the only way to lawfully call a registered number for telemarketing is to obtain the *current* subscriber's prior express invitation or permission (consent), which must be "evidenced by a signed, *written agreement between the consumer and seller* which states that the *consumer* agrees to be contacted *by this seller* and *includes the telephone number* to which the calls may be placed." 47 C.F.R. § 64.1200(c)(2)(ii) (emphasis added). And though the subscriber's (i.e. Mr. Weingrad's) prior permission is required, a private cause of action runs to "*any person* who has received more than one telephone call" in violation of those regulations. 47 U.S.C. § 227(c)(5).

Consent under the TCPA belongs to "subscribers," not telephone numbers. 47 C.F.R. § 64.1200(c)(2)(ii). Because the "Do-Not-Call Registry lists numbers, not names," a "telemarketer ordinarily does not know if consent to receive telephone messages comes from the subscriber of a particular number or some other user." *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 990 n.8 (9th Cir. 2023). Though this approach "may cause telemarketers difficulties," it is up to "Congress or implementing agencies to address any such supposed difficulties." *Id.* The applicable regulation defines "subscriber" in relevant part as the person currently responsible for payment and authorized to manage the account. 47 C.F.R. § 64.1100(h). When a number is reassigned to a

21

Opposition to Motion for S.J.

different subscriber, any prior consent to contact that number is extinguished. *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 705 (D.C. Cir. 2018). For that matter, DaBella's own claims of "consent" are contradictory. It claims that it received "a prior consent received in 2023 for Plaintiff's telephone number," MSJ at 11, but also claims to rely on a website visit on "February 6, 2025,"  McMillan Dec. ¶ 4. It's unclear which (if not both) "consents" it even relies upon.

This matters because there is no wrong number defense under the TCPA; if DaBella is relying on a consent it allegedly obtained in 2023, before the telephone number was reassigned to Plaintiff, it relies on a legal nullity. The Ninth Circuit has squarely rejected DaBella's previous subscriber consent defense in analogous contexts. In *N.L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164 (9th Cir. 2020), the Ninth Circuit held that the TCPA's reference to the "called party" means the current subscriber, not the person the caller intended to reach. "Congress intended, as consistent with the statute's text and purpose, to impose strict liability for nonconsented-to robocalls, even when innocently made to a wrong or reassigned number." *Massarello v. Power Home Remodeling Grp., LLC*, 2025 WL 2463153, at *3 (E.D. Mich. Aug. 27, 2025). This 2023 lead appears to be the only "consent" upon which DaBella in its MSJ.

But, to the extent DaBella contends its 2025 lead also constituted "consent," an argument which it does not even appear to make, despite referencing this "consent" in the McMillan declaration, even that does not entitle it to summary judgment. DaBella cannot simply rely on hearsay statements as to where it obtained the February 2025 "consent" without any testimony from the website owner at summary judgment, and certainly not on the disputed evidentiary record here. *Hossfeld v. Allstate Ins. Co.*, 726 F. Supp. 3d 852, 873 (N.D. Ill. 2024). The McMillan declaration is the same type of declaration the *Hossfeld* Court rejected on the basis that it was subject to multiple levels of hearsay. *Id.* at 873.

Opposition to Motion for S.J.

Notably, in *Hossfeld*, the relationship with the parties was similar to that here, with Allstate agents hiring a marketing company, who then subcontracted with another marketing company to obtain the numbers used to call the plaintiff. *Id.* at 877-78. In *Hossfeld*, Allstate relied on a spreadsheet containing the Plaintiff's information, purportedly obtained from an entity called KP Leads, who itself stated that it obtained the information from website submissions. *Hossfeld*, 726 F. Supp. 3d at 873. Just as in *Hossfeld*, DaBella has not laid an evidentiary predicate tracing the hearsay statements in the McMillan Declaration "to their source, *i.e.*, the data and statements that underly them." And just as in *Hossfeld*, there is not just one, but multiple levels of hearsay. All the McMillan Declaration states is that DaBella "receiv[ed]" a "lead [that] was submitted on the registration form at the website located at https://searchrenovation.us." Without the lead generators providing evidence for the underlying data *itself*, the lead generators' statements to McMillan and DaBella are themselves hearsay. As such, DaBella is not entitled to summary judgment because it has adduced no *admissible* evidence of any alleged website visit, let alone consent, as an initial matter.

Just as in *Hossfeld*, DaBella has not laid an evidentiary predicate for its claims of consent in its declaration. The website operator, SBBNet, and purchaser/reseller of the website data, Richardson Marketing Group, have produced *no evidence* of classwide consent information and have not even proffered *any* evidence substantiating even the Plaintiff's lead on which DaBella relies. This is little surprise, as it is likely that either SBBNet or Richardson simply made up the IP address it claimed visited the website. All DaBella has is a hearsay statement, compounded by multiple levels of hearsay, that the Plaintiff's information was submitted from a website. Without the lead generators, SBBNet and Richardson, providing evidence for the underlying data itself, the lead generators' statements to DaBella are themselves hearsay. *Id.*

Opposition to Motion for S.J.

Because Defendant has adduced no evidence to meet its affirmative burden of proving consent *with respect to Plaintiff*, summary judgment on this basis ought to be denied.

E.     *Defendant cannot avail itself of a Reassigned Number Database defense absent further proof.*

Summary judgment out to be denied to DaBella on the issue of whether or not it has a defense under the TCPA's reassigned number database regime, including under Rule 56(d), because DaBella has adduced no evidence to even show that it *uses the database as an initial matter*. Defendant contends that the "RND shows **no** reassignment of the telephone number." But obtaining summary judgment based on the use of the reassigned number database requires much more than DaBella's handwaving about the Plaintiff's number allegedly reflecting no reassignment on that database. "[T]he reassignment of a wireless number extinguishes any consent given by the number's previous holder and exposes the caller to liability for reaching a party who has not given consent." *ACA Int'l*, 885 F.3d at 705. A contrary rule would "effectively require consumers to opt out of such calls when the TCPA clearly requires the opposite—that consumers opt in before they can be contacted." *Id.* But contrary to DaBella's interest balancing and policy argument, *ACA* makes clear that the standard is strict liability, not reasonable reliance, when the caller does not adduce any evidence to show it even used the RND. *Id.* at 707-08.

Nowhere in DaBella's motion does it claim that it *even used* the RND, and the parties have thus far conducted no discovery into the same. If Defendant used the Reassigned Number Database in accordance with its strict statutory and regulatory requirements and contacted the Plaintiff due to some failure of the database, that *might* afford a *potential* defense to DaBella. *See Elleby v. Liberty Univ., Inc.*, No. 521CV00093KDBDCK, 2022 WL 715577, at *3 (W.D.N.C. Mar. 9, 2022) (considering but ultimately rejecting good faith defense based on use of Reassigned Number Database). But if DaBella didn't even use the RND, it has no claim to any

24

Opposition to Motion for S.J.

potential safe harbor. *Elleby* is particularly instructive, and it forecloses DaBella's gambit here. In that case, the defendant claimed it could avail itself of a "good faith" or "reasonable reliance" standard based on the FCC's orders establishing the RND because it claimed that the reassignment of the named plaintiff's number made compliance impossible and allegedly contravened the TCPA's stated purpose. But the court rejected that argument offhand because there was no dispute that the defendant *did not even use the reassigned number database* and thus could not avail itself of any FCC safe harbor tied to its use. *Id.* at *3 n.2.

In order to avail itself of the regulatory safe harbor, DaBella must demonstrate that it has met the strict regulations concerning use of the database, contained at 47 C.F.R. § 64.1200(m), and must also demonstrate that it actually subscribes to the database either as a caller or caller agent, to even begin to avail itself of a possible safe harbor. *Advanced Methods to Target and Eliminate Unlawful Robocalls*, CG Docket No. 17-59, Second Report and Order, 33 FCC Rcd 12024 at at 12027, 12034-35 (2018) (*Reassigned Numbers Order*).

Finally, although this Court need not address the same now, it is doubtful that there can be any safe harbor for using the reassigned number database (assuming, *arguendo*, DaBella did so), particularly after *Loper Bright*, *McLaughlin*, and the D.C. Circuit's skepticism about the FCC's initial rule. In enacting the TCPA's do not call regulations in 47 U.S.C. § 227(c), Congress did not explicitly authorize the creation of *any* safe harbor, let alone for one stemming from the use of a database that it *also* did not authorize. Under the Supreme Court's ruling in *McLaughlin*, district courts are not bound by the FCC's interpretation of the TCPA and, thus, are not bound by agency guidance purporting to exempt certain calls for callers that use the RND, even if DaBella has proven this fact. This is to say nothing of the fact that Congress did not explicitly authorize the use of such database to provide a safe harbor, doubtless because it

Opposition to Motion for S.J.

mandated the FTC to maintain the DNCR using a database of its choosing. As is evident above from Congress' mandate to use a "national or other appropriate database[]" in the 2007 Act regarding maintenance of the DNC database itself, Congress knows how to mandate the use of specific databases for specific purposes, and did not do so for reassignment, let alone explicitly authorize the use of the RND to provide a *safe harbor* to a statutory scheme it devised.

Indeed, even before *Loper Bright* and *McLaughlin*, the Sixth Circuit declined to follow the FCC's regulatory guidance on the issue based on the D.C. Circuit Court specifically setting aside the FCC's guidance related to reassigned telephone numbers as being unfair, arbitrary, and capricious. *Allan v. Pa. Higher Educ. Assistance Agency*, 968 F.3d 567, 571 (6th Cir. 2020) (citing *ACA Int'l*, 885 F.3d at 700 and striking down the Reassigned Numbers Order). The FCC's interpretations that DaBella cites with respect to the RND may not even be binding on this Court, according to the U.S. Supreme Court, the Sixth Circuit, and the D.C. Circuit, even if it did use the RND. But DaBella doesn't even do that. So, the motion for summary judgment here fails because additional discovery is required to prove DaBella used the RND to avail itself of a safe harbor that may not even exist, and summary judgment on this basis ought to be denied.

F.    *Plaintiff received eight calls, including one after he filed this lawsuit; there is no EBR for the September 11 call.*

Defendant's reliance on *Top Healthcare* and *Gillam* is misplaced and simply rehashes arguments this Court has already rejected in DaBella's Motion to Dismiss. *Weingrad v. DaBella Exteriors, LLC*, No. 3:25-CV-396-SI, 2026 WL 496609, at *7 (D. Or. Feb. 23, 2026). Both *Top Healthcare* and *Gillam* turned on a single dispositive fact: the plaintiffs answered only one call and alleged nothing whatsoever about the content or purpose of the remaining missed or declined calls, leaving the court no basis to infer those unanswered calls were solicitations. Here, the record is categorically different. Plaintiff received *two* text message calls on February 6 that

26

Opposition to Motion for S.J.

constitute telephone solicitations *on their face*. The first transmitted DaBella's logo. The second stated: "Hi Robert, this is DaBella. I see you are interested in a Home Improvement estimate. I can get you scheduled for a free in home estimate. What day/time works best?" Unlike a missed voice call whose content and purpose may be unknown, these text message calls are written communications that identify the sender and state their commercial purpose explicitly, satisfying the statutory definition of a "telephone solicitation," which is defined as "the *initiation* of a telephone call or message for the *purpose* of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4) (emphasis added).

But there is far more. Plaintiff also received four voice telephone calls from DaBella on February 6, answering two, on which he heard dead air before disconnection, a hallmark of telemarketing call center operations, followed the next day by a call from the same caller ID on which DaBella's representative "Teresa" attempted to sell him windows and schedule an in-home estimate. As relevant here, the content and timing of an answered solicitation call, coupled with dead air on two of the calls, a hallmark of unsolicited calls made from a call centre, supports a reasonable inference that prior unanswered calls (or calls with dead air) from the same number served the same purpose. As the Court explained in *Moore v. Healthcare Sols. Inc.*, No. 21-CV-4919, 2022 WL 17487823, at *3 (N.D. Ill. Dec. 7, 2022):

> Moore acknowledges that he never spoke with anyone — including anyone from Healthcare Solutions — during the first call. That said, he points out that both calls came from the same number, on the same day. So, it is reasonable to assume that the same caller made both calls for the same reason. . . . The issue of who made the first call isn't much of a whodunit. Moore received two calls from the same number, and the second caller was Healthcare Solutions. It is reasonable to conclude that Healthcare Solutions called the first time, too. Does Healthcare Solutions share a phone number with someone else? Unlikely.

The *Murch* court, on facts less compelling than these, rejected a nearly identical argument, holding it reasonable to infer that two unanswered calls from the same number shared

Opposition to Motion for S.J.

the same solicitation purpose as a third, answered call. *Murch*, 2025 U.S. Dist. LEXIS 169651, *30-*33. The *Moore* and *Murch* decisions are hardly outliers. *Atkinson v. Choice Home Warranty*, No. CV 22-04464, 2023 WL 166168, at *5 (D.N.J. Jan. 11, 2023) ("[W]hile Plaintiff only alleges the specific content of one call, she answered the phone on at least three occasions, claims that Defendant began calling [the plaintiff] on her cellular telephone to sell Plaintiff a home warranty plan, that the calls were for telemarketing purposes, and that Defendant placed calls to [the plaintiff] on numerous occasions attempting to solicit Plaintiff a home warranty plan[.] These allegations create a reasonable inference that more than one of the seven calls explicitly listed were 'telephone solicitations' in violation of the statute."); *Bird v. Pro Star Builders, Inc.*, No. 222CV03610JLSJEM, 2022 WL 18216007, at *3 (C.D. Cal. Nov. 28, 2022) (collecting authority for the proposition that one sufficiently alleges "multiple calls from the same entity when he or she received more than one call from the same number but traced the calls back to the defendant after having answered only once" and concluding that "[I]t is reasonable to infer that the same caller is responsible for calls from the same number, whether those calls are answered or not.").

Moreover, Defendant's argument with respect to the September 11 call yet again injects a requirement that does not exist in the statute. *See id.* Section 227(c)(5) requires only that a plaintiff "receive[] more than one telephone call," not "more than one *violative* telephone call." This is simply a variation of the argument that this Court already rejected with respect to Defendant's motion to dismiss in claiming that the Plaintiff received only one call. *See DaBella*, 2026 WL 496609, at *7. Here, Plaintiff received two written text message calls whose solicitation purpose is explicit, two additional answered calls with dead air on February 6, and a fifth call on February 7 on which DaBella attempted to sell him windows. Plaintiff then received

28

Opposition to Motion for S.J.

another call on September 11 after he had requested not to be contacted. That is plainly more than one telephone call and telephone solicitation. "Where the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services, the TCPA has been violated, even if the call was not answered." *Harrison v. Humana, Inc.*, No. 3:24-CV-00262-GNS, 2024 WL 4828737, at *5 (W.D. Ky. Nov. 19, 2024).

Defendant's EBR defenses with respect to both the national and internal do not call classes fail for two related reasons. First, Plaintiff's conduct on the February 7 call did not constitute an "inquiry or application regarding products or services" sufficient to establish an EBR. *Charvat*, which Defendant itself cites, is instructive. There, the court found an EBR *inquiry*, which lasts 90 days, existed when plaintiff asked specifically about the warranty on windows that were sold during the call there. *Charvat v. Southard Corp.*, No. 2:18-CV-190, 2019 WL 13128407, at *5 (S.D. Ohio Sept. 30, 2019). Here, Plaintiff never asked any questions about the windows being offered. He simply asked for the Defendant's information and scheduled an appointment to verify Defendant's identity (an appointment he then cancelled), which is "more akin to an inquiry about a business's hours or location, which the FCC has said is insufficient to create an EBR, than to a question about products and services." *Id.* Consent cannot be obtained on and during the course of an illegal call in any event. *Bradley v. DentalPlans.com*, 2024 WL 2865075, at *15 (D. Md. June 6, 2024). "In determining whether there has been a violation of the TCPA, the relevant question is a Defendant's purpose in initiating the calls, not what occurred on each call." *Harrison*, 2024 WL 4828737, at *5. Here, Plaintiff engaged DaBella's representative only to ascertain who was calling him illegally, precisely the kind of investigation that does not constitute consent. *Shelton v. Nat'l Gas & Elec., LLC*, 2019 WL 1506378, at *4-*5 (E.D. Pa. Apr. 5, 2019).

29

Opposition to Motion for S.J.

Second, even if an EBR had been formed on the February 7 call, which it was not, it was long terminated by the time of the September 11 call. This is so for two independently sufficient reasons. First, the EBR regulation expressly provides that the relationship ends when terminated by either party and specifically states that a do-not-call request terminates an EBR "even if the subscriber continues to do business with the seller." 47 C.F.R. § 64.1200(f)(5)(i). Filing suit constitutes revocation of any consent or termination of any existing business relationship. *McMillion v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2018 WL 692105, at *6 (N.D. Cal. Feb. 2, 2018) ("the service of plaintiffs' complaint effectively revoked consent to be called"); *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376, 394 (D. Mass. 2024) ("Though his number was not in QuoteWizard's DNC files, that is because he expressed his desire for the texts to cease by suing, rather than texting back."). DaBella's September 11, 2025 call, during the pendency of this lawsuit, in which its representative asked if Plaintiff was "still interested in getting a quote for windows" and then abruptly hung up when confronted, cannot reasonably be held to be an EBR, as this Court explicitly observed. *DaBella*, 2026 WL 496609, at *7 ("DaBella makes no argument that Mr. Weingrad did not, in effect, communicate with the company that he wanted the communications to stop, or that DaBella was unaware of Mr. Weingrad's desires.").

Second, if any EBR was created, it would have been the "inquiry" type of EBR, which expires after 90 days, not the "payment or transaction" type, which lasts for 18 months. 47 C.F.R. § 64.1200(f)(5); *Charvat*, 2019 WL 13128407, at *5 (holding that inquiry as to the length of a window warranty created an "inquiry" type EBR). Here, DaBella does not contend that the Plaintiff made a "payment" or entered into any sort of commercial "transaction" with DaBella; all it has shown (at best) is that an "inquiry" was created after the February 7th call, which such "inquiry" would have expired on May 8 or thereabouts, and certainly long enough time to render

30

Opposition to Motion for S.J.

the EBR invalid on the September 11 call, more than six months after the February 7th call.

Because it is readily apparent that the Plaintiff received at least two violative telephone

solicitations before any possible consent, he can continue his National DNC claim, and his

internal DNC claim also survives because there is no EBR.

G.      *Plaintiff has been injured because he has suffered a violation of the statute.*

Equally meritless is DaBella's argument that Mr. Weingrad should lose here for the same

reason that Melody Stoops lost in *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782 (W.D.

Pa. 2016). Defendant would have the Court believe that *Stoops*, which predates the litany of

subsequent rulings clarifying not only its limited usefulness but also cases *specifically*

*addressing similar plaintiffs' standing*, stands for the proposition: "no standing for repeat TCPA

litigant." Of course it doesn't. *Stoops* has never been understood to stand for the proposition that

a so-called "serial litigant[]," MSJ at 32, a loaded term with zero legal significance, lacks

standing under the TCPA. The facts of *Stoops*, the single case depriving a TCPA plaintiff of

Article III standing based on the proven factual lack of an actual injury in fact, and even then,

only after having proven the same at summary judgment, are as follows:

- Ms. Stoops "purchased at least thirty-five cell phones and cell phone numbers with prepaid minutes for the purpose of filing lawsuits under the Telephone Consumer Protection Act." *Id.* at 788.
- She selected Florida telephone numbers for these cell phones "because there is a depression in Florida," where "people would be usually defaulting on their loans or their credit cards." *Id.*
- She "collected a shoe box full of cell phones to fish for accidental wrong number calls." *Id.* at 796.
- Finally, she admitted that she specifically bought those cell phones "in order to manufacture" a TCPA lawsuit and admitted that "It's my business. It's what I do." *Id.* at 799.

On that testimony and much more similar ilk, the district court held that Ms. Stoops had

suffered no injury-in-fact. *Id.* at 800-01. DaBella's suggestion that Plaintiff's history of filing

Opposition to Motion for S.J.

other TCPA actions entitles it to summary judgment fails as a matter of law. The attempted use of past litigation to prevent a litigant from pursuing a valid claim in federal court warrants careful scrutiny. *Outley v. New York*, 837 F.2d 587, 591-92 (2d Cir. 1988). "[N]othing in the Constitution, though, requires a plaintiff to be a naïf.  Litigation is not college athletics: there is no 'amateurs only' rule." *Cunningham v. Rapid Response Monitoring Servs.*, 251 F. Supp. 3d 1187, 1195 (M.D. Tenn. 2017); *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) ("What the district judge did not explain, though, is why 'professional [plaintiff]' is a dirty word.  It implies experience, if not expertise.  The district judge did not cite a single decision supporting the proposition that someone whose rights have been violated by 50 different persons may sue only a subset of the offenders.") (Easterbrook, J.); *Abramson v. Oasis Power LLC*, No. 2:18-cv-00479, 2018 U.S. Dist. LEXIS 129090, at *16 (W.D. Pa. July 31, 2018) (same).

DaBella's gross mischaracterizations of the Plaintiff's testimony notwithstanding, as an initial matter, Mr. Weingrad isn't alleged to have done any of what Ms. Stoops or any of the other plaintiffs in the cases it identified did. In *Laccinole*, just as in *Stoops*, the plaintiff testified that he maintained "'at least eight' burner phones . . . and has purchased 'at least twelve' burner phones in the last five years." *Laccinole v. Int'l Union of Police Associations AFL-CIO*, 638 F. Supp. 3d 110, 115 (D.R.I. 2022). Like in *Stoops*, Mr. Laccinole "[did] not give out his burner phone numbers to his friends or family." *Id.* By contrast, the Plaintiff here has testified that he uses the number for personal, residential and household reasons. (Weingrad Dep 52:19-24.) The Plaintiff maintains two cell phones because he recently moved to Oregon from the Philadelphia area, and the time zone difference was causing him to wake up. (Weingrad Dep 18:6-22). And, despite maligning the Plaintiff for lawfully recording the calls he receives, MSJ at 32, the Plaintiff, a U.S. Air Force veteran, also testified that he does so because he is hard of hearing and

Opposition to Motion for S.J.

that the call recordings assist both his memory and ability to record important information, a functionality he uses "in all aspects of [his] life." (Weingrad Dep 32:13-25, 33:1-14). Nor is the Plaintiff at all like the plaintiff in *Human*, where a forensic examination of the Plaintiff's phone revealed evidence that the plaintiff was fraudulently submitting requests for contact from dozens of different companies using a dozen different fake names. *Human v. Fisher Invs., Inc.*, No. 4:24-CV-01177-MTS, 2025 WL 2614039, at \*2 (E.D. Mo. Sept. 10, 2025). If anything, the evidence here shows the opposite: DaBella deposed the subscriber of record for the IP address it contends submitted the lead, and that deposition revealed no evidence that the subscriber ever visited the website or colluded with Mr. Weingrad.

In *Morris v. Unitedhealthcare Ins. Co.*, No. 4:15-CV-638, 2016 WL 7115973, at \*6 (E.D. Tex. Nov. 9, 2016), report and recommendation adopted, 2016 WL 7104091 (E.D. Tex. Dec. 6, 2016), cited by DaBella, the Court held that standing existed where defendant "proffered no evidence that [the subject phone line] is a residential telephone number Plaintiff maintains purely for the purpose of filing TCPA lawsuits" and actually *distinguished Stoops* on this basis, holding that the plaintiff there had standing. *Morris* is one of multiple cases interpreting *Stoops* and its progeny where courts have agreed Article III standing is lacking only where a plaintiff has purchased a line *solely to generate TCPA litigation* and *with no other purpose. Greenley v. Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1139 (D. Minn. 2017) (finding standing where "[h]ere, by contrast [to Stoops], [plaintiff] attests that he did not purchase the cellular telephone that [defendant] contacted for the sole purpose of initiating TCPA litigation."); *Evans v. Nat'l Auto Div., LLC*, Civ. No. 15-8714, 2016 WL 4770033, at \*3 (D.N.J. Sep. 13, 2016) ("*Stoops* is distinguishable from this case on the grounds that the plaintiff in that case

33

Opposition to Motion for S.J.

acknowledged that she only purchased cell phones in order to file TCPA lawsuits."); *Bais Yaakov of Spring Valley v. Educ. Testing Serv.*, 367 F. Supp. 3d 93, 115 (S.D.N.Y. 2019) (same).

The judicial inquiry "begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004). A plaintiff alleging a violation under the TCPA "need not allege any additional harm beyond the one Congress has identified." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (citing *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 165 (2016)). Here, Plaintiff's claims "satisfy the demands of Article III because his alleged injury under the TCPA constitutes a concrete harm." *Dickson v. Direct Energy, LP*, 69 F.4th 338, 343 (6th Cir. 2023). "The mere fact [Plaintiff] alleges he received unsolicited and intrusive text messages is sufficient to establish a concrete harm that Congress identified and sought to redress with the TCPA." *Deleo v. Nat'l Republican Senatorial Comm.*, No. 221CV03807BRMESK, 2021 WL 5083831, at *5 (D.N.J. Nov. 1, 2021). A plaintiff loses Article III standing "only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue," *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). "[T]he benefit of any doubt goes to the plaintiff." *Id.*

Mr. Weingrad has Article III standing because he received multiple illegal calls which violated the TCPA and resulted in the violations of privacy, and occupation of telephone lines, storage space, and bandwidth, rendering them unavailable for legitimate communication, including while driving and performing other critical tasks, that the statute was designed to protect against. Defendant points to no reason why it is entitled to judgment as a matter of law on this issue, and certainly has adduced no evidence showing that Mr. Weingrad's interests are so

34

Opposition to Motion for S.J.

"inconsistent with" the TCPA's purposes. This is so even if Congress never intended the TCPA to be used so broadly by so-called "serial litigants." *Bostock v. Clayton County*, 590 U.S. 644, 652-53 (2020). As a result, Mr. Weingrad has suffered a cognizable injury-in-fact as a result of his receipt of the illegal calls at issue and thus has standing.

## V.    CONCLUSION

DaBella's bid for summary judgment ought to be denied, class discovery proceed in earnest, and a jury trial scheduled posthaste.

RESPECTFULLY SUBMITTED AND DATED this March 23, 2026.

> s/Andrew Roman Perrong
> Andrew Roman Perrong, OSB No. 243320
> a@perronglaw.com
> Perrong Law LLC
> 2657 Mount Carmel Avenue
> Glenside, PA 19038
> 215-225-5529
> Lead Attorney for Plaintiff and the Proposed Class

## CERTIFICATE OF WORD COUNT

This brief complies with the applicable page-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains exactly 35 pages, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

Dated: March 23, 2026.

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.

35

Opposition to Motion for S.J.

## <u>CERTIFICATE OF SERVICE</u>

I certify that I filed the foregoing via ECF on the below date, which will automatically

send a copy to all attorneys of record on the case.

Dated: March 23, 2026                          */s/ Andrew Roman Perrong*
                                         Andrew Roman Perrong, Esq.

36

Opposition to Motion for S.J.