Andrew Roman Perrong, OSB No. 243320
a@perronglaw.com
Perrong Law LLC
1669 Edgewood Road #218
Yardley, PA 19067
215-225-5529

Lead Attorney for Plaintiff and the Proposed Class

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| LEON WEINGRAD, individually and on behalf of a class of all persons and entities similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DABELLA EXTERIORS LLC,<br><br>Defendant. | Case No. 3:25-cv-00396-SI<br><br>**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND MEMORANDUM IN SUPPORT**<br><br>**REQUEST FOR ORAL ARGUMENT**<br><br>**CLASS ACTION ALLEGATION TCPA (47 U.S.C. § 227)**<br><br>**DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

Page

LR 7-1 CERTIFICATION ........ 1

MOTION ........ 1

MEMORANDUM IN SUPPORT ........ 2

I. INTRODUCTION ........ 2

II. FACTUAL BACKGROUND ........ 5

A. DaBella buys internet leads and calls them from its own call centers. ........ 5

B. Richardson Marketing Group, SBBNet, and a website no one at DaBella has ever vetted. ........ 5

C. "A clear pattern": complaints, settlements, and termination. ........ 6

D. The ghosts. ........ 7

E. Plaintiff's "lead": three strangers. ........ 8

F. DaBella's consent evidence was recreated after the fact by one employee during this litigation. ........ 8

G. The disclosure. ........ 9

H. DaBella's internal do-not-call list and caller ID. ........ 9

I. Mr. Woolfson's analysis. ........ 11

III. LEGAL STANDARD ........ 11

IV. THE PROPOSED CLASSES ........ 12

V. ARGUMENT ........ 14

A. The one question that will drive the Registry Class's claims, whether DaBella can prove consent, has one answer for everyone. ........ 14

1. Where DaBella has no consent evidence, the absence of consent is uniform. ........ 15

2. DaBella has not laid, and without its vendors cannot lay, a foundation connecting any submission to any subscriber. ........ 16

3. The disclosure is the same for everyone, and whether it is legally sufficient is one question with one answer. ........ 19

4. DaBella's "wrong number" and "lead fraud" theory assumes what DaBella cannot prove and inverts the burden. ........ 21

5. DaBella's authorities involve heterogeneous sources of consent; this case involves one website. .... 22

6. The evidence of what DaBella knew is common to every class member. .... 23

B. The requirements of Rule 23(a) are met. .... 24

1. Numerosity .... 24

2. Commonality .... 25

3. Typicality. .... 26

4. Adequacy. .... 28

C. The requirements of Rule 23(b)(3) are met. .... 29

1. Predominance. .... 29

2. Superiority .... 31

D. The Internal Do Not Call and Caller ID Classes likewise turn on DaBella's own systems. .... 32

E. At a minimum, the Court should certify the searchrenovation.us class DaBella itself proposed. .... 34

VI. CONCLUSION .... 36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Custom Heating & Air Conditioning, Inc. v. Kabbage, Inc.*, No. 16 C 2513, 2018 WL 488257 (N.D. Ill. Jan. 18, 2018) ....15

*Aley v. Lightfire Partners, LLC*, No. 5:22-cv-00330, 2024 WL 4007345 (N.D.N.Y. Aug. 30, 2024) ....27

*Allison v. Dolich*, No. 3:14-cv-01005-AC, 2019 WL 921436 (D. Or. Feb. 25, 2019), aff'd, 815 F. App'x 135 (9th Cir. 2020) ....24

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ....29

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) ....2, 11, 20, 21, 29, 31

*Anthony v. Fed. Sav. Bank*, No. 21 C 2509, 2025 WL 3101827 (N.D. Ill. Nov. 6, 2025) ....4, 15, 26, 29, 30

*Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708 (9th Cir. 2010) ....31

*Bee, Denning, Inc. v. Capital All. Grp.*, 310 F.R.D. 614 (S.D. Cal. 2015) ....31

*Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022) ....20

*Bradley v. DentalPlans.com*, 2024 WL 2865075 (D. Md. June 6, 2024) ....27

*Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119 (6th Cir. 2016) ....15

*Clark v. Via Renewables, Inc.*, No. 24-cv-00568-JSC, 2025 WL 2968027 (N.D. Cal. Oct. 21, 2025) ....23

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ....29

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019) ....32

*Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187 (M.D. Tenn. 2017) ....28

*Davis v. Capital One, N.A.*, No. 1:22-cv-00903, 2023 WL 6964051 (E.D. Va. 2023) ....23

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ....28

*Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318 (5th Cir. 2008) ....23

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839 (7th Cir. 2022) ................................15

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ..........................................................26

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992).......................................................26

*Hossfeld v. Allstate Ins. Co.*, 726 F. Supp. 3d 852 (N.D. Ill. 2024), rev'd on other grounds, 179 F.4th 1046 (7th Cir. 2026) ..............................................................3, 18, 19, 23

*Jackson v. Athena Bitcoin, Inc.*, No. 4:24CV331-MW/MJF, 2025 WL 2237453 (N.D. Fla. June 18, 2025).........................................................................................................30

*Kearns v. LoanDepot.com, LLC*, No. 8:22-cv-01217-JWH-JDE, 2025 WL 3010182 (C.D. Cal. Oct. 20, 2025) ...............................................................................................31

*Knapper v. Cox Commc'ns, Inc.*, 329 F.R.D. 238 (D. Ariz. 2019)................................................30

*Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643 (4th Cir. 2019) ...........................................14, 24

*Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376 (D. Mass. 2024) ..................19, 20, 26, 30, 32

*Mattson v. Rocket Mortg., LLC*, No. 3:18-cv-00989-YY, 2024 WL 4794710 (D. Or. Sept. 16, 2024) ..........................................................................................................28

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006) .....................................................28

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc) ...........................................................................11, 19, 22, 29, 30

*Pickett v. Iowa Beef Processors*, 209 F.3d 1276 (11th Cir. 2000)................................................28

*Shelton v. Nat'l Gas & Elec., LLC*, No. 17-4063, 2019 WL 1506378 (E.D. Pa. Apr. 5, 2019) ..............................................................................................................................27

*True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923 (9th Cir. 2018)....14, 15, 19, 22, 30

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) .............................................................14

*U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040 (9th Cir. 2009) ........................16

*United States v. Lizarraga-Tirado*, 789 F.3d 1107 (9th Cir. 2015)........................................16, 18

*Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037 (9th Cir. 2017)..................12, 14, 27, 32

*Wakefield v. ViSalus, Inc.*, 51 F.4th 1109 (9th Cir. 2022) ...........................................................24

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .......................................................2, 11, 25

*Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288 (1st Cir. 2000) ....................................15

*Weingrad v. DaBella Exteriors, LLC*, No. 3:25-cv-396-SI, 2026 WL 496609 (D. Or. Feb. 23, 2026) ....................................4, 32, 33, 36

*Williams v. PillPack LLC*, 343 F.R.D. 201 (W.D. Wash. 2022) ....................19, 20, 21, 26, 27, 30

**Statutes**

28 U.S.C. § 1658(a) ....................................13

47 U.S.C. § 227(b) ....................................20

47 U.S.C. § 227(c)(5) ....................................12, 23, 25, 31, 32

**Rules**

Fed. R. Civ. P. 23(a) ....................................1, 11, 24

Fed. R. Civ. P. 23(b)(3) ....................................1, 11, 22, 31

Fed. R. Civ. P. 23(c)(1)(C) ....................................14

Fed. R. Civ. P. 23(g) ....................................1

Fed. R. Civ. P. 26(e) ....................................13

Fed. R. Evid. 803(6) advisory committee's note ....................................18

Fed. R. Evid. 901 ....................................17, 18

Fed. R. Evid. 902 ....................................16, 17

**Regulations**

47 C.F.R. § 64.1200(c)(2) ....................................12

47 C.F.R. § 64.1200(c)(2)(ii) ....................................12, 16, 20, 22

47 C.F.R. § 64.1200(d) ....................................32

47 C.F.R. § 64.1200(e) ....................................12

47 C.F.R. § 64.1200(f)(3) ....................................20

47 C.F.R. § 64.1200(f)(5) ....................................21

47 C.F.R. § 64.1200(f)(9) ....................................20

47 C.F.R. § 64.1601(e) ....................................32, 33

**Administrative Materials**

*In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014 (2003) ....................................................................................................30

**Other Authorities**

Fed. Trade Comm'n, Biennial Report to Congress Under the Do-Not-Call Registry Fee Extension Act of 2007 (Dec. 2025) ..........................................................................17, 21

## LR 7-1 CERTIFICATION

Counsel for Plaintiff conferred with counsel for Defendant DaBella Exteriors LLC ("DaBella") regarding this motion by telephone on October 15, 2026, attended by Andrew Perrong for Plaintiff and Diane Zelmer and Drew Eyman for Defendant. After a good faith effort, the parties were unable to resolve the issues presented, and DaBella opposes the motion.

## MOTION

Pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(3), and 23(g), Plaintiff Leon Weingrad moves the Court for an order:

1. certifying the National Do Not Call Registry Class, the Internal Do Not Call Class, and the Caller ID Class defined in Section IV below under Rule 23(a) and 23(b)(3), or, in the alternative, the searchrenovation.us Class defined in Section V.E.;
2. appointing Plaintiff as Class Representative;
3. appointing Perrong Law LLC and Paronich Law, P.C. as Class Counsel under Rule 23(g); and
4. denying DaBella's pending Motion to Deny Class Certification or Strike Class Allegations (ECF 32) for the reasons stated in this motion and in Plaintiff's opposition (ECF 51).

This motion is supported by the memorandum below, the Declarations of Andrew Roman Perrong, Anthony I. Paronich, and Leon Weingrad and their exhibits, the May 18, June 4, and September 14, 2026 declarations of Aaron Woolfson, and the record in this action.

**MEMORANDUM IN SUPPORT**

## I. INTRODUCTION

This is a class jury trial worth having.

The question on a motion for class certification is not who will win. It is whether the case turns on questions that can be answered once, with common evidence, for everyone. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013). This case does. DaBella's own call centers placed the calls, so there is no vicarious liability question. DaBella's own calling data, which the parties have stipulated is authentic, shows who was called and when, and Plaintiff's expert has matched it against the FTC's Do Not Call Registry, identifying 245,415 calls to 5,730 Registry-listed numbers. And DaBella's discovery responses demonstrate it did not comply with the TCPA's caller ID requirements. What remains is DaBella's consent defense, and DaBella's consent evidence is the same, and equally deficient, for every class member.

Start with this email. On October 8, 2025, seven months into this lawsuit, DaBella's Senior Demand Generation Manager wrote to the vendor that sold DaBella Plaintiff's number:

> I have some serious concerns with the traffic coming from refixhome.com and searchrenovation.us. Nearly every serious litigant we have encountered this year has come from one of those sites . . . . [T]here is a clear pattern here.

(DABELLA000073.[1]) The vendor, Richardson Marketing Group, did not disagree: "the data in aggregate clearly reveal the issue." (DABELLA000072.)

That pattern is the heart of this case, and it is common to the class. Every piece of consent evidence DaBella has produced comes from one website, searchrenovation.us. No one at

---

[1] Bates references to DaBella's document production are contained in a single Exhibit, Exhibit A.

DaBella has ever spoken with its owner. (McMillan Dep. I 66:13-21; McMillan Dep. II 16:25-17:21.)[2] Richardson and SBBNet, the companies who purchased data from the website as part of their relationship with DaBella, have ignored Plaintiff's subpoenas. (ECF 53 ¶¶ 11-13.) So, in August 2026, DaBella's Rule 30(b)(6) designee wrote a script, scraped playback data from a third party's servers, and built DaBella's consent spreadsheet himself: "This is the one where I did not trust my vendors to send me anything." (McMillan Dep. II 8:21-9:23, 27:19-20.)

Plaintiff's own "lead" shows what that evidence is worth. It pairs his number with a stranger's name, "Robert Bronson," and the IP address of a second stranger, a night-shift bakery worker who did not submit the form, would have been asleep at the time of the purported submission, and who does not know Mr. Weingrad. (McMillan Dep. I 38:12-39:3; Van Cleave Dep. 11:7-13, 15:2-22, ECF 35-1.) The only people who could stand behind that submission, or explain why a complete stranger's IP address got assigned to a web submission bearing Plaintiff's number, are the website operator, Richardson, and SBBNet. They are ghosts.

Consent is therefore the question, and every part of it is common. For the portion of the class whose leads did not come from searchrenovation.us, DaBella has no consent evidence at all. For the rest, it has a record that someone submitted a web form, not evidence that the subscriber DaBella called agreed to be called by DaBella, and the gap between the two is identical for everyone. *See Hossfeld v. Allstate Ins. Co.*, 726 F. Supp. 3d 852, 873-74 (N.D. Ill.

[2] "McMillan Dep. I" and "McMillan Dep. II" are the August 11 and October 7, 2026 sessions of the Rule 30(b)(6) deposition of DaBella's designee, Josiah McMillan; "Evans Dep." and "Clark Dep." are the October 7, 2026 depositions of DaBella employees Dave Evans and Santiago Clark. "Woolfson Decl.," "Woolfson Suppl. Decl.," and "Woolfson Reply" are Mr. Woolfson's May 18, June 4, and September 14, 2026 declarations (Exhibits C, D, and E), and "Kalat Supp. Rpt." is the supplemental report of DaBella's expert, David Kalat (Exhibit F). Cited transcripts and documents are attached as exhibits to this motion and are filed of record herewith. References to written discovery responses are contained in a single Exhibit, Exhibit B.

2024) (granting summary judgment for plaintiff when evidence of consent was inadmissible hearsay), *rev'd on other grounds*, 179 F.4th 1046 (7th Cir. 2026). And the one disclosure the searchrenovation.us records display never names DaBella. (Kalat Supp. Rpt. ¶¶ 10-11.) However the Court resolves the consent defense, the answer will be the same for every class member.

The same records answer Plaintiff's other two claims. DaBella's policy requires its agents to code every request to stop calling "DNC" in its software, so DaBella's own system identifies who asked it to stop and when. (DABELLA000028, 34.) And DaBella admitted that its calls transmitted a telephone number or a geographic location, not its name, as caller ID. (Def.'s Resp. to Pl.'s 2d Interrog. No. 6.)

The disagreement between Plaintiff's expert, Aaron Woolfson, and DaBella's expert, David Kalat, on do not call registration, does not stand in the way. It goes to weight, and it is the same battle the Northern District of Illinois resolved in Mr. Woolfson's favor in certifying a National DNC class last year. *Anthony v. Fed. Sav. Bank*, No. 21 C 2509, 2025 WL 3101827, at *4-6 (N.D. Ill. Nov. 6, 2025). DaBella has already asked this Court to deny certification (ECF 32), but "motions for class certification are the more appropriate vehicle for arguments about class definitions." *Weingrad v. DaBella Exteriors, LLC*, No. 3:25-cv-396-SI, 2026 WL 496609, at *7 (D. Or. Feb. 23, 2026). DaBella, for its part, argues that its disclosure "contains no such legal defect" as to *anyone* who saw it. (ECF 63 at 11.) Plaintiff disagrees, but DaBella's own position shows that this is a uniform question resolvable as to the class in a single stroke. Either way, that question will be answered once, for everyone.

## II. FACTUAL BACKGROUND

### A. DaBella buys internet leads and calls them from its own call centers.

DaBella sells roofing, windows, siding, and bath remodeling to homeowners from three call centers, in Portland, Boise, and Dallas. (McMillan Dep. I 10:8-17, 11:4-16.) By its own account, it places "hundreds of thousands of calls" per month. (ECF 32 at 16.) The model is simple: "we buy leads from other vendors; we . . . send those to the call center. Call center calls them." (Clark Dep. 7:2-6.) Each vendor submits leads to its own login endpoint in DaBella's ActiveProspect "LeadConduit" system, which feeds DaBella's Salesforce database, and DaBella's agents dial them through DaBella's own platforms, Salesforce Service Cloud Voice and, since April 2025, Five9. (McMillan Dep. II 14:17-15:4; McMillan Dep. I 28:22-29:13.)

DaBella has no department responsible for TCPA compliance. (McMillan Dep. I 11:17-19.) Its written policy promises to scrub its calling lists against the National Do Not Call Registry every 31 days (DABELLA000027, 33), but DaBella does not scrub internet leads at all. Rather, it uses its Registry subscription only for aged door-to-door "canvass" leads. (McMillan Dep. I 57:18-58:7, 59:12-61:5, 62:2-8.) And no one reviews the TrustedForm certificate that supposedly documents putative consent before calling. It simply "[h]as to be there and populated." (*Id.* 50:10-14.) Nor does DaBella confirm that the name on a lead matches the person who owns the number. (*Id.* 38:22-25.)

### B. Richardson Marketing Group, SBBNet, and a website no one at DaBella has ever vetted.

Dave Evans, whose job is "the operational side of lead generation and consent," onboarded Richardson and signed its insertion order. (Evans Dep. 6:12-21, 8:23-9:10, 14:4-6.) He does not recall asking where its leads came from or reviewing its advertisements or consent language, and DaBella has no onboarding records beyond the insertion order. (*Id.* 12:3-8, 13:1-

25; McMillan Dep. I 22:6-23:3.) DaBella's designee could not say whether anyone looked at searchrenovation.us before DaBella bought leads from it. (McMillan Dep. I 37:20-38:11.) Nor did DaBella ask about Richardson's litigation history. Mr. Evans had "no idea" Richardson had been involved in a prior TCPA class action settlement and had not thought to ask. (Evans Dep. 15:11-23.) In fact, Mr. Evans committed that "[i]t will be for me from today on." (Evans Dep. 15:5-10.) Richardson's later account manager at DaBella never asked about TCPA compliance issues, prior lawsuits, or whether Richardson itself made calls to generate leads, either. (Clark Dep. 16:3-16.)

DaBella understood that Richardson claimed to drive traffic to the subject website through Facebook and Google ads, but it did not own the site. Instead, it "leased the traffic." (Clark Dep. 13:18-14:9, 17:3-13; McMillan Dep. I 25:20-26:7.) DaBella's only information about the owner of the website, an entity called "Empaxco," came from Richardson. (McMillan Dep. I 35:24-36:14.) In May 2026, Richardson told DaBella it had not "talked shop" with the website owner "in probably 5 years" and offered to put DaBella in touch. (DABELLA000156-58.) DaBella has still never communicated with the site. (McMillan Dep. II 16:25-17:21.)

SBBNet is a lead aggregator that resells leads bought from other vendors. It was involved in generating Plaintiff's lead and remains a DaBella vendor. (McMillan Dep. I 23:12-24:9, 25:20-26:3.) DaBella has never asked SBBNet for a list of the publishers it uses. (*Id.* 35:20-23.)

**C. "A clear pattern": complaints, settlements, and termination.**

On October 8, 2025, DaBella's manager wrote to Richardson that "[n]early every serious litigant we have encountered this year has come from" refixhome.com or searchrenovation.us, that "over 12%" of Richardson's September inquiries for which he had call data "requested to be placed on our DNC list," and that "there is a clear pattern here." (DABELLA000073.)

Responding to another consumer's demand, Richardson's CEO wrote that the consumer's "information was definitely added to our website" and wondered "if the person who did call, added him as a legit lead." (*Id.*) Richardson's account manager conceded that Richardson could not "fully isolate or limit traffic to search-based visitors." (DABELLA000072.) On October 13, DaBella paused all Richardson traffic because "[t]he volume of litigants . . . has exceeded our comfortability." (*Id.*)

DaBella terminated Richardson because of "[a] high number of complaints" and "something going on with their lead generation practices," the only vendor it has ever terminated for complaints. (McMillan Dep. I 20:6-22, 49:12-50:5.) It has paid to settle between two and five claims arising from Richardson leads, and four of the seven demands or suits it received in a single year involved searchrenovation.us. (*Id.* 65:6-66:1; ECF 32 at 16 n.2.) Another pending TCPA case against DaBella, *Littman v. DaBella Exteriors*, also arises from a searchrenovation.us lead and alleges caller ID violations as well. (McMillan Dep. I 72:2-73:6; Def.'s Resp. to Pl.'s 2d RFP No. 2.) Yet DaBella kept buying Richardson's leads for *seven months* after Plaintiff sued in March 2025, and it still buys from SBBNet. (McMillan Dep. I 20:6-8, 23:12-14.)

### D. The ghosts.

The only entities that could explain how any searchrenovation.us lead was generated have refused to participate in this case. SBBNet asked for an extension on Plaintiff's subpoena and then never responded and Richardson "wholesale failed to respond." (ECF 53 ¶¶ 11-13 & Exs. A-D.) DaBella does not dispute that the subpoenas were served in June 2025 and February 2026. (ECF 63 at 7.) DaBella has never asked SBBNet, a current vendor, why it ignored the subpoena. (McMillan Dep. I 47:15-18.) The website's owner has never been heard from at all.

### E. Plaintiff's "lead": three strangers.

Plaintiff's cell phone number has been on the National Do Not Call Registry since at least August 28, 2021, and was reassigned to him in July 2024. (Woolfson Decl. ¶ 38; ECF 54 ¶ 10.) In February 2025, DaBella texted him and called him repeatedly to sell him windows. (ECF 54 ¶ 16; DABELLA000079-83.) DaBella says it called because a lead for his number came through searchrenovation.us under the name "Robert Bronson," a person DaBella has never spoken to. (McMillan Dep. I 38:12-39:3; ECF 34 ¶¶ 3-6.)

The IP address on the lead belongs to Bryan Van Cleave, whom DaBella deposed. He works the overnight shift at a bakery, never visited searchrenovation.us, and has no affiliation with any lead generator or Plaintiff. (Van Cleave Dep. 11:7-13, 15:2-22, 22:17-23:22, ECF 35-1.) Plaintiff never visited the site either. (Weingrad Dep. 22:18-23:2; Weingrad Decl. ¶ 7; Pl.'s Suppl. Resp. to Interrog. No. 7.) DaBella's "consent" record for Plaintiff thus ties together three people who have nothing to do with one another: Plaintiff's number, a stranger's name, and a completely random person's IP address.

### F. DaBella's consent evidence was recreated after the fact by one employee during this litigation.

On August 11, 2026, DaBella's consent evidence was a spreadsheet SBBNet had emailed to DaBella. (McMillan Dep. I 40:11-24, 42:3-6.) DaBella did not know how, by whom, or from what data SBBNet created it, and its designee could not explain the columns "without speculation." (*Id.* 41:11-21, 45:9-17.)

By October 7, 2026, that evidence had been replaced. In late August, DaBella's designee wrote a script that extracted playback data from ActiveProspect's TrustedForm certificates and ran "slightly fuzzier matches" against DaBella's Salesforce records. (McMillan Dep. II 8:21-9:8, 14:9-16.) Nothing in the result came from Richardson or the website operator. (*Id.* 9:9-23, 18:7-

22.) Richardson's own records had "missed a few leads" or "added a couple." (*Id.* 16:14-22, 28:5-11.) DaBella first produced the recreated data on August 31, 2026, with its expert's supplemental report. (DABELLA000226-1295 (not reproduced); McMillan Dep. II 21:3-22:15.) That expert explained that the matching "depended on matching information in the third-party records from lead vendors." (Kalat Supp. Rpt. ¶ 13.)

### G. The disclosure.

DaBella claims that every purported searchrenovation.us playback displays the same text, which DaBella's expert understands "would have been seen by every one of the persons who submitted their information on that same site." (Kalat Supp. Rpt. ¶ 11.) It allegedly reads in full:

> By clicking Submit, you represent that you are 18+ years of age and agree to the Privacy Policy and Terms & Conditions. By clicking Submit, "you agree by your electronic signature that you give express written consent to receive marketing communications regarding Solar and Home services by automatic dialing system and pre-recorded calls and artificial voice messages and one or more of its Marketing Partners at the phone number and e-mail address provided by you, including wireless numbers, if applicable, even if you have previously registered the provided number on the Do Not Call registry. SMS/MMS and data messaging rates may apply." Your understand [sic] that my consent here is not a condition for buying any goods or services.

(*Id.* ¶ 10.) The disclosure does not mention DaBella, which contends it is one of the unnamed "Marketing Partners." (ECF 63 at 12.)

### H. DaBella's internal do-not-call list and caller ID.

DaBella's written policy requires an agent who receives a request to stop calling to "disposition the consumer as 'DNC' into our software system," which "will be used . . . as a database for our 'Do-Not-Call' list." (DABELLA000028.) Each day, data entry staff add the DNC entries to a "master DNC database," kept for five years. (DABELLA000033-34.) DaBella

maintains that list, and Plaintiff's number is on it. (McMillan Dep. I 53:7-11.) A consumer who replies "STOP" to DaBella's texts is removed from its system automatically. (*Id.* 51:12-20; DABELLA000026.) DaBella can also apply the status in bulk. In June 2025, after a claim arising from one vendor's campaign, its manager directed staff to "DNC" every number from that campaign "in our system unless there is a TrustedForm associated with the lead." (DABELLA000097.) DaBella's data tracks these requests. For example, its manager could calculate the share of Richardson's leads that asked to be placed on the list, and DaBella's records contain fields it uses "to denote that a callee had requested no more calls." (DABELLA000073; Woolfson Suppl. Decl. ¶ 59.) Plaintiff told DaBella on February 8, 2025 that he would call if he was interested, and he sued in March. (Weingrad Dep. 70:1-4; Weingrad Decl. ¶ 6.) On September 11, 2025, another DaBella vendor called his number and transferred the call into DaBella's call center. The representative asked for "Robert" and whether he was still interested in a window quote. (ECF 54 ¶¶ 20-21; McMillan Dep. I 53:21-54:11.)

The same policy says nothing about caller ID. (DABELLA000027-35.) DaBella has third parties, AWS and Regal, "purchase, manage numbers for dialing, and branding," and has no documents showing what caller ID they transmitted. (Def.'s Resp. to Pl.'s 2d RFP Nos. 1, 6-7, 18.) It admits that the number that called Plaintiff transmitted "the telephone number and/or a geographic location" rather than DaBella's name. (Def.'s Resp. to Pl.'s 2d Interrog. No. 6; Def.'s Resp. to Pl.'s 2d RFA No. 2.) Apart from its main 844 number, DaBella admits it has no branded numbers, although branded caller ID is available for purchase from the carrier. (McMillan Dep. I 33:4-12.) Its call log "includes all of those outbound caller IDs." (*Id.* 31:22-25.)

**I. Mr. Woolfson's analysis.**

Mr. Woolfson applied the same "waterfall" methodology he has applied in hundreds of matters for plaintiffs and defendants. This methodology consists of SQL queries comparing each call against the FTC's daily Registry files to identify numbers that were on the Registry for more than 30 days and called two or more times within 365 days. (Woolfson Decl. ¶¶ 28-39; Woolfson Reply ¶¶ 3, 9-14, 24-27.) Mr. Woolfson applied it to DaBella's calling data for Richardson and SBBNet leads, which DaBella's designee compiled from DaBella's own database and whose authenticity the parties have stipulated. (McMillan Dep. I 67:21-69:9.) Starting from 581,296 calls to 11,826 numbers placed between July 1, 2024 and April 24, 2025, he removed inbound calls, duplicates, uncompleted calls, and, conservatively, every call placed after a number had called DaBella. That left 245,415 calls to 5,730 unique numbers that meet the Registry Class definition, including five calls to Plaintiff. (Woolfson Suppl. Decl. ¶¶ 34-39, 58 & Ex. 11.) Mr. Kalat's four criticisms, each of which Mr. Woolfson answered, are addressed in Section V.C.1.

## III. LEGAL STANDARD

A class may be certified if the requirements of Rule 23(a) are met and, for a damages class, if common questions predominate and a class action is superior. Fed. R. Civ. P. 23(a), (b)(3). The Court's "rigorous analysis" may "entail some overlap with the merits," *Dukes*, 564 U.S. at 351, but grants "no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 466. The Court decides "whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial," and it "cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive." *Olean*

*Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 667 (9th Cir. 2022) (en banc).

The TCPA provides a private right of action to any person who receives "more than one telephone call within any 12-month period by or on behalf of the same entity" in violation of the FCC's regulations under § 227(c). 47 U.S.C. § 227(c)(5). Those regulations prohibit telephone solicitations to residential subscribers, including wireless subscribers, whose numbers are on the National Do Not Call Registry. 47 C.F.R. § 64.1200(c)(2), (e). A seller may call a registered number only with "prior express invitation or permission," which "must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed." *Id.* § 64.1200(c)(2)(ii). Consent "is an affirmative defense for which the defendant bears the burden of proof." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017).

## IV. THE PROPOSED CLASSES

Plaintiff seeks certification of three classes.

**The National Do Not Call Registry Class (the "Registry Class"):**

All persons in the United States who, from March 6, 2021 through the date of trial, (1) had a telephone number registered on the National Do Not Call Registry for at least 31 days, (2) received more than one telephone call from DaBella within any 12-month period, (3) to a telephone number DaBella obtained as a lead from Richardson Marketing Group or SBBNet, Inc.

**The Internal Do Not Call Class:**

All persons in the United States who, from March 6, 2021 through the date of trial, (1) received two or more telemarketing calls from or on behalf of DaBella within any 12-month period, (2) to a telephone number DaBella obtained as a lead from Richardson Marketing Group or SBBNet, Inc., (3) at least one of which was made more than 30 days after the person asked DaBella to stop contacting them, and (4) who were not DaBella customers at the time.

**The Caller ID Class:**

All persons in the United States who, from March 6, 2021 through the date of trial, (1) received two or more telemarketing calls from DaBella within any 12-month period, (2) to a telephone number DaBella obtained as a lead from Richardson Marketing Group or SBBNet, Inc., (3) from a telephone number other than 844-322-3552.

Excluded from each class are DaBella, its officers and directors, counsel for the parties, and the Court and its staff.

The definitions track the pleaded classes (ECF 23 ¶ 62) and conform them to the record. First, they are limited to leads DaBella bought from Richardson and SBBNet, which are the leads for which DaBella produced calling data, the leads Mr. Woolfson analyzed, and the only leads to which DaBella's purported consent evidence relates. (McMillan Dep. I 42:3-6, 67:21-68:10; Kalat Supp. Rpt. ¶¶ 8-16.) Second, the class period runs from four years before suit, 28 U.S.C. § 1658(a), through trial. DaBella kept buying and calling Richardson's leads until October 2025, after its own manager had identified "a clear pattern" of litigants, and it still buys from SBBNet. (DABELLA000072-73; McMillan Dep. I 20:6-8, 23:12-14.) Third, the Internal Do Not Call Class allows DaBella the full 30 days the regulation permitted for honoring a request before April 2025.

Membership turns on objective records, including DaBella's call logs and the outbound caller IDs they include, its vendor attribution, its "DNC" dispositions, and the FTC's Registry data. Mr. Woolfson has already identified 5,730 Registry Class members in the data DaBella produced for July 1, 2024 through April 24, 2025. (Woolfson Suppl. Decl. ¶¶ 34, 39 & Ex. 11.) The same methodology will identify the remaining members of each class from DaBella's records, which DaBella must produce in supplementation. (Woolfson Decl. ¶¶ 28-40; Woolfson Suppl. Decl. ¶ 59); Fed. R. Civ. P. 26(e). The Court may refine the definitions as the case

proceeds. Fed. R. Civ. P. 23(c)(1)(C). In the alternative, Plaintiff asks the Court to certify a narrower searchrenovation.us class. *See* Section V.E, *infra*.

## V. ARGUMENT

### A. The one question that will drive the Registry Class's claims, whether DaBella can prove consent, has one answer for everyone.

A common question is one where "the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). The status of a number's registration on the Do Not Call Registry comes from the FTC's daily files, and the number, timing, and purpose of the calls come from DaBella's own authenticated call logs. (Woolfson Decl. ¶¶ 28-39; McMillan Dep. I 12:8-13, 67:21-69:9.) That is why Do Not Call classes "offer[] many advantages for class-wide adjudication." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655 (4th Cir. 2019).

DaBella contests consent, on which it bears the burden. *Van Patten*, 847 F.3d at 1044. Whether consent defeats predominance turns on whether the evidence available to prove consent can be resolved for all members of the class in a single adjudication, not on the abstract possibility that someone agreed to be called or the merits of that resolution. *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931-32 (9th Cir. 2018). In framing that analysis here, three questions must be kept separate. First, whether DaBella's records are what DaBella says they are, second, whether the subscriber of each number actually gave the permission those records attribute to him, and, third, whether the language the records display is legally sufficient. DaBella must win all three to prove consent for anyone, and each is answered with the same evidence for every class member.

### 1. *Where DaBella has no consent evidence, the absence of consent is uniform.*

All of DaBella's consent evidence concerns a single website. (McMillan Dep. I 42:3-6; McMillan Dep. II 20:3-9; Kalat Supp. Rpt. ¶¶ 8-17.) DaBella's own expert ties only 650 of the 5,730 class numbers to that website. (Kalat Supp. Rpt. ¶ 16; Woolfson Suppl. Decl. ¶ 39.) For the other 5,080, roughly 89 percent of the class, DaBella has produced no consent evidence at all. What it offers instead is a policy of buying leads that arrive with TrustedForm certificates. (ECF 34 ¶ 15; McMillan Dep. I 16:8-22.) A policy of buying leads that vendors *describe* in inadmissible hearsay statements as leads for which they have obtained consent is not admissible evidence that any subscriber consented, especially when DaBella did not review the certificates before dialing. (McMillan Dep. I 50:10-14.)

The *Anthony* court rejected the same showing. Because the defendants bought numbers from third parties, made no effort to obtain permission themselves, and produced no evidence that any class member consented, consent was resolvable classwide. 2025 WL 3101827, at *10-11; *see Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 844 (7th Cir. 2022) (where the defendant "made no attempt to seek permission from any of the recipients," there is "a generalized, class-wide manner of proving lack of consent"). A defendant cannot defeat predominance with "the very specter of possible consent." *A Custom Heating & Air Conditioning, Inc. v. Kabbage, Inc.*, No. 16 C 2513, 2018 WL 488257, at *4 (N.D. Ill. Jan. 18, 2018); *see Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1126 (6th Cir. 2016) ("The mere mention of a defense is not enough."). Courts do not allow "speculation and surmise to tip the decisional scales in a class certification ruling." *True Health*, 896 F.3d at 932 (citing *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) and *Bridging Cmtys.*).

The searchrenovation.us leads are not different in kind. For those leads, DaBella has a record that *someone* submitted a form, not evidence that the subscriber DaBella called was that someone. Moreover, as explained, the consent disclosure on that website is deficient as a matter of law. But even if the disclosure were adequate, DaBella would still have to prove that each class member entered into "a signed, written agreement between the consumer and seller." 47 C.F.R. § 64.1200(c)(2)(ii). A record can be authentic and still not be the subscriber's agreement, as Plaintiff's lead proves. If it was submitted at all, it was not submitted by the subscriber, and it did not even name DaBella. For that matter, a third party's recording of a purported form submission is inadmissible hearsay because the website operator, the only entity with firsthand knowledge of what was submitted to the website, has not authenticated it. DaBella cannot close that gap for any class member, and the reason is the same for all of these leads.

#### ***2. DaBella has not laid, and without its vendors cannot lay, a foundation connecting any submission to any subscriber.***

DaBella's evidence for the searchrenovation.us leads is the litigation compilation described in Section II.F. DaBella may argue that this is sufficient to authenticate them, but it is not. A printout prepared for litigation can be a business record, but only if it is drawn from data maintained in the ordinary course of business of an entity who can authenticate them. *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1043-45 (9th Cir. 2009) ("The important issue is whether the database, not the printout from the database, was compiled in the ordinary course of business."). And although purely machine-generated output is not hearsay and can be authenticated by a qualified person's certification, Fed. R. Evid. 902(13), its reliability is still a question of authentication and appropriate foundation. *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109-10 (9th Cir. 2015). But here, all DaBella has done is pull records from ActiveProspect using a workaround method after the fact, based on data contained in a

spreadsheet sent to it during the pendency of this litigation. Nobody from ActiveProspect has vouched for the data, and DaBella used a homegrown black box system to extract it from ActiveProspect under questionable circumstances. This does not come close to the foundation required by Rules 901 and 902. Without the website operator, DaBella cannot lay a foundation.

But, even assuming, *arguendo*, that the ActiveProspect records were to be admissible at trial, that gets DaBella only to the threshold. At most, it would show that someone (maybe even SBBNet or Richardson Marketing Group) or something (like a bot or automated submission system) entered some data into the searchrenovation.us website form.

It would not show *whether the underlying data were reliably generated*, because the TrustedForm script runs on the *website operator's page*, no one at DaBella has ever spoken to the operator, and the operator has not authenticated or confirmed the authenticity, accuracy, or laid any foundation for what was submitted to the website or how these submissions are made. (McMillan Dep. I 48:19-49:9, 66:13-21.) Apropos of this point, the records do not show *whether a consumer made the submission at all,* rather than the operator, a script, or a vendor feeding traffic into the form. When pressed, Richardson could not isolate the sources of its traffic, and its CEO speculated that consumers' information is being "added" to its website by others. (DABELLA000072-73.) The FTC has warned that "consent farms" "trick consumers into purportedly giving permission" to dozens or hundreds of third parties. Fed. Trade Comm'n, *Biennial Report to Congress Under the Do-Not-Call Registry Fee Extension Act of 2007*, at 10 (Dec. 2025) ("FTC Report"). And, without the website operator to lay a foundation for the underlying submission evidence, it is inadmissible.

For the same reasons, not even DaBella can establish whether its "fuzzier" matching introduced errors not present in the underlying web submission. (McMillan Dep. II 9:1-8, 16:14-

22.) In other words, DaBella cannot lay a foundation for each system in the chain*,* the website, Richardson, or SBBNet, none of which has a witness, or whether even an accurate record shows that the subscriber of the called number consented.

That is the distinction *Lizarraga-Tirado* makes. 789 F.3d at 1109. There, the Ninth Circuit distinguished between a GPS tack created by a computer program automatically or whether it was entered manually and then labeled, the latter case being "classic hearsay." *Id.* So too here. The parts of a lead that matter, the name, the phone number, the submitter, and the click, are not the machine's output. Rather, they are inputs typed by an unknown person. A computer entry "placed manually and then labeled" by a person is "classic hearsay." *Id.* at 1109-10. When the information in a business record comes from an outsider who has not laid a foundation for it, an "essential link is broken," however accurately it is recorded by the computer system. Fed. R. Evid. 803(6) advisory committee note.

In whatever way the problem is framed, DaBella must produce evidence "sufficient to support a finding" that each record is what DaBella claims, the subscriber's agreement to be called by DaBella. Fed. R. Evid. 901(a). DaBella has no witness who can show that a system it does not operate is reliable or that the data put into it are accurate. *See Lizarraga-Tirado*, 789 F.3d at 1110. At best, DaBella can establish that the information it purchased was allegedly entered into the SearchRenovation website. But DaBella cannot establish how or why it got there, cannot authenticate it, and cannot even verify that the information matches the website's records. These evidentiary issues apply across the entire class.

*Hossfeld* addressed the same gap. There, Allstate relied on consent with lead data its vendors had passed along, but *no one from the lead source authenticated the data or explained how it was generated*. The court held that Allstate could not rely on it as a result, a holding the

Seventh Circuit did not reach. 726 F. Supp. 3d at 873-74; 179 F.4th 1046. DaBella says its TrustedForm records are more reliable than Allstate's spreadsheets and thus not categorically inadmissible as a matter of law. (ECF 63 at 7-8.) But, assuming, *arguendo*, they are admissible at trial, for purposes of class certification, whether the records are reliable enough or not is a single uniform jury question about a single body of records, and the only witnesses who could answer it are the website's owner, Richardson, and SBBNet. They are ghosts. (Section II.D.)

Plaintiff will move to exclude the evidence at an appropriate time, but the point for Rule 23 is narrower. On the present record, DaBella has not established the foundation needed to connect any submission to any subscriber, the only witnesses who could do so are the same for everyone and likewise have not done so, and the common question will need to be decided only once. *See Olean*, 31 F.4th at 666-67. If DaBella cannot close the gap, its searchrenovation.us leads stand where its other leads already stand, without evidence of consent. If it can, its records display a single disclosure, and the sufficiency of that disclosure is one more common question.

#### ***3. The disclosure is the same for everyone, and whether it is legally sufficient is one question with one answer.***

When consent turns on uniform documents, it can be decided for the class by examining the documents. *True Health*, 896 F.3d at 931-32. In *Mantha v. QuoteWizard.com, LLC*, the court certified a Do Not Call class even though "some (or, likely, virtually all)" class members may have clicked a consent form, because every form shared "the same dispositive legal defect": none named the defendant. 347 F.R.D. 376, 397 (D. Mass. 2024); *see also Williams v. PillPack LLC*, 343 F.R.D. 201, 208 (W.D. Wash. 2022) (same, where the website did not list the defendant as a marketing partner). DaBella relies on the same passage of *Mantha*. (ECF 63 at 10-11.) It agrees that a uniform legal defect makes consent a common question, but it simply denies there is one as a matter of law. But, as has been explained, all that is required at class

certification is a showing that the question is answerable on common evidence classwide, not necessarily that the evidence be resolved in the class's favor on the merits. *Amgen*, 568 U.S. at 459. Whether the consent form's language is sufficient under the TCPA is a merits dispute with a common answer. The disclosure presents four such questions of sufficiency.

*Clear and conspicuous notice.* A consumer is bound by website terms only if the site provides "reasonably conspicuous notice" of them, "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022). The FCC likewise requires written telemarketing consent to rest on a disclosure "apparent to the reasonable consumer, separate and distinguishable from the advertising copy or other disclosures." 47 C.F.R. § 64.1200(f)(3), *see also* (f)(9). Whether any admissible evidence concerning the text on the searchrenovation.us website meets that standard is decided by looking at one page, as *Berman* did from screenshots. 30 F.4th at 856-58.

*Seller identification.* An exemption requires a written agreement that "the consumer agrees to be contacted by this seller." 47 C.F.R. § 64.1200(c)(2)(ii). The disclosure never mentions DaBella, although DaBella's own policy requires approved consent language to "identify 'Dabella.'" (DABELLA000032.) Whether consent to calls from "one or more of its Marketing Partners" is an agreement to be contacted by "this seller" is precisely the question *Mantha* and *Williams* held common.

*Scope.* The disclosure consents to "marketing communications . . . by automatic dialing system and pre-recorded calls and artificial voice messages," the technologies regulated by 47 U.S.C. § 227(b). Whether that authorizes live solicitation calls to numbers on the Registry is a

question of reading one sentence. DaBella's answer, that entering a phone number on a webform is consent by itself (ECF 63 at 12), is a legal position that applies to every class member alike.

*Established business relationship.* That exemption requires the subscriber's "inquiry or application regarding products or services offered by the entity" placing the call. 47 C.F.R. § 64.1200(f)(5). As the FTC explained, consumers whose numbers are "provided by lead generators" may "have a relationship with the lead generator," but "they do not have an established business relationship with the seller who has purchased the leads." FTC Report at 9. Whether a visit to a website that never names DaBella is an inquiry about DaBella's services is, again, a question about one page.

Each question has one answer. If DaBella is right, and if DaBella can establish what the searchrenovation.us website showed with admissible evidence, its defense would succeed for every searchrenovation.us lead. But if Plaintiff is right, or if DaBella is unable to adduce sufficient evidence to meet its affirmative burden, it fails for every one. A common question whose resolution would "end the case" for everyone does not create individual issues. *Amgen*, 568 U.S. at 460. And if the disclosure fails, whether any particular person visited the site, including Plaintiff, does not matter. *Williams*, 343 F.R.D. at 213.

#### ***4. DaBella's "wrong number" and "lead fraud" theory assumes what DaBella cannot prove and inverts the burden.***

DaBella's answer is that it "has a practice in place" to obtain consent and that sorting fraudulent leads from real ones "would require discovery of each and every single class member." (ECF 63 at 5, 10; ECF 32 at 41.) The theory fails for four reasons.

*First, it assumes the conclusion.* Sorting real submissions from fraudulent ones presupposes evidence that a submission occurred and can be tied to the subscriber DaBella called. Whether DaBella has that evidence is the antecedent question, and it is common.

*Second, it inverts the burden.* Plaintiff need not prove that any lead was fraudulent; DaBella must prove "a signed, written agreement between the consumer and seller." 47 C.F.R. § 64.1200(c)(2)(ii). The "wrong number" cases DaBella cites (ECF 32 at 22) involved defendants that held consent in the form of a signed writing from an identified customer and reached a different person after the number changed hands. DaBella has never identified a consenting customer for any number, and it does not check that the name on a lead matches the number. (McMillan Dep. I 38:22-25.) "Robert Bronson" is a string of text, not a witness.

*Third, the problem is systemic, not idiosyncratic.* DaBella's own manager saw "a clear pattern" of litigants and a 12% do-not-call request rate in Richardson's leads, Richardson agreed that "the data in aggregate clearly reveal the issue," and DaBella terminated Richardson over it. (DABELLA000072-73; McMillan Dep. I 20:6-22, 49:12-50:5.) Whether these leads came from a process capable of producing genuine consent is itself a common question.

*Fourth, DaBella's own alternative proves the point.* DaBella asks the Court to limit any class to "fraudulent leads submitted under a wrong name." (ECF 32 at 41.) That is a fail-safe class defined by the merits of DaBella's own defense. *See Olean*, 31 F.4th at 669 n.14.

#### ***5. DaBella's authorities involve heterogeneous sources of consent; this case involves one website.***

The question under Rule 23(b)(3) is not whether a defendant invokes consent, but whether consent would actually have to be proven one class member at a time. *True Health* draws that line. There, consent did not defeat predominance for recipients whose consent turned on uniform registration forms and license agreements, but did where consent had been obtained through varied, individual means. 896 F.3d at 931-33. The authorities DaBella has cited in this litigation fall on the second side of that line.

*Gene & Gene LLC v. BioPay LLC* involved a fax list compiled "over time and from a variety of sources," so that consent could be determined only by asking each recipient. 541 F.3d 318, 328-29 (5th Cir. 2008). Even there, the court recognized that certification is appropriate where plaintiffs advance any "viable theory employing generalized proof to establish liability with respect to the class involved." *Id.* at 328. *Clark v. Via Renewables, Inc.* denied certification where the defendant supported consent with admissible evidence and the plaintiff identified no uniform defect in it. No. 24-cv-00568-JSC, 2025 WL 2968027, at *7-8 (N.D. Cal. Oct. 21, 2025). And *Davis v. Capital One, N.A.*, No. 1:22-cv-00903, 2023 WL 6964051 (E.D. Va. Oct. 20, 2023), and the cases it draws on involved varied forms like *BioPay*, including oral consent, in-person consent, and hundreds of dealerships. (*See* ECF 51 at 35-36.)

This case is the opposite. All of DaBella's consent evidence comes from *one website*, with *one disclosure*, *one compilation* built by *one DaBella employee*, and *one set of missing witnesses*. That is *Hossfeld*'s situation, not *Gene & Gene*'s, and Plaintiff's theory employs generalized proof at every step.

***6. The evidence of what DaBella knew is common to every class member.***

The jury will also decide whether DaBella's violations were "willful[] or knowing[]." 47 U.S.C. § 227(c)(5). That evidence does not vary by class member either. DaBella has no TCPA compliance department and, despite a written policy promising a Registry scrub every 31 days, does not scrub internet leads at all. (McMillan Dep. I 11:17-19, 57:18-61:5; DABELLA000027.) It onboarded Richardson without asking where its leads came from, reviewing its consent language, asking whether it had been sued, or looking at the website. (Evans Dep. 12:3-15:23; McMillan Dep. I 37:20-38:11.) It kept buying Richardson's leads for seven months after Plaintiff sued, through a 12% opt-out rate and "a clear pattern" of litigants, and it still buys from SBBNet.

(DABELLA000072-73; McMillan Dep. I 20:6-8, 23:12-14.) A jury will hear that evidence once. Juries have decided classwide TCPA cases before, including in this District. *Krakauer*, 925 F.3d at 655 (Do Not Call class); *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109 (9th Cir. 2022) (affirming cass-wide liability verdict after TCPA class trial before this Court).

### B. The requirements of Rule 23(a) are met.

Rule 23(a) requires numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). Each is met.

#### *1. Numerosity.*

Rule 23(a)(1) "does not impose a bright-line numerical threshold"; the question is whether joinder is impracticable in light of the size of the class, the size of the claims, and the dispersion of the members. *Allison v. Dolich*, No. 3:14-cv-01005-AC, 2019 WL 921436, at *14 (D. Or. Feb. 25, 2019), *aff'd*, 815 F. App'x 135 (9th Cir. 2020). Classes of 40 or more are generally sufficient. *Id.*

Mr. Woolfson identified 5,730 Registry Class members, called 245,415 times, each tied to a call record in DaBella's own data. (Woolfson Suppl. Decl. ¶¶ 39, 58 & Ex. 11.) That is more than 140 times the conventional threshold. Even taking into account the conservative estimate proffered by DaBella's own expert, numerosity is satisfied many times over: Mr. Kalat confirmed that 650 Registry-listed numbers sourced from searchrenovation.us *alone* appear on Mr. Woolfson's list. (Kalat Supp. Rpt. ¶¶ 15-16.) The numbers for the caller ID class are larger, since that class relies on neither consent nor presence on the DNC Registry. And even assuming a 12% do-not-call rate on the internal DNC class, that class is also sufficiently numerous.

### *2. Commonality.*

Commonality requires a common contention "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. The bar is permissive and "even *a single* common question will do." *Id.* at 359 (cleaned up) (emphasis added).

This case presents not just a single, but many, such questions, each answered by DaBella's own records and witnesses:

- Does DaBella have any consent evidence for leads that did not come from searchrenovation.us? (Section V.A.1.)
- Can DaBella connect its searchrenovation.us records to the subscribers it called? (Section V.A.2.)
- Is the searchrenovation.us disclosure a clear and conspicuous written agreement to be contacted by DaBella under 47 C.F.R. § 64.1200(c)(2)(ii), or create a business relationship with DaBella? (Section V.A.3.)
- Were DaBella's calls to sell home improvements telephone solicitations? (Clark Dep. 7:2-6; McMillan Dep. I 12:8-13.)
- Did DaBella call numbers more than once in twelve months, and were those numbers on the National Do Not Call Registry? (Woolfson Decl. ¶¶ 28-39.)
- Did DaBella honor requests to stop calling, and did it transmit its name as caller ID? (Section V.D.)
- Were DaBella's violations willful or knowing? (Section V.A.6); 47 U.S.C. § 227(c)(5).

Courts certifying Do Not Call classes have found commonality on precisely these questions. *Mantha*, 347 F.R.D. at 393; *Williams*, 343 F.R.D. at 207; *Anthony*, 2025 WL 3101827, at *7-8. DaBella's only response is that consent is individualized. For the reasons in Section V.A, it is not.

#### ***3. Typicality.***

Typicality asks "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (cleaned up). The representative's claims need only be "reasonably co-extensive with those of absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

Plaintiff's claim *is* the class claim. His number had been on the Registry for years, and DaBella's call center called it repeatedly to sell him windows, five times by Mr. Woolfson's count. (Woolfson Decl. ¶ 38; Woolfson Suppl. Decl. ¶ 39; DABELLA000079-83.) DaBella attributes the lead to searchrenovation.us through Richardson and SBBNet, and it defends his claim with the same claimed disclosure and the same reconstructed homegrown collection of records it will use against every other class member. (McMillan Dep. I 38:12-21.) A defense defeats typicality only when it is "unique" to the representative and "threaten[s] to become the focus of the litigation." *Hanon*, 976 F.2d at 508. DaBella raises three. None qualifies.

*The website visit.* DaBella argues that Plaintiff, who never visited searchrenovation.us, cannot represent people who did. (ECF 63 at 10 & n.5.) Neither, for that matter, can DaBella establish whether real people even visited the website. And if DaBella cannot connect the website records to the subscribers it called, or if the disclosure is deficient, no one's visit matters.

*Williams*, 343 F.R.D. at 213; *Aley v. Lightfire Partners, LLC*, No. 5:22-cv-00330, 2024 WL 4007345, at *4-5 (N.D.N.Y. Aug. 30, 2024) (plaintiff who denied visiting the consent website was typical). Nor is Plaintiff's experience unique. DaBella's manager wrote that "[n]early every serious litigant" it encountered came from these sites. (DABELLA000073.) DaBella's proposed limitation to people who "assert that they did not visit the website" would define the class by the merits and require members to disprove consent, which is DaBella's burden, and, as explained above, a burden DaBella will be unable to meet because of uniform legal issues. *Van Patten*, 847 F.3d at 1044. Plaintiff's record is not a unique defense. It is Exhibit A on the common question whether DaBella's records prove anything about anyone.

*The February 7 call.* DaBella argues that Plaintiff consented by speaking with its agent. (ECF 64 at 18-20.) Not so. He engaged the caller to find out who was calling him. (ECF 54 ¶ 17.) A consumer who plays along to identify a telemarketer does not consent, *Shelton v. Nat'l Gas & Elec., LLC*, No. 17-4063, 2019 WL 1506378, at *4-*5 (E.D. Pa. Apr. 5, 2019), and consent purportedly given during an unlawful call does not cure that call or the ones before it, *Bradley v. DentalPlans.com*, 2024 WL 2865075, at *15 (D. Md. June 6, 2024). The argument concerns, at most, the number of violations, and it will not become the focus of a class trial.[3]

*The business number and prior registration arguments.* DaBella argues that Plaintiff's number is a "business" number because a prior subscriber's business was listed with it online, and that he cannot rely on a registration made before the number was reassigned to him. (ECF 63 at 13-14; ECF 64 at 10-16.) Plaintiff uses the number for personal purposes, has a separate work

[3] DaBella also invokes a September 11, 2025 call placed after suit was filed. (ECF 64 at 20-22.) DaBella's designee testified that a different vendor, px.com, transferred that call into DaBella's call center "in error." (McMillan Dep. I 53:21-54:11.) Plaintiff's Registry claim does not depend on that call and instead rests on the five calls Mr. Woolfson identified. (Woolfson Suppl. Decl. ¶ 39.) The call matters to the Internal Do Not Call Class, as Section V.D explains.

phone, and has no connection to the prior subscriber. (Weingrad Decl. ¶¶ 2-4; ECF 54 ¶¶ 10, 15, 29.) The *Mattson* decisions DaBella cites involved a plaintiff whose own business use was "hotly contested." *E.g.*, *Mattson v. Rocket Mortg., LLC*, No. 3:18-cv-00989-YY, 2024 WL 4794710, at *2 (D. Or. Sept. 16, 2024). These questions are pending on DaBella's motion, and will not occupy a class trial, particularly because of the uniform legal issues outlined already in the briefing on those matters.

#### ***4. Adequacy.***

Adequacy asks whether the named plaintiff and counsel have conflicts with other class members and whether they will prosecute the action vigorously. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). Here, Plaintiff's interest is the class's, to hold DaBella to its burden and recover the damages Congress fixed. DaBella says class members who "do not dispute the submission" of a form have adverse interests. (ECF 63 at 9.) Its authority involved class members who benefited from the very conduct others challenged. *See Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000). But no one benefits from DaBella calling without valid consent, and a class member who truly agreed to be called simply will not recover.

Plaintiff also sat for a deposition, answered multiple rounds of written discovery and withstood a subpoena to his employer that this Court found "tips too far into harassment." (ECF 77 at 5-6; Weingrad Decl. ¶¶ 14-16.) He understands his duties to the class and has arranged for counsel to advance its costs. (Weingrad Decl. ¶¶ 9-13, 18.) DaBella's remaining attack is that Plaintiff has filed other TCPA suits. (ECF 32 at 16-17.) That is not a conflict. "[N]othing in the Constitution, though, requires a plaintiff to be a naïf. Litigation is not college athletics: there is no 'amateurs only' rule." *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1195 (M.D. Tenn. 2017); *accord Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 954

(7th Cir. 2006). And the Plaintiff here has done what countless other repeat TCPA plaintiffs have done: pressed this case through class discovery to this motion.

Plaintiff's counsel are also adequate. They have worked extensively on the claims, and have the experience, knowledge of the law, and resources to represent a class. Proposed class counsel have been appointed to lead numerous TCPA class actions. (Perrong Decl. ¶¶ 2-7; Paronich Decl. ¶¶ 2-5.) They investigated these claims, pursued third-party discovery, took the depositions of DaBella's designee and employees, and retained an expert whose methodology has been accepted in certifying classes like this one. (Perrong Decl. ¶¶ 8-10; Paronich Decl. ¶ 6); *Anthony*, 2025 WL 3101827, at *4-6. They will commit the resources needed to try the case. (Perrong Decl. ¶ 11; Paronich Decl. ¶ 7.)

### C. The requirements of Rule 23(b)(3) are met.

#### *1. Predominance.*

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). It is "more demanding" than commonality, *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), but asks only whether "the main issues in a case" are common, *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir. 2001), and whether a common question predominates "begins . . . with the elements of the underlying cause of action," *Olean*, 31 F.4th at 665, "not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459.

Predominance here is satisfied many times over. First, a number's status on the registry and whether it received repeated calls has cohesion because Mr. Woolfson's comparison of DaBella's call data against the FTC's Registry files identifies every qualifying number. (Woolfson Suppl. Decl. ¶¶ 34-39; McMillan Dep. I 67:21-69:9.) Courts routinely hold that such

analysis satisfies predominance. *Knapper v. Cox Commc'ns, Inc.*, 329 F.R.D. 238, 244 (D. Ariz. 2019); *Williams*, 343 F.R.D. at 211; *Anthony*, 2025 WL 3101827, at *7-8.

And any battle of the experts goes to evidentiary weight, not predominance. Mr. Kalat does not dispute that DaBella's records can be analyzed classwide; he analyzed them himself. (Kalat Supp. Rpt. ¶ 15.) His four criticisms (one number he says was not on the Registry, residential status, call durations, and the content of the leads) apply uniformly across the data, and Mr. Woolfson answered each. (Woolfson Reply ¶¶ 17-47.) Mr. Kalat did not even produce the queries behind them. (*Id.* ¶ 47.) Disputes of this kind go to the weight of common evidence. *See Olean*, 31 F.4th at 666-67. The *Anthony* court said exactly that about the same expert's same methodology and certified the class. 2025 WL 3101827, at *6.

Relatedly, the question of the purpose of the call also predominates. Every call was placed to a purchased lead to sell home improvement services. (Clark Dep. 7:2-6; McMillan Dep. I 10:8-17.) The FCC presumes that wireless subscribers on the Registry are residential subscribers. *In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14039 ¶ 36 (2003). Any residual question can be resolved through carrier records, which record line use classification. (Woolfson Reply ¶¶ 29-33); *see Jackson v. Athena Bitcoin, Inc.*, No. 4:24CV331-MW/MJF, 2025 WL 2237453, at *6-7 (N.D. Fla. June 18, 2025); *Mantha*, 347 F.R.D. at 391-92.

Finally, for the reasons in Section V.A, the consent defense rises or falls on common proof. Consent that turns on uniform documents does not defeat predominance. *True Health*, 896 F.3d at 932. DaBella's own position, that its disclosure is valid as to everyone who saw it (ECF 63 at 11-12), frames the defense in classwide terms. To this end, it is important to understand that class certification is not a jury trial or summary judgment. DaBella will say, as it has twice

already (ECF 32; ECF 63), that its consent evidence is sufficient. That is a merits argument the Court does not resolve on this motion. *Amgen*, 568 U.S. at 459-60, 466. What matters now is that when the merits are decided, they will be decided the same way for every class member. And the related question of whether those violations were willful is likely evaluated by a jury determination of DaBella's own conduct. (Section V.A.6.) Statutory damages are fixed per violation and calculated mechanically from the call records. 47 U.S.C. § 227(c)(5); *Kearns v. LoanDepot.com, LLC*, No. 8:22-cv-01217-JWH-JDE, 2025 WL 3010182, at *7 (C.D. Cal. Oct. 20, 2025) ("Individual differences in calculating the amount of damages will not defeat class certification where common issues otherwise predominate.").

***2. Superiority.***

A class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Each violation is worth $500, less than the cost of prosecuting a federal suit, and few consumers could prosecute one against a defendant that has filed four motions in this case alone. Fed. R. Civ. P. 23(b)(3)(A)-(B). The handful of individual demands DaBella has received (ECF 32 at 16 n.2) confirms the point. DaBella settled them one by one and kept buying the leads. "[I]n the context of the TCPA, the class action device likely is the optimal means of forcing corporations to internalize the social costs of their actions." *Bee, Denning, Inc. v. Capital All. Grp.*, 310 F.R.D. 614, 630 (S.D. Cal. 2015). The prospect of a large aggregate award is no reason to deny certification, since Congress fixed damages by statute. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 719 (9th Cir. 2010). And the classes are manageable. Fed. R. Civ. P. 23(b)(3)(D). DaBella was based in Oregon during the relevant time and made the decisions at issue here. DaBella's own records identify class members, and notice is accomplished using carrier records (Woolfson Decl. ¶ 41; Woolfson

Reply ¶¶ 29-33). The trial will be short, DaBella's designee and two employees, the two experts, and Plaintiff, with DaBella's emails, policies, call logs, and recreated consent records as the exhibits. A jury will answer a handful of questions all at once.

### D. The Internal Do Not Call and Caller ID Classes likewise turn on DaBella's own systems.

The TCPA's private right of action reaches the FCC's internal do-not-call and caller ID rules, both of which the FCC adopted under § 227(c), and this Court has already sustained both claims. 47 U.S.C. § 227(c)(5); 47 C.F.R. §§ 64.1200(d), 64.1601(e); *Weingrad*, 2026 WL 496609, at *3-*5. Neither claim turns on consent, and both are proven with DaBella's records.

*The Internal Do Not Call Class.* A telemarketer must maintain a list of people who ask not to be called and must honor each request within a reasonable time, which may not exceed 30 days (now ten business days). 47 C.F.R. § 64.1200(d)(3). A request to stop calling ends whatever permission came before. *See Van Patten*, 847 F.3d at 1047-48. Every element is common. DaBella's policy requires its agents to code each request "DNC" in its software and to add those entries to its master list daily. (DABELLA000028, 33-34.) Whether a class member asked to stop, and whether DaBella called again more than 30 days later, is therefore answered by matching DaBella's "DNC" dispositions against its own call logs, the same exercise Mr. Woolfson performed for the Registry Class. (Woolfson Decl. ¶ 40; Woolfson Suppl. Decl. ¶ 59.) *See Mantha*, 347 F.R.D. at 392 (analyzing internal do-not-call claims from the defendant's "internal DNC files"). DaBella's defense is classwide, too. It says it "maintains TCPA policies and procedures, provides training and maintains records in compliance with the DNC rules." (Def.'s Resp. to Pl.'s 1st Interrog. No. 13.) Because membership requires a request to stop, the class includes only people, like Plaintiff, injured by DaBella's failure to honor one by receiving a later call. *See Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1272-73 (11th Cir. 2019).

Plaintiff's claim is typical. He told DaBella he would call if he was interested *and then sued*, his number was on DaBella's internal do-not-call list, and a call transferred into DaBella's call center nevertheless solicited him again seven months later. (Section II.H.) DaBella says the September 11 call reached its call center through a vendor "in error" (McMillan Dep. I 53:21-54:11), but a solicitation transferred into DaBella's own call center, to a number on DaBella's own list, tests the same procedures at issue for the class. And as this Court has noted, DaBella "makes no argument that Mr. Weingrad did not, in effect, communicate with the company that he wanted the communications to stop." *Weingrad*, 2026 WL 496609, at *7.

*The Caller ID Class.* A telemarketer must transmit caller identification that includes a telephone number "and, when available by the telemarketer's carrier, the name of the telemarketer." 47 C.F.R. § 64.1601(e)(1). DaBella's caller ID is set centrally by its vendors, AWS and Regal, which "purchase, manage numbers for dialing, and branding." (Def.'s Resp. to Pl.'s 2d RFP Nos. 1, 6-7, 18.) DaBella admits that its calls to Plaintiff transmitted a telephone number or a geographic location, not its name, and its designee testified that DaBella has no branded numbers other than its 844 line, although branded caller ID can be purchased. (Def.'s Resp. to Pl.'s 2d Interrog. No. 6; Def.'s Resp. to Pl.'s 2d RFA No. 2; McMillan Dep. I 33:4-12.) Its policy does not mention caller ID, and it has no communications about it or even attempting to comply. (DABELLA000027-35; Def.'s Resp. to Pl.'s 2d Interrog. No. 5; Def.'s Resp. to Pl.'s 2d RFP Nos. 3-4.) DaBella's discovery responses thus demonstrate that it violated 47 C.F.R. § 64.1601(e)(1) because it admits that it did not transmit a branded caller ID except for a single number, that that functionality was available, and that DaBella did not use it. That is all that this claim requires.

The rule has no consent exception or defense. DaBella's calls to Plaintiff came from unbranded, non-compliant numbers that did not transmit any compliant caller ID naming DaBella. (Woolfson Suppl. Decl. ¶ 39; Def.'s Resp. to Pl.'s 2d Interrog. No. 6.) And the class is numerous. Even after Mr. Woolfson's conservative exclusions, DaBella's data shows 464,512 completed calls to 11,590 Richardson and SBBNet numbers in ten months, and the only number DaBella branded was its 844 line. (Woolfson Suppl. Decl. ¶ 37; McMillan Dep. I 33:8-12.) Because DaBella's call log "includes all of those outbound caller IDs" (McMillan Dep. I 31:22-25), ascertaining which calls were placed without compliant Caller ID, or to the single branded caller ID, is a simple matter of filtering out the branded caller ID from DaBella's own records.

Both classes add common questions to a trial that will already be held. They involve the same calls, the same records, and the same witnesses, and a class action is superior for them for the same reasons. (Section V.C.2.)

### E. At a minimum, the Court should certify the searchrenovation.us class DaBella itself proposed.

The Registry Class satisfies Rule 23 as defined because a lead's source is not an element of the claim. DaBella placed every call itself, and DaBella relied on the same set of lead records for each. Nor do Richardson's and SBBNet's leads divide neatly by source. SBBNet aggregates leads from "multiple different lead vendors" that DaBella has never identified. (McMillan Dep. I 25:20-26:3, 35:2-23.) Richardson drew on Facebook and Google advertising and sent DaBella leads from at least one other website, refixhome.com. (Clark Dep. 17:3-13; McMillan Dep. I 28:9-13; McMillan Dep. II 16:21-24.) And Richardson admitted that it "can't fully isolate or limit traffic to search-based visitors" because its campaigns "utilize a blend of sources, including native, social, and display." (DABELLA000072.)

That variation is already built into Mr. Woolfson's analysis, which covers every Richardson and SBBNet lead, whatever its source. (McMillan Dep. I 67:25-68:10; Woolfson Suppl. Decl. ¶¶ 24, 34.) The searchrenovation.us share of that universe has also already been measured. DaBella's expert found that 650 of the 5,730 class numbers, about 11 percent, came from that site. (Kalat Supp. Rpt. ¶¶ 8, 16; Woolfson Suppl. Decl. ¶ 39.) The other 5,080 came through Richardson and SBBNet from other sources, for which DaBella has no consent evidence at all. (Section V.A.1.)

DaBella nevertheless has twice asked the Court, in the alternative, to narrow any class to leads generated on searchrenovation.us, arguing that other sources are not common and typical to Plaintiff's claims. (ECF 32 at 42; ECF 63 at 11 n.6.) The Registry Class satisfies Rule 23 as defined, and that premise fails for the reasons just given. But if the Court shares DaBella's concern, the remedy is to narrow the class, not to deny certification, and the narrower class should turn on the lead's origin, not, as DaBella phrased it, on who "submitted" a consent form:

> All persons in the United States who, from March 6, 2021, through the date of trial, (1) had a telephone number registered on the National Do Not Call Registry for at least 31 days, (2) received more than one telephone call from DaBella within any 12-month period, (3) to a telephone number DaBella obtained as a lead originating from searchrenovation.us.

Putting DaBella's proposal aside, everything in Sections V.A through V.C applies to that class with greater force. Its members are identified from data DaBella has already produced, and DaBella's own expert puts its size at no fewer than 650 numbers. (Kalat Supp. Rpt. ¶ 16.) DaBella's other alternative, a class limited to "fraudulent leads submitted under a wrong name" (ECF 32 at 41), should be rejected as a fail-safe class. (Section V.A.4.)

Finally, DaBella's Motion to Deny Class Certification (ECF 32) should be denied for the reasons stated here and in Plaintiff's opposition (ECF 51). That motion was filed before

extensive discovery, including the depositions, before DaBella recreated its consent records, and before either expert's reports. This motion presents the full record and is the "more appropriate vehicle" for deciding certification. *Weingrad*, 2026 WL 496609, at *7.

## VI. CONCLUSION

This case presents 245,415 calls to 5,730 numbers on the Registry, consent evidence from only one website, one disclosure, one spreadsheet recreated by one DaBella employee, two vendors who will not answer subpoenas, and a website owner no one at DaBella has ever spoken to. It presents a lead that ties Plaintiff's number to a stranger's name and a completely random person's IP address. And it presents a do-not-call list and a caller ID configuration that DaBella applied to everyone. Each question has one answer, and the answer is the same for every class member. This is a class jury trial worth having.

Plaintiff respectfully requests that the Court certify the Registry Class (or, in the alternative, the searchrenovation.us class), the Internal Do Not Call Class, and the Caller ID Class, appoint Plaintiff as Class Representative, appoint Perrong Law LLC and Paronich Law, P.C. as Class Counsel, and deny DaBella's Motion to Deny Class Certification or Strike Class Allegations (ECF 32).

DATED: October 16, 2026

Respectfully submitted,

/s/ Andrew Roman Perrong
Andrew Roman Perrong, OSB No. 243320
a@perronglaw.com
Perrong Law LLC
1669 Edgewood Road #218
Yardley, PA 19067
215-225-5529

*Lead Attorney for Plaintiff and the Proposed Class*

Anthony I. Paronich (*pro hac vice*)
anthony@paronichlaw.com
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
617-485-0018

*Attorney for Plaintiff and the Proposed Class*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,903 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED: October 16, 2026

/s/ Andrew Roman Perrong
Andrew Roman Perrong, OSB No. 243320

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing via ECF on the date below, which will automatically send a copy to all attorneys of record.

DATED: October 16, 2026

/s/ Andrew Roman Perrong
Andrew Roman Perrong, OSB No. 243320