**UNITED STATES DISTRICT COURT**
**OR THE WESTERN DISTRICT OF OREGON**
**PORTLAND DIVISION**

**LEON WEINGRAD,** individually and on behalf of all others similarly situated,

*Plaintiff,*

v.

**DABELLA EXTERIORS LLC.**

*Defendant.*

Case No. **3:25-cv-00396-SI**

Presiding:
**Hon. MICHAEL H. SIMON**

**DECLARATION OF EXPERT AARON WOOLFSON**

## DECLARATION OF EXPERT AARON WOOLFSON

I, Aaron Woolfson, state and declare as follows:

1. I have been retained by the Plaintiff to determine whether there is a reliable methodology for analyzing the call records in this lawsuit reflecting the calling done by or on behalf of the DaBella Exteriors, LLC ("DaBella Exteriors", "DaBella" or "Defendant").

2. I had previously proffered a declaration in this matter on May 18, 2026. In my May 18th declaration, I outlined a methodology, called a waterfall analysis, that could be used to identify the quantity of calls contained within call detail records ("CDRs") that were placed to telephone numbers that had been on the national Do Not Call ("DNC") list for more than thirty (30) days, and of those, which telephone numbers had been called on two (2) or more occurrences within a twelve (12) month period; and the method to further clarify those telephone numbers were associated with a residential type of service.[1]

---

[1] It is my understanding that telephone numbers contained within the national DNC list, are presumed to be residential in nature. As described within my report, an additional confirmatory process can be conducted to remove any numbers that telephone companies have flagged as non-residential.

3. As described in that Declaration, it was my conclusion that there is a reliable method to identify those calls that had been placed to numbers indicated on the national DNC list and, of those, which were called at least two times withing a 12-month period; and, which of those numbers are residential telephone numbers; and, and which of those telephone numbers were listed on the DNC list for more than thirty (30) days prior to receipt of calls from the Defendant, where there were two (2) or more calls within 365 days of one another.

4. I have now received the call detail records from the Defendants, and have been asked to opine whether the waterfall method that I had outlined within my May 18th declaration could be relied upon to identify those calls placed to telephone numbers that were on the national DNC list for more than thirty (30) days, and of those, which had been called on two (2) or more occurrences within 365 days; and, whether there is a method to further clarify those telephone numbers were associated with a residential type of service.[2]

5. It is also my opinion that there is a reliable method to identify calls with other particular criteria based on the additional types of information included in the CDRs, records of leads, and/or other records maintained by or on behalf of Defendant or in any available database.

6. This report reflects the results of my study of the underlying facts, independent analysis of the data and documents provided by the Defendant and third parties. My rate is $440.00 per hour for expert engagements, and $675.00 per hour for depositions, trial, and arbitration appearances.

7. I am personally familiar with the matters that are contained within this declaration, and if called to testify, I can accurately and competently testify as to them.

[2] I understand from that which has been indicated to me by the FCC, that that national DNC registry is intended to protect residential numbers. Accordingly, telephone numbers contained within the national DNC list are presumed to be residential in nature. As described within my report, an additional confirmatory process can be conducted to remove any numbers that telephone companies have flagged as non-residential.

**Qualifications and Expert Engagements.**

8. I have over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls. I have implemented call recording and call data collection and retention systems for commercial, government, aerospace, telecommunications, and payroll industries. My professional experience includes serving as an expert witness in cases where I evaluated the technical aspects of telephone systems, including whether they had a random or sequential number generator.

9. My qualifications and curriculum vitae are attached to this expert report as Exhibit 1. A list of the other cases in which I have testified as an expert at trial or by deposition during the previous four years is attached as Exhibit 2. I have been qualified by both Federal and State courts.[3] My testimony has been relied upon by courts in both individual and class actions,[4] by plaintiffs and defendants. My opinions have also been relied upon in arbitrations, including TCPA claims.

10. I was the developer of the automated Verification of Deposit ("VOD") and Verification of Mortgage ("VOM") system that was used by Chase, Wells Fargo, Bank of America, as well as some regional banks and mortgage lenders, to facilitate the review of mortgage applications by call center staff. These systems required a great deal of integration between the telephone systems and the financial institution's computer systems, and relied heavily on my deep understanding of database and time keeping integration technologies. It also required me to build interfaces to the ACH[5] exchanges, and with Global Payments and other large automated electronic inter-exchanges of

---

[3] *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court) (2017) 19 Cal. App. 5th 277, footnote 5, at page 8, ("[T]here was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court ...") *(ABM Industries Overtime Cases, A132387, A133077, A133695, 19 Cal. App. 5th 277 (Dec. 11, 2017; pub. ord. Jan. 10, 2018))*. (Exhibit 3).

[4] "The Court notes that Mr. Woolfson's expert report appears to include information related to the merits of the case in addition to class certification issues." *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, Case No 3:13-cv-01556-JLS-DHB (S.D. Cal.), Sep. 21, 2015 ECF 132 at page 3.

[5] Automated Clearing House ("ACH").

financial information. Other processes necessitated integrating fax and OCR[6] capabilities as well as enhanced call routing – inbound and outbound – including predictive elements of enhanced call processing, and the precise timings of these events.

11. I am the inventor of "Canvas", a programming language that I developed for interfacing between telephone systems and telephone networks, capable of processing hundreds of thousands of calls a day. To date, hundreds of millions of calls have been handled by Canvas on behalf of call centers, financial institutions, conference calling companies, and organizations offering Interactive Voice Response ("IVR") services.[7]

12. I have developed highly available, upwardly scalable databases for use in the telecommunications industry. The databases and telephone systems that I have personally developed and/or coded are used by telephone companies and call centers throughout the United States and Canada to catalogue and index various customer-calling activities. Some of the companies that have used my databases and/or telephone equipment (which I personally created and manufactured) have included Japan Telecom, Experian, Bank of America, Wells Fargo Bank, JP Morgan, Bank of the West, Cogent Communications, Zone Telecom (ANPI), Aion Networks, Smartcall Conferencing, and First National Collection Bureau, Inc., and the United States government, including the Department of Justice.

13. Through my hands-on work experience in developing databases and telephone systems, I have become very familiar with the technology related to telephone systems and their interfaces with the networks through which calls are processed, received, and transmitted. I am also familiar with how dialing systems work, and how telephone systems handle inbound and outbound calls.

---

[6] The OCR ("Optical Character Recognition") process as integrated into the automatic monitoring of telephone calls in real time to determine whether the call was a voice or fax call, and if a fax call, decoding the contents of each fax-page into machine readable text *while* a fax was being transmitted to the bank's computers for integration with a database.

[7] IVR is a technology that allows a computer to interact with humans through the use of voice and/or DTMF tones input via a telephone keypad. DTMF ("Dual Tone Multi Frequency") is the signal you generate when you press a telephone's touch keys.

14. I have been responsible for the design and development of specialized hardware and software systems that are highly dependent upon the capabilities of the computers upon which they run, and are in use at mission-critical applications, including Patriot Missile (SAIC, Patriot RTOS), Air Traffic Control Systems (Kongsberg Geospatial Corporation), and Point Lepreau Nuclear Generating Station, New Brunswick, Canada (Energié NB).

15. I held a CPCN[8] ("Certificate of Public Convenience and Necessity") – a special license and compliance certification granted to companies that provide essential public services, such as telephone corporations. The California Public Utilities Commission granted my most recent CPCN on July 18, 2017. This was a reissue of my initial CPCN granted to TelSwitch on June 10, 1994, which I held for approximately 18 years before taking a hiatus from providing public telephone services. The license originally granted to me in 1994 allowed me to interconnect the equipment that I designed, built, and programmed with the phone network for the purpose of providing wholesale and retail telecommunications services.

16. I have also been qualified as an expert in matters involving the TCPA and have previously been engaged on behalf of defendants and plaintiffs to analyze records of calls (and texts). For example, in *Wright v. eXp Realty, LLC*, No. 6:18-cv-01851-PGB-EJK (M.D. Fla.), I was engaged on behalf of the defendant in a case in which the Court certified a class of consumers who received pre-recorded calls to their cellular telephone numbers.

**Expertise Specifically Related to Database Work.**

17. I was relied upon as an expert witness in the case of *Hines v. KFC*, filed in the United States District Court, Southern District of California (Case No. 09cv2422 JM (POR). In *Hines*, the court granted plaintiff's motion for class certification and certified plaintiff's meal period and rest break claims based on my analysis after finding that I am an "expert in the compilation and analysis of databases …."

---

[8] Certificate of Convenience and Necessity ("CPCN") U-5410-C granted to TelSwitch, Inc. on 06-10-1994 (Decision 94-06-022). Reissued as U-7327-C on 07-18-2017 (Decision 17-07-009). TelSwitch, Inc. no longer maintains a CPCN.

18. I was expert for the plaintiffs in *Albert H. Cicairos, Frank A. Daniel, Richard Wheeler and George Thompson v Summit Logistics, Inc.* and *Kenneth Bluford v Safeway Stores, Inc.* (Case No. CV014837 [Consolidated with Case No. CV028541] Superior Court of California, County of San Joaquin). I have been told that, among other cases, *Bluford v Safeway, Inc.* established the framework for what eventually became known as AB1513 and Labor Code section 226.2, which governs compensation in the piece rate context.

19. In addition, I served as an expert in the *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court). Relying heavily upon my expert finding, the Appellate Court reversed the trial court's ruling and certified the plaintiffs' proposed wage and hour classes. The court noted that there was sufficient evidence contained within my expert report to support certification of the classes and subclasses, and that my experience was sufficient to allow my expert report to be admitted as evidence for that purpose. (Exhibit 3).

20. I was also expert in *Beatriz Aldapa And Elmer Avalos v. Fowler Packing Company, Inc., Ag Force, LLC, Fowler Marketing International LLC,* (Case No. 1:15-CV-00420-DAD-SAB ED, Ca.), where the employer used Datatech to maintain an accounting of piece-work and non-piece-work hours worked by agricultural workers. The court order in *Fowler Packing* is attached as Exhibit 4.

21. I have applied similar methods to structure large amounts of unstructured data on behalf of defendant *Verizon Wireless* and *Collecto* in *Lofton v. Verizon* (Case No. 3:13-cv-05665) and *Lofton v. Collecto* (Case No. 4:13-cv-03293-YGR). In *Lofton v. Collecto*, I was ordered by the district court of the Northern District of California to reconstruct a database from information that was in defendant Verizon's possession that Plaintiff stated was "un-structurable" and useless for purposes of analysis and determination of the results of calls that took place. I was able to complete the re-structuring of Verizon's data so that the parties could reach a successful settlement. The portion of the Court's Order from *Lofton v. Verizon* instructing me to create a database from Verizon's unstructured data is

attached as Exhibit 5.

22. I engaged on behalf of plaintiff Michael Anthony in *Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc. and FDE Marketing Group LLC* (Case No. 1:21-cv-02509, ND, Il, Eastern Div.) in which I undertook a comprehensive analysis of the Defendants records in support of class certification. The order granting class certification is attached as Exhibit 6.

23. I was also engaged on behalf of plaintiff Robert Mason in *Robert Mason et al v. Spring EQ, LLC* (Case No. 5:24-cv-01833-MWC-AGR, CD, Ca). In the court's order denying defendant's motion to decertify the class, the course stated that the plaintiff has sufficiently identified a method by which an expert can separate residential from business numbers and that "The fact that most of the numbers identified by Defendant did not appear in the post-Waterfall dataset, as Mr. Woolfson attests, further suggests the method is reliable. Defendant's new evidence does not compel a different result" (ECF 166, page 12 of 14). The court's order is attached as Exhibit 7.

**Materials and Documents Reviewed and Relied Upon.**

24. In conducting my analysis and preparing my conclusions and opinions, I relied upon the following materials and information:

**I. Materials upon which I relied:**

(a) The Amended Complaint (ECF 23).

**II. Additional materials that are available:**

*(a)* Call logs:
*"20260514 Combined Call Logs.csv"*
*"PhoneNumbersEmpaxco SBB searchrenovation only.csv"*
*"RichardsonCalls.csv"*

**III. Electronic database resources that are available:**

(a) Index of the North American Numbering Administrator's Numbering Plan Area Codes that are TCPA-eligible, sorted by location ("Numbering Plan, Appendix A").

(b) The National Exchange Carrier Association ("NECA") North American Numbering Plan 1000-block assignments database.

(c) External, publicly available databases for use in identifying the type of line and the Federal TCPA-eligible area code (and DNC) list that is published daily by the FTC[9] and whether a number had been migrated or reassigned.

25. It is my understanding that another expert has expressed an opinion on the subject number's reassignment status. I have not been retained to conduct such an analysis. If so retained, I have the capability of running such an analysis, including with reference to additional databases necessary, in my professional opinion, to develop a complete finding as the reassignment status of the subject number and the other class numbers.

**Methods and Tools Used to Analyze Records.**

26. I create and analyze databases using Structured Query Language (SQL). A database is a computerized compilation of data organized into tables, each table having columns (attributes), with column headings, and rows of information. Tables that share at least one attribute in common are "related." Tables without a common attribute may still be related via other tables with which they do share a common attribute. The pathways relating those separate tables are called "joins." Once tables have been related by a join, a user may view the combined information in the joined tables to derive new and/or useful information. To access such information, a user sends queries to the database, which executes the queries and retrieves the requested information from the tables in the database. A database, however, only recognizes queries written in complex "query languages." The most common query language is SQL. A proper query in this

[9] TelSwitch, Inc's FTC Organization ID is 10159990-70991, Subscription Account Number (SAN) 10418065-518065-26.

language consists of one or more "clauses." Common types of clauses are SELECT, WHERE, FROM, HAVING, ORDER BY, and GROUP BY clauses. Thus, to compose a proper inquiry, a user must understand the structure and content of the relational database as well as the complex syntax of the specific query language.

27. When analyzing call records, I start by creating a database to serve as a repository for the call records. I then create a set of tables to accumulate the results of the identifiers related to the telephone calls, such as *isPorted*, *isWireless*, *mostRecentPortDate*, *state*, and *operating (telephone) company number*.

28. I use standardized SQL queries to tag each call (or text) record according to (a) any data field contained in the call records, including the telephone number called, the date of a call, the duration and disposition of any call; and (b) any data field contained in any associated leads records. I am also able to add (c) whether the telephone number to which the call had been placed was on the national DNC list, and if so, whether the number had been indicated on the DNC list for more than thirty (30) days as of the transmission. This is precisely the task that I have undertaken in this matter upon the data.

29. I am guided by my many years of experience with these precise tasks, and I personally constructed all SQL statements myself and am the sole author of all work product associated with the methodologies I have (and will) undertake.

**Steps I take to Organize and Analyze the Call Records.**

30. I started by opening the files that contained the call data (referred to as "Call Detail Records" or "CDRs"). I did this to (a) determine the format that the records are stored in, and then (b) to determine what pre-processing that I would need to conduct in order to achieve an import of the calls (or texts).[10]

31. I then imported the CDR file into a SQL database table using Microsoft SQL™ Server Management Studio ("SSMS"). I placed the contents of the call files into

[10] I typically do not need to apply any pre-process to the CDRs, as most CDRs originate from electronic call data capture systems that are already Electronic Data Interface ("EDI") capable.

a database table called *dbo.calls*.[11] I then ran SQL statements upon these database tables.

32. To identify qualifying calls, including which calls were placed to telephone numbers that were cellular when called and/or on the national DNC list for more than thirty (30) days, I apply a set of filters to tag calls to identify which calls:

a. that were placed either (a) to a number that contained precisely ten digits and started with a 2 through 9, or (b) to a number that contained precisely eleven digits and started with a 1 followed by a 2 through 9; and,

b. that were contained within structurable data; and,

c. that had an associated date; and,

d. contained a call disposition of "*completed*" and the duration of the call (if present), indicated a duration equal to or greater than three (3) seconds; and,

e. Were placed to area codes that were subject to the TCPA, according to the FTC (Appendix A); and,

f. Whether the telephone number was on the national DNC for more than thirty days as of the date of the transmission; and,

g. Had been called on two (2) or more occurrences within 365 days while the number was contained within the national DNC list for more than thirty (30) days.

33. Finally, I add columns to the record layout to which additional information can be appended from sets of data files that can be exchanged with the telephone companies to obtain subscribership information. The layout is based upon a well-defined format called an Electronic Data Interchange ("EDI") format, and is used to query the telephone company databases in order to obtain the subscriber contact

[11] If there are leads available, I place those into a database table called *dbo.leads*.

information as well as residential or business designations.

**<u>Waterfall Analysis</u>. Steps that I applied to determine the quantities of calls that were placed to telephone numbers that had been on the national Do-Not-Call ("DNC") list for more than thirty (30) days, and were called on two (2) or more occurrences within 365 days, and the quantity of unique numbers to which those calls were placed.**

34. I started with the set of data that was provided, which included 581,296 calls that were placed to 11,826 distinct numbers between 07/01/2024 and 04/24/2025 that were contained within the source file listed in paragraph 24(II)(a).

35. I began by removing 4,511 calls that indicated that a call may have been *inbound*. I then checked to determine whether there were any duplicate records within the production of calls.[12] I identified, and then removed, 35,881 duplicative records within the Defendant's CDR file where the record had precisely matched another record of a call placed to that same phone number at that same time. I also removed 759 records that appeared to be to numbers not contained within the FTC's index of TCPA-eligible area codes.[13].

36. I then removed 9,197 records that where the call did not indicate a disposition of "*completed*" *or* those calls that contained a disposition of "*completed*" and indicated a duration was present on the present, but the duration indicated three (3) seconds. This left 530,948 records.

37. From the 530,948 remaining records, I removed 66,436 calls that were placed to 1,053 unique telephone numbers where the call that had been placed had been made to a telephone number *after* the telephone number to which the Defendant indicated they had received an *inbound* call from that number. This left 464,512 calls that had been placed to 11,590 unique telephone numbers.

38. From the remaining 464,512 records, I removed 218,640 calls were placed

[12] This often occurs when the call records are stored in multiple archive locations, where overlap occurs between them. The various pieces of equipment involved will often store the call details in multiple archive locations.

[13] This process removes any numbers made to Canada or other area codes that are dialable from the United States as part of the North American Numbering Plan, but are not part of the United States dial plan.

to numbers that were either (a) not on the DNC list, or (b) were on the DNC list but the calls were placed before the number had been on the DNC list for more than thirty (30) days. I also removed 457 calls from the list where the number was on the DNC, but there were not two (2) or more calls to that telephone number within 365 days.

| | | |
|---|---|---|
| All items within "Defendant call Records" files [callLogs] : | 581,296 | 581,296 |
| Removal of any records that do not contain a telephone number: (N/A) | - | 581,296 |
| Remove any calls that were inbound. | (4,511) | 576,785 |
| Removal of any apparent duplicate call records (e.g. Removal of any records from the remaining call detail records ("CDR") where the call was recorded duplicatively. | (35,881) | 540,904 |
| Removal of any number that was not part of the FTC's list of valid TCPA-eligible north american numbering plan destination area codes, or records indicating a telephone number that was not ten a standard 10-digit number, or the record did not have a properly formatted date/time. | (759) | 540,145 |
| Removal of any call where the callDisposition was not "completed", or the callDisposition was "Completed" and there was a duration indicated, but it was less than three (3) seconds. | (9,197) | 530,948 |
| Removal of those calls that were sent to a number after the sent had replied with any non-stop message. (N/A) | (66,436) | 464,512 |
| Removal of any calls from the list where the number to which the calls were placed to numbers that were (a) not on the DNC list, or (b) were on the DNC list but the calls were made before the number had been on the DNC list for more than thirty (30) days. | (218,640) | |
| Removal of any calls from the list where the number to which the calls were placed to numbers that were on the NDNC list for more than thirty days, but there were not two (2) or more calls to that # within 365 days. | (457) | |
| Quantity of unique numbers to which the 245,415 calls were sent, where the # was on the DNC list for more than thirty days and there were two (2) or more calls within 365 days, includes five (5) calls to the number belonging to the Named Plainitff ending in -6495. | 5,730 | |

39. This resulted in 245,415 calls that had been placed to 5,730 unique telephone numbers, including five (5) calls placed to the Named Plaintiff's number ending in -6495.[14]

| filename | phoneNo | CallDurationInSeconds | callDisposition | callType | isDNC>30 |
|---|---|---|---|---|---|
| 20260514 Combined Call Logs.csv | 6495 | 30 | completed | Outbound | YES |
| 20260514 Combined Call Logs.csv | 6495 | 31 | completed | Outbound | YES |
| 20260514 Combined Call Logs.csv | 6495 | 26 | completed | Outbound | YES |
| 20260514 Combined Call Logs.csv | 6495 | 28 | completed | Outbound | YES |
| 20260514 Combined Call Logs.csv | 6495 | 231 | completed | Outbound | YES |

[14] The SQL queries that I used to perform the analysis is attached as Exhibit 8.

**Identification of subscribers and Line-Classification by Telephone Number.**

40. As described previously, I utilize a database provided by the FCC, called the WDNC database, to attribute the line classification type to telephone numbers, along with other pieces of information.

41. The line classification type processing engine allows a file containing phone calls (or texts) to be tagged with labels indicating whether the number called, or texted, was wireless (colloquially known as "isWireless") and the host Operating Company Number ("OCN").

42. Using the information from the Defendant's and/or Defendant's third-parties' own files, I am able to apply the return-results from the national telephone number assignment database, which is required to be made available to entities for all purposes stemming from the TCPA. These data elements include *isWireless*, *isPorted*, *isPortedDate, and Operating Company Number.*[15]

43. By using the information provided, I am able to determine the Carrier (Company) of Record and Operating Company Number of telephone numbers that were validly formatted and contained and were part of the FTC's DNC-eligible area codes. I am also able to determine which calls (or texts) are to numbers that were assigned to a phone carrier on the date that the number was called or texted, and whether the numbers were part of the United States portion of the North American Numbering Plan ("NANP") or the expanded area[16] on the date when contacted.

44. By using the *Carrier Of Record* and *Operating Company Number* from the data, I am able to build an Electronic Data Interchange ("EDI") record exchange database from the CDR records and organize it by carrier for the purpose of structuring the data into the correct EDI format that is in the expected layout that they are familiar with.

[15] The carrier-of-record and operating company number, in combination with the Telephone Number, colloquially called "MDN" or "ANI", provide the necessary fields for the creation of export files that are used by the various telephone companies in the Common-Language presentation-format expected by the Local Exchange Carriers or Wireless Exchange Carriers that host the telephone numbers, to provide subscriber information for each number.

[16] Canada and some Caribbean islands that use the North American Numbering Plan but are not part of the United States Dialing Area.

The csv. files, organized by carrier, can, if necessary, be utilized in subpoenas to telephone carriers to determine contact information, and/or any other information desired from the carrier, by structuring the data into a format that the carriers already use for exchanging data between and amongst themselves will facilitate as much of a response as is possible.

**Telephone Companies databases maintain subscriber information in electronic format as part of their standard record keeping.**

45. Wireless and wireline carriers maintain historical records that can be used to identify the contact information (Exhibit 9, properly redacted) associated with telephone numbers. As part of record-keeping requirements imposed upon them by the FCC, telephone companies must maintain items that are responsive to subpoenas. They also use this information to for their own customer service purposes,

46. The line type and customer information attributes are also maintained to support local-number-portability ("LNP") requests. In other words, when someone wishes to move their number from one carrier to another, they are required to provide certain requisite information, such a name and contact information, which must match then match the other carrier's records from where the number was being ported. These exchanges of port-in/port-out requests are handled electronically, and exchanged between and amongst the phone carriers[17],[18] using a process called Electronic Data Interchange ("EDI") protocol. The EDI process encompasses a well-defined, regimented set of

---

[17] LNP includes both non-mobile and mobile carriers. Companies, regardless of the carrier type are required to support Local Number Portability ("LNP"). The National Portability Administration Center ("NPAC") is responsible for maintaining the database of the national numbering inventory, and as part of the FCC's order granting authority to iConectiv to maintain this, they agreed to continue to make data available for TCPA for purposes stemming from the TCPA. (FCC 15-35, ¶ 142).

[18] As indicated in *footnote 9* of its filing dated January 20, 2026, the current LNPA describes the data as being made available in the following manner: "In addition to the NPAC, the LNPA provides three mandatory ancillary services, defined by the terms of the NAPM LLC contract, that support fraud mitigation and consumer protection: the Enhanced Law Enforcement Platform ("ELEP") service, the Wireless Do Not Call ("WDNC") service, and the PortData Validate service. ELEP supports law enforcement agencies and public safety answering points by providing port-corrected service provider information. WDNC identifies telephone numbers that have been ported from wireline and wireless services, specifically for the purpose of allowing telemarketers prospectively to avoid violations of the Telephone Consumer Protection Act. PortData Validate enables risk analysis based on recent porting activity and helps determine whether a call or text may constitute an illegal robocall or robotext, as defined by the Commission." (*see* https://www.fcc.gov/ecfs/document/10120117345557/1 last visited 04/29/2026).

informational exchanges, and provides an efficient manner to handle, and route, port-in and port-out requests using a common set of data attributes.

47. I have become familiar with the manner in which telephone companies maintain these records to handle their own customer service and reporting requirements, as well as to provide support for the EDI protocol. Both in my role in providing billing and customer service software to phone companies, and in my role as a consulting expert for phone companies who are involved in litigation, I am familiar with the type of information that phone companies maintain on behalf of their customers.

48. As an example, I was the expert for Verizon Wireless in *Lofton v. Verizon Wireless (VAW) LLC*, No. 13-cv-05665-YGR (N.D. Cal.). In the course of my work on that case, I came to understand that Verizon Wireless maintained records of which belonged to which subscribers. In addition, I learned which types of information, which included line subscribership details that were maintained on a historical basis. Similarly, I am aware that other companies, such as AT&T Wireless and T-Mobile, maintain similar information for both compliance and customer support purposes. This information is also maintained so that calls (and texts) for invoicing purposes can be rated and billed properly, and so that subpoenas can be properly responded to.

49. I also formerly ran a consumer telephone company, called Tel-One Network Services, which was similarly expected to maintain contact information. Part of my responsibility at Tel-One Network Services was to interface with other telephone companies such as Pacific Bell (now AT&T) during the process of onboarding new subscribers, and maintaining accurate customer information, because Tel-One was expected to work with the proper department, depending upon the type of the product being offered.

**Telephone Companies databases maintain subscriber information and residential / business line classifications in electronic format as part of their standard record keeping.**

50. I understand that telephone numbers that are on the national DNC list are

residential for purposes of the TCPA. For instance, in *Keon Jackson et al v. Athena Bitcoin, Inc.* (Case No. 4:24-cv-00331-MW-MJF), in which I was expert for defendant *Athena*, I tagged those telephone numbers that appeared on the national DNC list as *residential* because I understand that the DNC is intended to protect residential telephone numbers.

51. I also understand that carriers themselves maintain records that identify the residential or business status of telephone numbers. This is because wireless and wireline carriers maintain historical records that can be used to identify the residential or business classification for any particular phone number, as well as contact information.[19]

52. As part of record-keeping requirements imposed upon them by the FCC, telephone companies must maintain those items for the reporting of residential and business line classifications, as well as being able to respond to subpoenas. They also use this information to route customer service calls to the correct residential or business service center.

53. The line type and customer information attributes are also maintained to support local-number-portability ("LNP") requests. In other words, when someone wishes to move their number from one carrier to another, they are required to provide certain requisite information, such a name and contact information, which must match then match the other carrier's records from where the number was being ported. These exchanges of port-in/port-out requests are handled electronically, and exchanged between and amongst the phone carriers using a process called Electronic Data Interchange ("EDI") protocol. The EDI process encompasses a well-defined, regimented set of informational exchanges, and provides an efficient manner to handle, and route, port-in and port-out requests using a common set of data attributes.

54. I have become familiar with the manner in which telephone companies maintain these records to handle their own customer service and reporting requirements,

[19] I understand that Carla Peak, expert for Saggio in *Jason Saggio et al v. Medicredit, Inc.* (Case No. 4:22-cv-01005-JAR, ED, Mo, Eastern Div.) described a method that could be reliably applied to further identify those proposed putative class members, using "data "from PacificEast, Nexxa, or Lexis Nexis" to identify residential class members. *See* decl. Peak, doc. 108-1 at 2-13 (*Jason Saggio et al v. Medicredit, Inc.*) and depo. Peak, doc. 108-2 (*Jason Saggio et al v. Medicredit, Inc.*) The court's order (ECF 126) is attached as Exhibit 10.

as well as to provide support for the EDI protocol. Both in my role in providing billing and customer service software to phone companies, and in my role as a consulting expert for phone companies who are involved in litigation, I am familiar with the type of information that phone companies maintain on behalf of their customers.

55. As an example, I was the expert for Verizon Wireless in Lofton v. Verizon Wireless (VAW) LLC, No. 13-cv-05665-YGR (N.D. Cal.). In the course of my work on that case, I came to understand that Verizon Wireless maintained records of which numbers were residential or business subscribers. In addition, I learned which types of information, which included line subscribership details that were maintained on a historical basis. Similarly, I am aware that other companies, such as AT&T Wireless and T-Mobile, maintain similar information for both compliance and customer support purposes. This information is also maintained so that calls for invoicing purposes can be rated and billed properly, and so that subpoenas can be properly responded to.

56. I also formerly ran a consumer telephone company, called Tel-One Network Services, which was similarly expected to maintain both business and residential information on subscribers' numbers, as well as contact information. Part of my responsibility at Tel-One Network Services was to interface with other telephone companies such as Pacific Bell (now AT&T) during the process of onboarding new subscribers, because we had to work with the proper business or residential department, depending upon the type of the product being offered.

57. This is precisely the method that I undertook on behalf of plaintiff in *George Moore v. Club Exploria, LLC* (Case 1:19-cv-02504, ND. IL.) and on behalf of plaintiff in *Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc., and FDE Marketing Group LLC* (Case No. 1:21-cv-02509, ND, Il, Eastern Div.).

**Conclusion: I was able to determine that there were 581,296 calls placed to 11,826 unique telephone numbers that had been on the national Do-Not-Call ("DNC") list for more than thirty (30) days, and were called on (2) or more occurrences within 365 days.**

58. By using SQL database queries, I was able to determine that, out of the 581,296 calls contained within the source files, there were 245,415 calls that had been placed to 5,730 unique telephone numbers that were contained within the national DNC list for more than thirty (30) days and there were two (2) or more calls had been placed within 365 days to that number, including five (5) calls to the Named Plaintiff's number ending in -6495. (*see* Exhibit 11).

~~~

59. I understand that there may be additional data forthcoming that, among other items, includes annotations within fields present in the data, which the Defendant had used to denote that a callee had requested no more calls and/or that the call had been placed to a wrong number. Upon receipt of this additional, or supplemental data, I am prepared to proffer an amended report should I be asked.

60. I reserve the right to supplement this report if additional data is produced by Defendant's or any other third party in possession of applicable records.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed June 4th 2026 in Pleasant Hill, California.

Aaron Woolfson
~~~