**UNITED STATES DISTRICT COURT**
**OR THE WESTERN DISTRICT OF OREGON**
**PORTLAND DIVISION**

| | |
|---|---|
| **LEON WEINGRAD,** individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>**DABELLA EXTERIORS LLC**<br><br>*Defendant*. | Case No. **3:25-cv-00396-SI**<br>HON. **MICHAEL H. SIMON**<br><br>**REPLY DECLARATION OF PLAINTIFF'S EXPERT AARON WOOLFSON** |

**REPLY DECLARATION OF AARON WOOLFSON**
**TO REPORT OF DAVID KALAT**

1. My name is Aaron Woolfson. I am the founder of TelSwitch, Inc. which I started in 1994. I am over the age of eighteen (18) years old. I am personally familiar with the matters set forth in this report, and, if called as a witness, I could and would readily and competently testify as to them.

2. On May 18st, 2026, I proffered a declaration in support of class certification. In that declaration, I outlined a methodology I have used successfully in hundreds of matters to reliably analyze electronic call and text data that is similar as that which had been produced by the Defendants and third parties in this matter. And on June 4th, 2026, I proffered a declaration in support of class certification by applying the methodology upon data that I had received on May 27th, 2026.

3. By applying a common-sense approach, called a waterfall analysis, using Structured Query Language ("SQL") databases that are available to me, and applying data as the national Do Not Call ("DNC") list from the FTC, I was able to identify those telephone numbers to which there had been two (2) or more calls placed numbers within 365 days, and whether the number to which the call had been placed

was on the national DNC list for more than thirty (30) days. I was also able to apply diagnostic filters to then cross-check and validate the records, based upon other information attributes that are, or could be, applied to the data. [1], [2]

4. Among other things, my analysis successfully tagged the telephone numbers that had been on the national DNC list for more than thirty days, and whether there had been two (2) or more calls had been placed within 365 days of one another.

5. I also established columns for the attribution of additional data that could be obtained by querying phone carriers ("Carriers") using a standardized Electronic Data Interchange ("EDI") record format that can be used to yield information about the subscribers of the phone numbers in the DNC Class within the period indicated within the call detail logs.

6. The steps that I undertook as part of the waterfall analysis are based upon my experiences with the FTC's National DNC database and other database services such as that which is maintained on behalf of the FCC by the North American Numbering Plan Administrator.

7. I used and rely upon these databases, and the methodologies that I employed in conducting my analysis in the normal course of my business of providing database services to telephone companies, including in my development of software and equipment for call centers, such as First National Collections Bureau, as well as on behalf of various plaintiffs and defendants in hundreds of class action matters.

8. I also gained additional experience during my tenure with EngageTel,

---

[1] My analysis was limited to exclusively that which was within the four corners of the *electronic* call (and text) data that had been provided.

[2] I understand that the CDR containing the log of texts is a sample. This is because they did not include all messages that had been sent to, or received from telephone numbers, such as the named plaintiff. I understand that more records are supposed to be forthcoming. For instance, the electronic records did not contain the electronic analogs of the messages that had been attached to the complaint as print-outs.

where I was responsible for the development and provision of equipment used to record and capture approximately 250,000 inbound Do-Not-Call requests per day that were received as a result of those who had been robo-called.[3] I had also variously held a Certificate of Convenience and Necessity ("CPCN"), a special license granted by the California Public Utilities Commission ("CPUC") to operate as a public utility – specifically, a telecommunications carrier.

9. By following the steps outlined in the waterfall analysis, anyone with the requisite database expertise, using the same methods would be able to precisely replicate these steps, and would reach the same conclusions as to the quantity of phone calls that were made to telephone numbers contained on the DNC list for more than thirty (30) days and had received two or more messages.

10. I also retained *all* of the underlying data that I had imported, along with the tags that I had attributed to the call detail records. That way, I am able to answer any question that may be advanced by the ultimate beneficiary of my analysis, the trier of fact, without creating any new product. In other words, by simply applying filters to the underlying data, I am able to achieve further refinements, or filters. This is why I tag *everything*, and then apply filters to run reports – because if new laws affect which criteria is accepted, I am able to change that in real time.

11. In sum, the methods that I undertook on behalf of the Plaintiff in this matter were the same as I had applied in hundreds of matters, including on behalf of plaintiff in *George Moore v. Club Exploria, LLC* (Case 1:19-cv-02504, ND. IL.) and on behalf of plaintiff in *Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc., and FDE Marketing Group LLC* (Case No. 1:21-cv-02509, ND, Il, Eastern Div.)[4], matters in which the court had granted class certification based, as I

[3] *Marshall Spiegel et al v. Engagetel et al* (Case No. 1:15-cv-01809, ND, Il, E.D.)

[4] Jan Kostyun was also the expert in *Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc., and FDE Marketing Group LLC* (Case No. 1:21-cv-02509, ND, Il, Eastern Div.) for defendants.

understand, in part upon my methodology.

12. Regardless of whether I am retained by plaintiffs or defendants, the waterfall technique that I applied toward the data in this matter follows the same methodology that I undertake in *all* matters involving the allegations of violations of the TCPA to tag data using FTC[5] and/or the FCC's databases, including on behalf of *defendants* in *Carroll v. SGS*, *Inc.* (Case No. 3:16-cv-00537-SDD-SDJ, M.D. La.), *Lester v. Wells Fargo Bank, N.A.* (Case No. 5:15-cv-02439, W.D. La.), *Keyes v. Ocwen Loan Serv., LLC* (Case No. 2:17-cv-11492, E.D. Mich.), and *Wright v eXp Realty, LLC* (Case No. 6:18-cv-1851-PGB-EJK,M.D. Fla).

13. I continue to be regularly retained by plaintiffs and defendants in TCPA matters, and have worked on an equivalent number of cases for plaintiffs and defendants. Regardless of whether I am retained by plaintiffs or defendants, I apply precisely the same methodologies, including those described both herein, as well as those described within my declaration dated May 18th, 2029 and the results that are contained within my declaration June 4th, 2026.

**Steps that I undertook to Analyze Defendant's Data.**

14. As outlined in my May 18st, 2026 declaration, I followed the same steps as I undertake in all cases that involve allegations of two (2) or more calls within a twelve (12) month period to a phone number that was on the DNC list for more than thirty (30) days: (a) remove any calls that are duplicate; and, (b) remove any calls that were inbound; and, (c) remove any calls to phone numbers recognized as not within DNC eligible area codes by the FTC[6] (such as calls to Canada, etc.); and, (d) remove any calls that were not completed; and, (e) remove any calls that were placed to a number after that number had received an inbound call *from* that number; and, (f) remove calls to phone numbers that were not on the national DNC

[5] TelSwitch, Inc's FTC Organization ID is 10159990-70991, Subscription Account Number (SAN) 10376173-476173-26.

[6] "Valid DNC Area Code list, FTC 07-31-2022" (Decl. Woolfson, 10/26/2022, Exhibit 6)

list for more than thirty (30) days; and, (g) remove any calls to phone numbers that *were* on the DNC list for more than thirty (30) days, but for which there were not two (2) or more connected calls within 365 days to that phone number.

15. This report reflects the results of my study of the underlying facts[7], independent analysis of the data and documents provided by the Defendant and third parties. My rate is $440.00 per hour for expert engagements, and $675.00 per hour for depositions, trial, and arbitration appearances.

16. I am personally familiar with the matters that are contained within this declaration, and if called to testify, I can accurately and competently testify as to them.

**Mr. Kalat's assertions that my analysis produced unreliable results are unfounded.**

17. I am in possession of Defendants' Expert's Rebuttal Report of David Kalat (08/17/2026). In his report, Mr. Kalat appears to focus his criticism of my Declaration in three areas[8]:

| | |
|---|---|
| Opinion 1 | Woolfson identified *at least one* number that was not on the DNC list based upon his use of a third-party database that he received from Contact Center Compliance; and, |
| Opinion 2 | Woolfson has no way to identify whether a identify telephone numbers is registered as *residential*; and, |
| Opinion 3 | Woolfson use of a duration field does not adequately identify a call that conveyed a pre-recorded message; and, |
| Opinion 4 | Woolfson should have investigated the content of alleged leads. |

[7] I was not retained in this matter to determine the legal standards of any court decisions or their applicability to the cases. Rather, my databases are developed to contemplate any question that could be advanced from the trier of fact, and to be able to answer those specific questions, using objective data to answer the questions based upon specific parameters.

[8] In this Reply, for organizational purposes, I utilize the headers and opinion Mr. Kalat has proffered. However, in so doing, I do not represent that I agree with or adopt these characterizations.

18. The series of cascading logic filters (*i.e.*, waterfall analysis) is based upon my knowledge of how the telecommunications equipment employed by call centers generates call detail records ("CDRs"), and from my vast knowledge of databases.

19. It is also founded in my understanding of the practical implementations of the FTC's DNC and the FCC's databases as part of my regimented approach toward the qualification and validation of data that is (and has been) used by call centers in connection with telephony and Interactive Voice Response ("IVR") technologies, and the billing systems that measure those call durations.

.

**Kalat Opinion 1 – It is Mr. Kalat's opinion that Woolfson identified numbers that was not on the DNC list *as being on* the DNC list.**

20. Mr. Kalat's central argument surrounding my use of the National DNC database in conducting my analysis and rendering my opinions is that it my methodology is not reliable because he identified *one* number that his outside vendor, Contact Center Compliance, identified as not being on the national DNC list.

21. According to Kalat, Contact Center Compliance indicates that the telephone number 801-686-4532 was not on the national DNC list as of the dates of the calls.

| dest | calls | start | finish |
|---|---|---|---|
| (801) 686-4532 | 44 | 09/30/24 | 02/06/25 |

22. To determine whether the number 801-686-4532 was on the national DNC list, I used the Federal Trade Commission's national DNC list. According to the FTC's own records, the number 801-686-4532 was on the national DNC list contiguously between at least 1/1/2024 through 02/23/2026. Starting on 02/24/2026, the telephone number 801-686-4532 was no longer on the national

DNC list –well after the Defendant’s call detail reports had ended.

| 1 | phone # | date | index of FTC national DNC file | isListed? | source file |
|---|---|---|---|---|---|
| 730 | (801) 686-4532 | 02/12/26 | [dnc_2026]..[federalDNC_02-12-2026] | YES | 2026-2-12_Global_935ED4AF-45F2-46D7-933D-56AD34676A34.zip |
| 731 | (801) 686-4532 | 02/13/26 | [dnc_2026]..[federalDNC_02-13-2026] | YES | 2026-2-13_Global_8E94C3CB-1168-447D-8F7F-A14D068F1354.zip |
| 732 | (801) 686-4532 | 02/14/26 | [dnc_2026]..[federalDNC_02-14-2026] | YES | 2026-2-14_Global_151790DD-35D5-4D92-A537-8AD7D7CC312F.zip |
| 733 | (801) 686-4532 | 02/15/26 | [dnc_2026]..[federalDNC_02-15-2026] | YES | 2026-2-15_Global_916BB198-AEB2-4C59-AFD0-495BC08D4B38.zip |
| 734 | (801) 686-4532 | 02/16/26 | [dnc_2026]..[federalDNC_02-16-2026] | YES | 2026-2-16_Global_9B6FE73B-E1A2-45AF-A708-9A2F5D40C943.zip |
| 735 | (801) 686-4532 | 02/17/26 | [dnc_2026]..[federalDNC_02-17-2026] | YES | 2026-2-17_Global_1B940E9F-A9AE-4983-A6CD-CA945EB0A6D9.zip |
| 736 | (801) 686-4532 | 02/18/26 | [dnc_2026]..[federalDNC_02-18-2026] | YES | 2026-2-18_Global_4B3CC0C1-792E-4DAC-9651-5F2852767C3C.zip |
| 737 | (801) 686-4532 | 02/19/26 | [dnc_2026]..[federalDNC_02-19-2026] | YES | 2026-2-19_Global_7311C839-44CB-4BBF-BA1E-23B9828D95F2.zip |
| 738 | (801) 686-4532 | 02/20/26 | [dnc_2026]..[federalDNC_02-20-2026] | YES | 2026-2-20_Global_91D32A6E-7161-48A5-B55E-AC6C57963DFD.zip |
| 739 | (801) 686-4532 | 02/21/26 | [dnc_2026]..[federalDNC_02-21-2026] | YES | 2026-2-21_Global_7CD8CF03-20B6-46CE-8FAF-EAD1B0DA0AF1.zip |
| 740 | (801) 686-4532 | 02/22/26 | [dnc_2026]..[federalDNC_02-22-2026] | YES | 2026-2-22_Global_AC69FD62-A59C-4E6C-BDA9-4AFA9336E145.zip |
| 741 | (801) 686-4532 | 02/23/26 | [dnc_2026]..[federalDNC_02-23-2026] | YES | 2026-2-23_Global_6C1CB720-0A36-477C-A1D6-F89ECE63C252.zip |
| 742 | (801) 686-4532 | 02/24/26 | [dnc_2026]..[federalDNC_02-24-2026] | NO | 2026-2-24_Global_2F1C2CC2-66F4-4EC2-ADAB-94CA33A2B1D9.zip |
| 743 | (801) 686-4532 | 02/25/26 | [dnc_2026]..[federalDNC_02-25-2026] | NO | 2026-2-25_Global_607962B9-5E86-4257-9572-D601341F8153.zip |

23. In sum, all forty-four (44) telephone calls to 801-686-4532 that were within the Defendant’s records were placed to that number while it had been on the national DNC list for more than thirty (30) days. Attached as Exhibit 1 are the results of the actual national DNC list, along with the FTC’s source file index.

~~~

24. I started downloading and saving lists on approximately 01/01/2017, a date well before the beginning of the data. Between 01/01/2024 and 09/13/2026, I downloaded a total of 941 complete DNC downloads directly from the FTC.[9] The 941 files constitute a total count of 240,966,070,339 live records – the sum of *each day’s* total subscribership to the national DNC database.

25. Because the database is produced every day, the results must be stored in a database table representing each day. This is necessary in order to conduct an audit, because any call could have been made at any date, therefore the database must be capable of providing the responses to any of those dates as to whether the number had been on the DNC list for more than thirty (30) days.

26. To accomplish this extraordinary task, the complete national DNC

[9] Files were not available during periods of government shutdown.
~~~

inventory is obtained from the Federal Trade Commission. The contents of each day's files are cumulatively loaded and indexed. So, every day, the database grows over two hundred million records.[10]

27. In sum, TelSwitch, Inc. process billions of telephone records per year on behalf of plaintiffs and defendants. In 2025 alone, TelSwitch, Inc. processed 1,175,181,153 individual call detail records against the national DNC. And in 2026, TelSwitch, Inc. accurately and reliably tagged 1,175,602,242 records with an indication of whether those numbers were on the national DNC list for more than thirty (30) days before the call.

28. This is the methodology that was accepted in support of plaintiff's motion for class certification by the court in *Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc., and FDE Marketing Group LLC* (Case No. 1:21-cv-02509, ND, Il, Eastern Div.)[11] This was also the same methodology that I had applied on behalf of defendants in *Keon Jackson et al v. Athena Bitcoin, Inc.* (Case No. 4:24-cv-00331-MW-MJF, DC, Florida) and on behalf of defendants in *Fuentes v. Steel Supplements, Inc.* (Case No. 2:25-cv-02105-BRM-CF, DC, NJ).

**Opinion 2 – It is Mr. Kalat's opinion that Woolfson has no way to identify the numbers as to whether they were residential or business.**

29. I understand that the national DNC list is intended to protect the number and that the registration is intended to protect those numbers as *residential* numbers – regardless of who signed it up for the national DNC list. However, to further ensure that all those numbers in my conclusions are indicated as listed as residential numbers, I prepare a set of subpoena buckets that are intended to be sent to the telephone carriers in the form of subpoenas, whose records that can be applied post-certification to tag the business or residential status of those telephone numbers.

[10] There were 261,768,602 phone numbers contained on the DNC list produced 09/13/2026.
[11] The court presiding over *Federal Savings* is currently considering a motion for de-certification.

30. Mr. Kalat asserts that there would not be a practical manner to identify the potential business lines in this matter. This is without a basis, as the court had approved a methodology in *Spring EQ*, in which I had been retained to provide analysis to the records on behalf of the plaintiff *Robert Mason et al v. Spring EQ, LLC* (Case No. 5:24-cv-01833-MWC-AGR, CD, Ca).

31. I have worked on behalf of defendant T-Mobile on several matters, and defendant Verizon Wireless in *Lofton v Verizon Wireless*. The Electronic Data Interchange ("EDI") record exchange format is bulk record exchange format that is standardized, automated and regularly used by telephone companies in the course of their business operations to ensure that a smooth transition of numbers takes place from one carrier to another. The information generally contained within the files consists of the name and address of the account holder, and the residential and/or business flag, and can readily assist in identifying the proposed putative class members.

32. It is my understanding that phone carriers as a business necessity must efficiently handle transition requests for new customers, especially considering that there are typically thousands of phone numbers that are ported between and amongst the telephone carriers every day, with more around the holidays. This is the precise reason why there are mechanisms, such as the EDI format development, that standardize and automate the exchange of customer information.

33. In addition to the account holder, and address information (properly redacted) in *Robert Mason et al v. Spring EQ, LLC*, was account-type.

| | A | B | C | L | M | O |
|---|---|---|---|---|---|---|
| 1 | RequestedStartDate | RequestedStopDate | PHONE_NUMBER | ACCT_TYP_DESC | ACCT_SUB_TYP_DESC | BILLG_CITY_NM |
| 16 | 7/17/2023 | 7/27/2023 | 2068 | Individual | Regular | SUMMIT |
| 17 | 2/7/2022 | 6/19/2022 | 3004 | Individual | MCSA | HOBOKEN |
| 18 | 10/28/2022 | 11/23/2022 | 0187 | Business | Corporate | SMITHTOWN |

**Opinion 3 – It is Mr. Kalat's Woolfson use of a duration field does not adequately identify a call that connected.**

34. Phone carriers and telecommunications service providers rely on Call Detail Records (CDR's) for billing purposes, among other things, as a reliable measurement of connected calls that involved transmission of type of conversational activity, including connected calls.

35. It is also my understanding, based on a review of the operative Complaint, that the Plaintiff does not allege that he received any calls which used an artificial or prerecorded voice to send a message.

36. Therefore, in my experience in the telecommunications field, the durations and dispositions contained within the fully enumerated call detail records (CDR's) are reliable. This is because complete Call Detail Records contain specific characteristics such as start, finish, duration, time of day, and other informational attributes.

37. All telephone networks start billing for calls when a connection is made. Calls with no connection are indicated as zero seconds. If a call has a non-zero duration, that constitutes a connected call for purposes of billing – between phone companies for transport (such as one carrier to another), between phone companies and the service providers whose systems are used to establish those calls (such as the carrier and a platform provider), and ultimately between the service provider and the customer (such as the platform's equipment and defendants' handsets).

38. The signals indicating the positive answer on the receiver's handset (or voice mail, or call handling app) is conveyed back through the phone network to the platform's equipment, after which the measurement of billing commences. It is this connection – and the associated signalling - that starts billing. But more importantly, the signaling that indicates a connected call also establishes a bi-directional talk path (called media channel) that allows the equipment to send audio to the called party, and to annotate a disposition indicating it has done so in part or in whole.

39. This process of determining when a connection takes place is known as "answer supervision" which serves as both the establishment of the call from the "billing duration" perspective, as well as the establishment of the bi-directional talk-path, meaning that both parties can hear one another. Prior to the receipt of "answer supervision" and acknowledgement of that receipt sent to the calling end, from the called end, the equipment does not allow bi-directional or two-way audio. Rather, the called party can send audio, but the calling party's audio is blocked until the completion of the call setup, because technically a call has not been connected. Accordingly, telephony calling equipment, will not typically begin passing/transmitting an audio channel until a bi-directional talk path exists and has been confirmed to exist by using a handshake consisting of electronic signaling.

40. The following illustration demonstrates how the signaling progresses between phone equipment used to place calls, and the called party. The talk paths can only be established after the completion of all signaling and reverse-direction acknowledgement, or in other words, after the call is connected, billing commences, and a bi-directional talk path is opened.




41. In sum, the equipment annotates a connected call *only after* all of the

steps of call completion have occurred. The establishment of a *connected call* is a predicate for the conveyance of audio (e.g. a bi-directional talk). Only then is the duration recorded as a measurement of the start of the talk path, and the finish of the talk path. (e.g. a connected call).

42. The telephone network, and the equipment that is connected to it, operates using a standard set of interface protocols. The protocol that platform system uses is called Session Initiation Protocol ("SIP"), and in particular, it must adhere to RFC3261. This, among other specifications, is a set of standardizations that have been developed to ensure the stability and interoperable capabilities of the phone network as a whole. In particular, the connection is defined by RFC3261, because conversation can only take place once a "connection" occurs, and strict adherence to a standardized "connection" framework is essential.

43. A connection is described in "RFC 3261 - SIP: Session Initiation Protocol" and states that, when the call is connected, the measurement of call duration, or call connection, commences and lasts through the moment when the remote end acknowledges a disconnection of a connected call and the termination of a bi-directional talk path. Since the signalling of a "connected" call is dictated by the remote end that is what determines whether a call is connected. Likewise, since the playing of a pre-recorded messages is dictated by the calling party's equipment, but only after a bi-directional talk path is opened, the equipment is able to accurately annotate whether audio was transmitted in part or in whole. All equipment therefore must adhere to RFC3261, because it must be able to convey calls between and amongst any other possible equipment that may be employed within the phone network. Otherwise, platforms could not initiate calls and convey audio through the phone network.

44. As a result, call detail records indicating non-zero connection duration represent connected calls and any calls with a disposition indicating the transmission of a recorded message (if any), mean a recorded message played after a bi-directional

talk path was opened, regardless of the configuration of the equipment by Defendant or any other caller. And generally, without a connection occurring, records of calls are generally not created, or if they are, they indicate "zero" seconds with a "not connected" disposition.

**Opinion 4 – It is Mr. Kalat's opinion that Woolfson should have investigated the alleged leads.**

45. I have no opinions surrounding the applicability of the leads or whether they constitute valid consent, because that would require a legal determination and necessitate that I serve as a "gatekeeper" rather than in an expert capacity.

**Conclusions – Mr. Kalat's use of Contact Center Compliance's data for identification of numbers on the national DNC for numbers for more than thirty days incorrectly identifies numbers as not being on the national DNC list when, in fact, they were when called.**

46. First, the data that I maintain from the FTC, including historical DNC lists, provides authoritative and reliable indication of those numbers that had been contained on the national DNC list for more than thirty (30) days. By using the national DNC list, I was able to identify numbers that Mr. Kalat had stated *were not* on the national DNC list, as in fact being on the list. This is the same national DNC list that I had employed on behalf of plaintiffs in *Federal Savings* and *Spring EQ* – cases in which my use of the national DNC list to be reliable. Similarly, various matters involving defendants, such as *Wells Fargo*, have also found my methodologies to be reliable.

47. Second, Mr. Kalat failed to provide any *essential* work product – such as SQL scripts, with which he had founded his concerns and criticisms. Without Mr. Kalat's underlying database work product, his SQL queries, or any other queries or

assumptions, I am not able to identify where, without a measurement of contrast and comparison, I made any mistakes.

48. Thirdly, Mr. Kalat reaches several conclusions that are beyond his experience and expertise surrounding consent, and may trespass upon those areas best left for the trier of fact.

~~~

49. Finally, whether I had been hired by the plaintiff or the defendant in this matter, the approach, including the waterfall methodology, would be *precisely the same*. That is because data is simply data, and my analysis relies upon that which is within the four-square corners of the data – so that the ultimate beneficiary of the data, the trier of fact, has the best information with which to reach a conclusion.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed September 14th, 2026 in Pleasant Hill, California.



Aaron Woolfson
~~~