IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION
CASE NO.: 25-cv-396

LEON WEINGRAD, individually and on behalf of a class of all persons and entities similarly situated,

Plaintiff,

v.

DABELLA EXTERIORS LLC,

Defendant.

_____________________________________/

\- - -

VIDEOCONFERENCE DEPOSITION OF
JOSIAH MCMILLAN
WEDNESDAY, OCTOBER 7, 2026
10:00 A.M. - 10:53 A.M.

\- - -

Reported by:
RUVI GONZALEZ, Court Reporter
Notary Public, State of Florida

APPEARANCES:
(Via Zoom)

On behalf of the Plaintiff:
PARONICH LAW, P.C.
BY: ANTHONY PARONICH, ESQUIRE
350 Lincoln Street
Suite 2400
Hingham, MA 02043
(617) 485-0018
anthony@paronichlaw.com
On behalf of the Defendant:
BERENSON LLP
BY: DIANE J. ZELMER, ESQUIRE
1242 Southwest Pine Island Road
Suite 42-414
Cape Coral, FL 33991
(561) 429-4496
djz@berensonllp.com
DABELLA EXTERIORS LLC
BY: DENNIS GALLAGHER, ESQUIRE
400 East Anderson Lane
Austin, TX 78752
(512) 402-3655
dennis.gallagher@dabella.us

- - -

I N D E X

- - -


| Testimony of: JOSIAH MCMILLAN | PAGE |
|---|---|
| BY MR. PARONICH | 4 |


- - -

E X H I B I T S

- - -

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit-1 | Notice of Taking Deposition | 5 |
| Exhibit-2 | DaBella000183-000225 | 7 |
| Exhibit-3 | DaBella000226-001295 | 23 |

the subject of a different production. So is your understanding -- and please take your time, as much time as you need with the document -- this lead data as opposed to calling data, correct?

A. I believe so. Sorry --

Q. Okay.

A. -- it's unfortunate it's not an Excel document, because then I'd be able to just see the index, you know?

Q. I understand. This is just how it was produced to us. So -- all right. But if you want, I'm sure we could go off and get an Excel copy of it. Would that make you feel more confident in your answer if DaBella has access to an Excel version of that?

A. Yeah. One second. Let me make sure that this matches up with what I've got.

Q. Okay.

A. Yeah, these look like the leads.

Q. Great. Thank you. And I think you had alluded to it in your prior answer. But can you explain how this document was created?

A. Yeah. So this document was created because basically, more or less, what I did is looked into the Active Prospect platform. I wrote a script. With that script, what I did is took our API key, the cookie there, watched the playback, extracted all that playback data to

pull the raw form of the phone numbers through the lead IDs, everything that was possible from that Trusted Form certification URL, and tried to match in order from certification URL first as our primary key to say this is, like, the best and then look for subsequent slightly fuzzier matches like phone numbers and things like this to find identifiers in the broadest possible context to make sure I captured all data.

Q. Did -- thank you for that. Did any of the portion of the information from this document come from Richardson Marketing Group?

A. No.

Q. Did any of the information from this document come directly from the operator of the website, searchrenovations.us?

A. No. This was a document produced by me.

Q. Okay. You say produce, do you mean created by you?

A. Created. Created by me, yes.

Q. Okay. And so then to try to address several questions at once, was there anyone who participated in any version of creating this document besides yourself?

A. No.

Q. Are you -- if you enlarge the PDF, Mr. McMillan, are you able to see the labels, the column labels?

Q. -- take your time.

A. Yeah. So the trusted form cert URL is basically the unique identifier for the playback that occurs when someone is filling out a form, and we receive that trusted form certification. So it's a URL that's specific to that instance where the homeowner is putting in their form. And that is a unique identifier. That is another way that we can do linkages.

Q. Got it. Okay. So I understand that this document is a creation -- or a document that you created. When was it created?

A. I believe I ran these queries in late August.

Q. Of '26?

A. Uh-huh.

Q. Is that a yes?

A. Yes. Correct.

Q. Great. It's okay. And so can you explain to me how you were able to conclusively identify the sub-source as Richardson Marketing Group?

A. Sure. It's what was listed on that lead source object or was otherwise listed in the Salesforce lead. So this is something that can pull over. See that it's there. Whenever a piece of data comes through our active prospect lead conduit, it can only -- if it hits a certain endpoint, because each endpoint we give to each of our vendors is

distinct, then we can label it with the correct source. So each one has their own source submission document. When it comes through with this, we now know this is a Richardson Marketing Group lead.

Q. Had DaBella -- did DaBella inquire of Richardson Marketing Group directly? Any information that they independently maintained regarding any claim of consent for these website visits?

A. I don't quite understand the question. I'm sorry.

Q. It's okay. So Richardson Marketing Group is a vendor that DaBella works with, correct?

A. Not presently. But yes, it was.

Q. Fair. So Richardson Marketing Group was a vendor that DaBella worked with, correct?

A. That's correct.

Q. And in terms of participating in discovery in this lawsuit, did DaBella contact Richardson Marketing Group to try to gather information?

A. Initially, yes.

Q. Did Richardson Marketing Group ever provide any of the information that's in this document?

A. No. Their method of discovery was different. This is a different version of getting to that same information. Right? So we have a source of truth on our

end. They have what they sent on their end. The communication with them was not -- it didn't end up giving us a full gamut of what we wanted, as in it was not as extensive as I preferred.

So this was a way for seeing -- because we captured the domain upon which every single lead comes in, this was a way for me to see this domain is exactly the domain I want, and I know exactly from searchrenovation.us that everything is coming through correctly, and then matching back to all of our systems. They would not be able to see through our systems everything that comes through. So this was our way of seeing from everything we can see what actually came through.

Q. What did Richardson Marketing Group provide when you made the request to them for information?

A. They provided their records of all their leads that they sent to us during the timeframe that we asked for them, but I believe there was a little bit of -- they had missed a few leads on one end or they had added a couple of leads. I'd have to go back and see exactly what the issue was there. And then, i think there was another website that they sent leads to us from as well.

Q. Instead of just searchrenovation.us?

A. Correct.

Q. Did you ever have any conversations with the

owner of searchrenovation.us?

A. With the owner? No, not directly.

Q. Did you indirectly?

A. I'd have to go back and look at my emails to see if I managed to speak to the owner of it. We mostly did our inquiries to Richardson himself.

Q. Yeah. And I understand that you did most of your inquiries to Richardson himself. I'm interested if searchrenovation.us provided you any response at all?

A. Directly? No, I don't believe so.

Q. Okay. And when you say directly again, did they provide you a response indirectly?

A. I don't know that I inquired directly to them at all. I'd have to go back and look at my emails to see if this was something that we did at any point during discovery.

Q. Okay. A different way to phrase that is, as you sit here today to testify on behalf of DaBella, can you think of a single instance in which you communicated directly with searchrenovation.us?

A. No.

Q. Okay.

MS. ZELMER: Objection to the form. Are you talking about the owner of searchrenovation.us?

MR. PARONICH: My question didn't -- I don't

think I used the word owner, right? It was: Did you communicate directly with searchrenovations.us?

MS. ZELMER: Objection to the form.

MR. PARONICH: Okay. And we still have the answer.

BY MR. PARONICH:

Q. So having not had any recollection of any direct communication with search renovations.us, it's fair to say that they had no role in creating this document that's on the screen in front of us, that DaBella 183, correct?

A. That is correct.

MS. ZELMER: Object to the form.

BY MR. PARONICH:

Q. Oh, you spoke over each other, so I noted Ms. Zelmer's objection. But then your answer was what, Mr. McMillan?

A. Yes, I created this document.

Q. Okay. Right. But my question -- I know you created it, but my question was --

A. I had no outside help on creating this document.

Q. Including from searchrenovations.us, correct?

A. That is correct.

Q. Okay. So other than what we've discussed today, is there any information that you're aware of in DaBella's system related to any purported visits to

document I had produced initially.

BY MR. PARONICH:

Q. That's a fair point. Let me ask a slightly different question then. It's -- with respect to the sub-source of Richardson Marketing Group, is -- does this document represent the evidence that DaBella has regarding any purported website visits to searchrenovation.us?

A. Yes. Correct. For anything that they sent us directly.

MR. PARONICH: Okay. Well, Mr. McMillan, I promised we wouldn't be here very long, so I don't have any further questions right now. And Diane, unless you want to take a break and conduct an examination, I'm ready to consider the 30(b)(6) complete.

MS. ZELMER: Yeah. I just want to take a break real quick because I just want to clarify something.

MR. PARONICH: Yeah, want to come back at 30? Because we have -- unless you have someone else ready to go, we have till 11:00 So there's no time pressure.

MS. ZELMER: Yeah. And then we can talk about getting Santiago, see if he's ready to go.

MR. PARONICH: Okay.

MS. ZELMER: Okay.

- - -

(A recess was taken.)

- - -

THE REPORTER: We are back on the record.

MR. PARONICH: Thank you, Ruvi. So, Ms. Zelmer forwarded over to me an email that was the service of an expert report. But in there, there was a document production link. And so that -- and that was sent -- that was sent over on August 31st. That's right, Diane?

MS. ZELMER: Correct.

MR. PARONICH: Okay. So just to -- and just to make sure we're on the same page, this information that was relied upon by the expert in their August 31st report that was produced. But the first day the plaintiff got any of this information, that was also -- appears to be on August 31st. And just want to make sure I don't have a misunderstanding about what happened there?

MS. ZELMER: I don't believe so, but I don't think I'm -- I -- I'm the one being deposed.

MR. PARONICH: No, obviously not. But we're talking about establishing this document that you were going to be asked about during -- that you said you were going to ask about during the deposition, and I want to make sure that I understood when I got it in connection with an expert report, when, obviously, your

expert had it before the party opponent did, so --

MS. ZELMER: He had it -- he only had it to mask the data, and we produced it literally as soon as we got it. So, yeah, you only got it --

MR. PARONICH: Oh, well, maybe I'm misunderstanding. You're saying I had it before -- I had this document, but just the masked data I didn't have?

MS. ZELMER: No.

MR. PARONICH: Okay. So when --

MS. ZELMER: No. We had to mask it in order to produce it to you.

MR. PARONICH: Right. And -- but it wasn't produced to us until when you served the expert report?

MS. ZELMER: Correct.

MR. PARONICH: Okay. So then, Mr. McMillan, do you have that document in front of you? And if not, I can put it in the chat.

THE WITNESS: Put it in the chat, please.

MR. PARONICH: Yeah, of course. It's large, so it'll take a minute, but let me know when you see it. My computer says it should be there now.

THE WITNESS: Let's see, it's 29MB. It's a big one.

MR. PARONICH: Yeah. And just let me know when

you're able to access it, and I'll jump into my questions.

THE WITNESS: Downloading. Yep. Got it.

MR. PARONICH: Thank you. And so this will be our Exhibit-3.

- - -

(Exhibit-3, DaBella000226-001295, was marked for identification.)

- - -

BY MR. PARONICH:

Q. Do you recognize this document?

A. I do.

Q. Okay. And can you explain to me what it is, please?

A. Yeah. So this is the document that I produced using everything from the trusted forum. This is the one that is the correct one. Inasmuch as this is the data that I pulled straight out of Active Prospect with that scraping process. So as we looked at the -- as I looked at your record before, and when I noticed that Richardson Marketing Group was the only one, that kind of set off alarm bells in my head that maybe this was actually not the correct bit of data for your Exhibit-1, or whichever one, that piece of data there. This is --

Q. When you say the correct exhibit, what do you

mean by that? Because is it your position that document wasn't produced by DaBella?

A. The previous one?

Q. Yeah.

A. No, it was produced by me, as in I linked up data to it. But my answer before about whether or not anyone gave me initial data from anything was not correct, because I was assuming -- I thought we were talking about this exhibit that I have now.

Q. So I just want to make sure I understand what you meant when you testified that it wasn't the correct exhibit. What did you mean by that?

A. It was not as the -- it was not the most up-to-date and most expansive version of this, where I had everything from searchrenovation.us. That one was specific to searchrenovation.us plus Richardson Marketing Group. This one is search renovation plus all other lead vendors, which is what I really want to make sure was covered.

Q. Got it. So this document is similar but larger than the other document because it includes searchrenovation.us leads from both Richardson Marketing Group and Lone Bright; is that correct?

A. That is correct. Yes.

Q. Okay. So then when we -- so I imagine then we'll just only have a couple of questions here. Because the

process you testified earlier in terms of gathering the information through Active Prospect, was that the same process to create this document for both Richardson and Lone Bright?

A. That was the process used for this one, yes.

Q. Right. And the columns we're looking at, those columns are all substantially similar to the process you created, where you scraped the data from Active Prospect, but just did so with respect to both Richardson and Lone Bright, correct?

A. There are other vendors in there as well, yes. Anything that came in with searchrenovation.us, yes, that should be on here.

Q. Yep. Understood. But that would also include Richardson and Lone Bright, correct?

A. It would also include them. Yes.

Q. Okay. And then can you let me know what your understanding of what other vendors submitted searchrenovation.us leads other than Richardson and Lone Bright?

A. Yeah. Should be in here. I believe -- I know from the top of my head that px.com is one of them. I believe it may not be marked in here. Oh no, they are. Perfect. Let me find that. So if you see pinned sub-source, that one, you'll see things that say things like

px. Com, Quinn Street --

Q. I do. Yeah. So, like on page 44, there's a px.com, and I see a blue flyer -- a -- Blue Fire leads as well.

A. Correct, yep.

Q. Right. Okay. However, even though it appears to be potentially over-inclusive, with respect to other sub-sources, you are also confident that this document represents the evidence that you were able to compile with respect to Richardson and Lone Bright, specifically for searchrenovation.us?

A. Yes. This is the most expansive document, yes.

Q. Got it. So the document that we're looking at now is similar in terms of how it was constructed for the document we were looking at previously. It just includes all of the Lone Bright searchrenovation.us leads in addition to any other sub-sources?

A. Can you break that question apart? I'm sorry.

Q. That's okay. So we looked at the prior document and you explained how you made it, and you confirmed that you created this document in a similar fashion. But just with respect to more vendors, correct?

A. More or less correct. Yes.

Q. What -- in what ways was your creation of the document different?

A. Yeah. In this -- so my prior testimony, I thought that this was the document we were looking at. And that was my mistake on that part. Right? So when I was seeing that, that's why I made the comment about the number of lines on that Excel document and the fact that it's a PDF. So those leads that were given to us, those were stuff that we had asked our vendors for, Richardson Marketing Group, and from Lone Bright to say, hey, can you give us these things?

And then we ran those leads that they sent us against our database before. That was the initial exhibit that we were talking about. This is the document where I did do that scraping, where I looked at all those playbacks on the trusted forum, and I did pull that directly from the source of truth, which is Active Prospect. So they're distinct inasmuch as those ones were from their records that they handed to us to then run against our databases and see how those calls were coming through.

This is the one where I did not trust my vendors to send me anything. Instead, what I did is pull that data, scraped it from the playbacks, and then ran it against our databases.

Q. Yeah, I'm tracking. So it was -- so your testimony previously was accurate. It just should be applied to this document in terms of the process in stir --

instead of what Richardson provided. Is that a fair assessment?

A. That is a fair assessment. Yes.

Q. Okay. Well, thank you. That'll help us from having to cover all those prior questions. And so then the document we had before, is it a fair characterization to say that that was information provided by Richardson that was potentially under-inclusive, and this document represents what you believe to be the final product of any information regarding searchrenovation.us in DaBella system?

A. Yes, that is correct.

MR. PARONICH: Okay. Well, then with that, and unless, Diane, you have any further questions, now, we've covered everything we need to. And sorry for the confusion there, but thank you for your help getting through that.

MS. ZELMER: Yeah.

THE WITNESS: Yeah.

MS. ZELMER: Do you want to take a break, Josiah, or --

A. Yeah, that sounds great. I'd love to use the restroom.

MS. ZELMER: All right.

\- - -

(A recess was taken.)

CERTIFICATE OF REPORTER

I, RUVI GONZALEZ, Court Reporter and Notary Public, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location stated on Page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing deposition as typed is a true, accurate, and complete record of objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

___Ruvi Gonzalez___

RUVI GONZALEZ, a

Court Reporter and Notary Public

Date: 10/07/2026