IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION
CASE NO.: 25-cv-396

LEON WEINGRAD, individually and on behalf of a class of all persons and entities similarly situated,

Plaintiff,

v.

DABELLA EXTERIORS LLC,

Defendant.

_____________________________________/

\- - -

VIDEOCONFERENCE DEPOSITION OF
DAVE EVANS
WEDNESDAY, OCTOBER 7, 2026
11:31 A.M. - 11:51 A.M.

\- - -

Reported by:
RUVI GONZALEZ, Court Reporter
Notary Public, State of Florida

APPEARANCES:
(Via Zoom)

On behalf of the Plaintiff:
PARONICH LAW, P.C.
BY: ANTHONY PARONICH, ESQUIRE
350 Lincoln Street
Suite 2400
Hingham, MA 02043
(617) 485-0018
anthony@paronichlaw.com

On behalf of the Defendant:
BERENSON LLP
BY: DIANE J. ZELMER, ESQUIRE
1242 Southwest Pine Island Road
Suite 42-414
Cape Coral, FL 33991
(561) 429-4496
djz@berensonllp.com

DABELLA EXTERIORS LLC
BY: DENNIS GALLAGHER, ESQUIRE
400 East Anderson Lane
Austin, TX 78752
(512) 402-3655
dennis.gallagher@dabella.us

\- - -

I N D E X

\- - -

Testimony of: DAVE EVANS PAGE

BY MR. PARONICH 4

\- - -

E X H I B I T S

\- - -

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| | (No exhibits were marked.) | |

is that the law protects conversations between you and your counsel. So even if it feels technically responsive to a question, I don't want to hear about the specifics of any conversation you've had with your attorney. And that includes Mr. Gallagher. Do you understand?

A. Yes.

Q. Okay. Do you currently work at DaBella?

A. Yes.

Q. How long have you worked at DaBella?

A. 11 years.

Q. And what is your current position?

A. Digital marketing operations manager.

Q. Okay. And in the context of DaBella's business, what is a digital marketing operations manager? Did I get that correct?

A. Yes.

Q. Yeah? What is digital -- what does that position do?

A. My role is focused on the operational side of lead generation and consent. So I help onboard new -- new partners into our company.

Q. Is a partner synonym for a lead vendor?

A. Yes.

Q. Okay. And what steps are involved in onboarding a lead vendor at DaBella?

let me know what you mean by the compliance process?

A. Yeah, we primarily -- you know, compliance revolves around, you know, proper consent language and receiving a trusted form with each lead. So an actual form, a compliance piece for that lead, like a certificate. I can't think of what the word is right now.

Q. Understood. What about on the lead generation process side?

A. I don't understand your question. Sorry.

Q. You testified earlier that part of your responsibilities is making sure that the vendors are set up with the lead generation process, so they can be up and running. And what do you have to do to make sure that happens?

A. Just making sure that all the pieces are in place, all the compliance pieces and API and all those pieces.

Q. Yeah. So there was the compliance piece you were just talking about. And now you mentioned API. And is that in terms of how the leads can be delivered successfully to develop?

A. That's just how the leads are delivered.

Q. Okay. And so are you familiar with a company called Richardson Marketing Group?

A. Yes.

Q. And did you engage in the onboarding of Richardson Marketing Group?
A. Yes.
Q. Did you communicate with Richardson Marketing Group directly about that onboarding?
A. Yes.
Q. Who did you communicate with?
A. The representative of Richardson Marketing Group.
Q. Who was that?
A. Derek Richardson.
Q. Did you speak to anyone else at Richardson Marketing Group besides Mr. Richardson?
A. I don't -- I don't -- I can't recall. He's the only representative that I remember speaking to.
Q. Understood. And so what did you do in terms -- let me strike that.
So when communicating with Mr. Richardson, you helped him get set up on the API?
A. Yes.
Q. Okay. And what compliance communications did you have with Mr. Richardson?
A. Well, you know, as far as compliance goes, you know, I always talk about making sure that the proper language is there for the compliance piece, for the forms we get. And that also all leads come through with a trusted

THE WITNESS: Yes.

BY MR. PARONICH:

Q. Okay. Did you ask that of Richardson Marketing Group?

A. I don't recall.

Q. Do you recall anything Richardson Marketing Group told you in terms of where their leads were coming from?

A. I don't recall.

Q. Okay. Do you recall reviewing any information from Richardson Marketing Group specifically with respect to where their leads were being generated?

A. I don't understand your question. Sorry.

MR. PARONICH: Okay. Ruvi, could you read that back? I want to make sure I understood it. Or if I'll ask a different one or ask him to answer.

- - -

(A portion of the record was read by the reporter.)

- - -

BY MR. PARONICH:

Q. Yeah. So, Mr. Evans, I had asked you previously if you recalled if Richardson Marketing Group -- if they told you where their leads were coming from, and you had testified you don't recall; is that correct?

A. It's correct.

Q. Okay. So now that we know you don't recall what they said in terms of where their leads are coming from, my next question was if you recall reviewing any of the content of what their advertisements were saying?

A. I don't recall.

Q. Okay. Do you recall reviewing any proposed consent language from Richardson Marketing Group?

A. I don't recall.

Q. Is your process for onboarding a vendor documented anywhere in terms of a writing that you keep about the actions that you've taken?

A. We didn't really have a standard process like that at the time that I was onboarding him.

Q. Do you now?

A. We do have a more standard process now.

Q. But there's not a document with respect to the Richardson Marketing Group onboarding?

A. I mean, we have the IO, so I don't know if that's what you mean. The IO -- I believe we do have, but there's not, like, an onboarding document per se that I recall.

Q. I understand. So I am familiar with the IO. And then my question was if there is a different onboarding due diligence document, and it doesn't sound like you recall that there is one. Is that fair to say?

A. Not at the time, no.

Q. Okay. And do you sign the insertion orders on behalf of DaBella?

A. Yes.

Q. And did you sign the Richardson Marketing Group insertion order?

A. Yes. I -- yes.

Q. Okay. Do you recall -- let me strike that.

Do you negotiate the terms of the insertion orders?

A. I mean, if there's red lines to the insertion orders, then that would go above me potentially to my boss. So if there is red lining, that would -- that could go above me.

Q. Understood. So do you recall any memorable or noteworthy red lines or changes that were made to the Richardson insertion order?

A. I don't recall any.

Q. Okay. After the onboarding of Richardson was complete, did you remain in contact with them?

A. Well, the standard process at that time would be that I manage them for roughly three to five months, and then they would go to their long-term manager if they made it to, Hollywood, so to speak.

Q. Yeah. Understood. And so did you engage in that three to five month management process before they got passed on to a long-term manager?

A. Yeah, yeah. We engaged, yes.

Q. And did they complete that process, that three to five month process successfully?

A. Yes.

Q. Okay. During the onboarding process, do you ask vendors about any involvement they've had in prior TCPA lawsuits or compliance issues?

A. No.

Q. Is that part of the standard process now?

A. It will be for me from today on. I don't --

Q. Yeah. No, fair enough. Did you ever have a conversation with Mr. Richardson about the prior TCPA lawsuits he was involved in, even if it wasn't part of the standard process?

A. I had no -- I had no clue. I had no idea.

Q. Yeah. And did you --

A. I didn't know -- I didn't know that.

Q. Did you ever speak with Mr. Richardson about the prior TCPA class action settlement he was involved in?

A. I never was aware that he was in any kind of settlement or anything before.

Q. Okay. Well --

A. I never spoke to him, no.

Q. Understood, Mr. Evans. Thank you.

MR. PARONICH: So I don't have any further

CERTIFICATE OF REPORTER

I, RUVI GONZALEZ, Court Reporter and Notary Public, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location stated on Page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth, and nothing but the truth; that the foregoing deposition as typed is a true, accurate, and complete record of objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

_Ruvi Gonzalez_______________________

REPORTER NAME, a

Court Reporter and Notary Public

Date: 10/07/2026